IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Moira Goletz, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.:  04-351 SLR |
| | ) | |
| Prudential Insurance Company | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF MOIRA GOLETZ' OPENING BRIEF IN SUPPORT
OF HER MOTION FOR SUMMARY JUDGMENT**

GRADY & HAMPTON, L.L.C.
John S. Grady, Esq (009)
Laura F. Browning, Esq (4504)
6 North Bradford Street
Dover, DE  19904
(302) 678-1265

Dated:  June 10, 2005

## TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………………………………ii

TABLE OF CITATIONS………………………………...…………………………iv

NATURE AND STAGE OF THE PROCEEDINGS………….…………………….…1

STATEMENT OF FACTS……………………………………...……………………2

    A.    MS. GOLETZ BACKGROUND AND EMPLOYMENT WITH
        BANK ONE…………………………………………………..………………… 2

    B.    BANK ONE'S DISABILITY INSURANCE POLICY WITH
        PRUDENTIAL……………………………………………………….…………2

    C.    MS. GOLETZ' DISABILITY…..……………………………………….…3

    D.    GOLETZ PHYSICIANS' NOTES AND STATEMENTS…………………...3

    E.    PRUDENTIAL'S RESPONSE TO MRS. GOLETZ' CLAIM………………8

SUMMARY OF THE ARGUMENT…………………………………………………16

ARGUMENT…………………………………………………………………………18

    I.    SCOPE OF THE REVIEW……………………………………………..……18

        A.    SUMMARY JUDGMENT STANDARD……………...…………18

        B.    STANDARD OF REVIEW FOR ERISA CASES……………..…18

    II.    PRUDENTIAL ACTED IN A SELF-SERVING MANNER AND ITS
        DECISION WAS ARBITRARY AND CAPRICIOUS…………………..…19

        A.    PRUDENTIAL'S DENIAL IN THE FIRST APPEAL WAS
            SELF-SERVING AND ARBITRARY AND CAPRICIOUS…..……20

        B.    PRUDENTIAL'S DENIAL IN THE SECOND APPEAL WAS
            SELF-SERVING AND ARBITRARY AND CAPRICIOUS ………23

        C.    PRUDENTIAL'S DENIAL IN THE THIRD APPEAL WAS
            SELF-SERVING AND ARBITRARY AND CAPRICIOUS ………25

III.  PRUDENTIAL'S DECISION WAS ARBITRARY AND CAPRICIOUS
      IN THAT IT FAILED TO ACKNOWLEDGE MS. GOLETZ'
      SUBJECTIVE  COMPLAINTS……………………..…………………………30

IV.   PRUDENTIAL'S DECISION WAS ARBITRARY AND CAPRICIOUS
      AND NOT SUPPORTED BY SUBSTANTIAL EVIDENCE……..……….32

      A.  SCOPE OF REVIEW………………………………………..………32

      B.  PRUDENTIAL'S DECISION TO DENY BENEFITS WAS
          NOT SUPPORTED BY SUBSTANTIAL EVIDENCE……..………33

CONCLUSION………………………………………………………………………35

ATTACHED CASES

AFFIDAVIT OF SERVICE

## TABLE OF CITATIONS

## <u>CASES</u>

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822,
    123 S.Ct. 1965 (2003)………………………………………………...…25, 29

*Kosiba v. Merck & Co.*, 384 F.3d 58 (3rd Cir. 2004)……………………………..27, 28

*Mitchell v. Prudential Health Care Plan*, 2002 WL 1284947 (D.Del)………..18, 28-31

*Orvosh v. Program of Group Ins. For Salaried Employees*
    *of Volkswagen of Am.,* 222 F.2d 123 (3d Cir. 2000)…………………………...32

*Ott v. Litton Industries, Inc.*, 2005 WL 1215958 (M.D. Pa. May 20, 2005)………32,34

*Pinto v. Reliance Standard Life Ins.*, 214 F.3d 377 (3rd Cir. 2000)………………18, 28

*Russell v. The Paul Revere Life Ins. Co.*, 148 F.Supp.2d 392
    (D.Del. 2001)…………………………………………………………………….18

*Sanderson v. The Continental Casualty Corp.*, 279 F. Supp.2d 466
    (D.Del 2003)………………………………………………18, 19, 22, 24, 27, 31, 32

*Sanderson v. Continental Casualty Corp.*, 2003 WL 22078075
    (D.Del)……………………………………….…………..18, 22, 25, 30, 33, 34

## <u>OTHER AUTHORITIES</u>

Fed. R.Civ.P. 56(c)…………………………………………………………………..18

iv

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff, Moira Goletz, stopped working on May 20, 2000 because of extreme neck pain, arm pain and hand pain.  Prudential granted her claim for long-term disability for the first 24 months.  On June 24, 2002, Ms. Goletz was informed that her long-term disability benefits would be ceased as of October 29, 2002.  On July 29, 2002, she appealed this decision with Prudential.  On November 21, 2002, Prudential denied her first appeal stating that she did not meet the criteria for disability beyond October 29, 2002 and it was upholding the decision to terminate her long term disability ("LTD") benefits.  In February 2003, Ms. Goletz again appealed the decision and included more medical documents.  On May 12, 2003, Prudential denied her second appeal for her long-term disability benefits.  On May 23, 2003, Ms. Goletz' attorney, John Grady, appealed the previous decision again.  On March 15, 2004 Prudential made its final decision to deny her LTD benefits.

An ERISA action was timely filed on June 3, 2004. This represents Plaintiff, Moira Goletz, opening brief in support of her motion for summary judgment.

STATEMENT OF FACTS

A.  Ms. Goletz Background and Employment with Bank One.

Ms. Goletz is a 47-year-old woman with a high school education. A-231  In 1997, Ms. Goletz began working as a full-time employee for First USA Bank as a Customer Service Representative. First USA Bank later became Bank One Corporation.  Ms. Goletz was promoted to the position of Cardmember Advocacy Specialist. A-258  As a cardmember specialist, she worked in the President's office and resolved issues for customers who called. She often worked ten-hour days, about five hours of the day were spent sitting and the other five were spent on her feet. By May 20, 2000, Ms. Goletz was unable to work at her position at Bank One.  She was never able to return back to her position with Bank One.

B. Bank One's Disability Insurance Policy with Prudential.

Bank One policy was through Prudential—policy DG-56249-IL ("The Plan"). A-2. Prudential both funded and administered the Plan. A-577, A-11  The Plan covered all regular hourly, salaried, and commissioned employees. A-10.  As a full-time employee, Ms. Goletz became was insured under the Plan. A-2, A-258.  The Plan provided for the payment of long-term disability benefits to covered employees who met all contractual provisions, including the definition of disability. A-2.  The Plan defined *disabled* as:

> You are disabled when Prudential determines that:  you are unable to perform the material or substantial duties of your regular occupation due to your sickness or injury; and you have a 20% or more loss in your index monthly earnings due to that sickness or injury.  After 24 months of payment, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of *any gainful occupation* for which you are reasonably fitted by education, training or experience. A-11

Prudential approved the first 24 months of disability as Prudential determined that she was unable to perform her regular job as a cardmember specialist. A-68.   After 24

2

months, Prudential alleged that Ms. Goletz did not meet the definition of disability under the terms of The Plan, because she was able to hold "any gainful occupation." A-11.

The Plan defines *gainful occupation* as, "an occupation, including self-employment, that is or can be expected to provide you with an income equal to at least of the percentage of your index monthly earnings within twelve months of your return to work, depending on the plan for which you are enrolled." A-11.  Ms. Goletz had enrolled in the option II, which was 70% of her monthly earnings, but not more than $15,000. A-258.

C.  MS. GOLETZ'S DISABILITY.

Beginning in 1999 to the present, Ms. Goletz has had surgeries on her left wrist, left and right elbow, gallbladder, and left knee. Ms. Goletz has been treated by many medical experts, including physicians, chiropractors, and physical therapists.  Despite extensive treatment, she still experienced an extreme amount of daily pain in her joints, arms, back, neck, and knee.  By 2001, Ms. Goletz was diagnosed with seronegative inflammatory arthritis, generalized degenerative joint disease, and bilateral carpal tunnel syndrome.  Ms. Goletz had difficulty performing ordinary daily activities, which included walking, bathing, dressing, and cooking.  She also has significant difficulty typing or writing.  In November 2003, an administrative law judge for the Social Security Administration found her to be disabled.

D.  GOLETZ PHYSICIANS' NOTES AND STATEMENTS:

In 1992, her primary physician noted that she experienced pain in her arms and fingers. A-276.  He also noted that she had previous surgery on her hands, which included a left hand ganglion cyst removal. A-276.  Dr. Rowe, an orthopedist, treated Ms. Goletz for pain in her arms and hands. He diagnosed her with carpal tunnel syndrome of the left hand.

A-460.  On April 24, 1995, Dr. Rowe performed a release of the left carpel tunnel under Loupe magnification on Ms. Goletz. A-459.  In 1999, Ms. Goletz still had pain in her hands with numbness for about six months and in 1999 she returned to Dr. Rowe. A-455.  He diagnosed her with left ulnar nerve palsy and left wrist irritation. A-455 An EMG revealed bilateral ulnar neuropathy. A-455.  Dr. Rowe performed a left intramuscular ulnar nerve transposition surgery and injection of Depo-Medrol and Marcaine. A-453. Despite the surgery, Ms. Goletz continued to have left arm and wrist pain, which Dr. Rowe treated with steroid injections. A-449 In November 1999, Dr. Rowe noted that there had been "no change" in Ms. Goletz' wrist pain, and he began treating Ms. Goletz for her neck and back pain. A-450. He diagnosed her with a cervical and thoracic strain. A-450. Dr. Rowe noted, "[t]here is tightness and tenderness to palpation of the right trapezuis.  X-rays of the cervical spine…reveal straightening consistent with spasm and loss of the normal lordotic curve. There is anterior superior end plate spurring at C5." A-450

In March of 2000, Ms. Goletz underwent gall bladder surgery. A-447. At a May 18, 2000 office visit, Dr. Rowe noted: "she apparently worked in the garden on Saturday and this caused her entire left arm to start throbbing constantly.  In the past this only occurred only intermittently.  Most of the pain is at the elbow and wrist.  She reports dropping things because of her left arm." A-446

In July 2000, Ms. Goletz underwent a MRI of her of the cervical spine. A-442.  The MRI, "revealed mild spondylosis and degenerative disc disease." A-442.  Dr. Rowe continued to diagnose Ms. Goletz with a cervical and thoracic strain. A-442.  On July 17, 2000, Dr. Rowe noted, "we have tried chiropractic and physical therapy and there is little else to offer the patient."  Dr. Rowe referred Ms. Goletz to Dr. Upadhyay for pain management treatment. A-442

On February 23, 2001, Dr. Rowe completed a form for Prudential on which he noted that she could not work at any occupation. A-245. Dr. Rowe noted that Ms. Goletz was experiencing pain and numbness with her right elbow. A-245 Dr. Rowe eventually diagnosed Ms. Goletz with right elbow olecranon bursitis. A-440, A-251. Ms. Goletz had also been experiencing extreme joint pain. A-439 In 2001, she began seeing Dr. Tamesis who eventually diagnosed her with inflammatory polyarthritis. A-478. In a letter dated February 23, 2001, Dr. Tamesis noted that Ms. Goletz had multiple joint pains and:

> [s]he describes mostly pain involving her right elbow, describes some burning sensation of her left wrist followed by persistent pain. This has been ongoing for the last seven months. She has been receiving PT for these, however, she has not had much relief…She also complains of neck pains. It feels like there is a pulled muscle that is chronically present. She does complain of chronic paresthesia, weakness and stiffness of both her hands. She has tried Vioxx and other medication, however, she has not had much relief. A-478

In the March 9, 2001 office visit, Dr. Tamesis noted,

> Small joints of her hands: Now reveal evidence of synovitis and tenderness on palpation of her left wrist. She has some pain on abduction of both shoulders. Also marked pain on motion of her cervical spine…despite her negative serologies and inflammatory markers she does have the appearance of an inflammatory polyarthritis. A-477

He started Ms. Goletz on prednisone. A-477

On May 2, 2001, Dr. Rowe performed right elbow anterior intramuscular transposition of the ulnar nerve surgery. A-436. On January 23, 2002, Dr. Rowe completed a Work Status Form for Prudential that stated Ms. Goletz could not work. A-245. He noted his decision was based on objective findings due to the cervical sprain. A-245. At a February 4, 2002 office visit with Dr. Tamesis, Ms. Goletz complained of "pain all over in the neck left wrist, right hand, sciatica." A-475 On May 8, 2002, Dr. Tamesis wrote, "Seronegative inflammatory poly arthritis, still appears to be quiet active." A-473.

5

On July 11, 2002, Dr. Tamesis wrote: "I have found that she has evidence of an inflammatory polyarthritis that significantly limits her ability to do any significant activities of daily living. This markedly impairs her ability to participate in any occupation at this time resulting in her current disability…" A-471.

On July 26, 2002, Dr. Tamesis noted that Ms. Goletz was still having significant pain with the knee despite a steroid injection. A-472. He noted, "MRI revealed evidence of small joint effusion. No tears. She continues to be on Darvocet, Meteorite 4 tabs…" A-472. Ms. Goletz condition is unchanged by July 23, 2002. Dr. Tamesis diagnosed her with, "1. First degree MCL sprain, left knee, 2. DJD, left knee, 3. TFCC tear, left wrist, 4. Right elbow olecranon bursitis, 5. Cervicothroacit [sic] strain, 6. DDD (degenerative disc disease), C3-4 greater than C6-7 per MRI of 10/22/01, 7. Lumbosacral Strain." To treat her knee, Dr. Tamesis injected Ms. Goletz with DepoMedrol and Marcaine. He continued her on Darvocet. On September 9, 2002, Ms. Goletz returned to Dr. Tamesis office with increase in pains all over." Dr. Tamesis assessed her with Seronegative inflammatory arthritis. On physical exam, he found, "JOINTS: revealed marked pain on ROM of the cervical spine. Pain on ROM of both shoulder. Marked tenderness on palpation of carpal bones, MCPs and PIPs of both hands. Still with main on flexion/extension of both knees….Some mild discomfort on ROM of both ankles. Tenderness on palpation of various MTP joints. A-470.

In a January 8, 2003 letter, Dr. Tamesis wrote:

> [t]his is to certify that I have been seeing Moira Goletz since February of 2001 for her rheumatoid arthritis. This is a severe disabling inflammatory arthritis that results in multiple joint swelling and destruction of the joints. This markedly limits her activities of daily living, most especially those that require repetitive movements. I have now started her on Remicade infusion therapy that will require she receive these every 8 weeks at the minimum to

help control the disease process.  While this is ongoing and until we can control the disease I feel she continues to be disabled from any occupation. A-468.

On February 10, 2003, Dr. Rowe wrote a letter stating that Ms. Goletz' under his care for:

First degree MCL sprain and degenerative joint disease of the left knee. 2. Triangle fibro cartilage tear of the left writs. 3. Right elbow olecranon bursitis. 4. Cervical and thoracic strain.  5. Degenerative disc disease of the cervical spine. 6. Lumbosacral strain.  I have referred her to Dr. Ger for the left wrist, and it is my understanding that she is scheduled to undergo surgery for that problem on 02/12/03. A-251.

On April 10, 2003, Dr. Rowe noted that Ms. Goletz, "states that the left knee throbs at night. A-419.  Dr. Rowe diagnosed her with a "1st degree MCL sprain of the left knee and DJD left knee." A-419. Dr. Rowe performed surgery on Ms. Goletz' left knee on April 29, 2003. A-415. In surgery he found that the, "MRI performed, which had demonstrated no mensical tear and no other abnormality. However, intraoperatively the MRI was found to be wrong because she had extensive chondromalacia to the medical femoral condyle where her pain was present and also the patellas and a small area in the lateral tibial plateau." A-415.

In a letter dated May 8, 2003 to the Prudential Appeal Review Unit, Dr. Tamesis wrote that Ms. Goletz suffered from 1) seronegative inflammatory arthritis, 2) generalized degenerative joint disease, and 3) bilateral carpal tunnel syndrome. A-252.  He also wrote,

[t]his has significantly impacted upon her activities of daily living. She has significant difficulty in range of motion of her hands.  This limits her ability to lift objects above 10 pounds.  She also has significant difficulty in grasping objects and doing repetitive tasks as grip remains weak.  Any inflammatory arthritis can also produce generalized joint pains and stiffness that can involve any joint even in the absence of definite swelling such as pains of the shoulders and hips.  She is now on high dose immunosuppressive agents, nonsteroidal anti-inflammatory medications, narcotic analgesics, and periodic boluses of crticostesriods [sic]. A-53.

Dr. Rowe wrote a letter dated May 8, 2003 to Prudential about Ms. Goletz' condition. In it, he wrote:

Ms. Goletz has been under my care for multiple complaints for some time. Most recently, she underwent left knee arthroscopic chondroplasty of the patella, medial femoral condyle, and lateral tibial plateau on 4/29/03. She has additional complains of a right elbow olecranon bursitis, cervical and thoracic strain, degenerative disc disease of the cervical spin and lumbosacral strain. I last evaluation her on 5/6/03, at which time she was told to continue weight bearing with her walker, and to continue a home exercise program. She is to return on 5/28/03 at 1:00 and she remains unable to work until that visit… A-252.

E. Prudential's Response to Mrs. Goletz' Claim;

On April 17, 2001, Alexis Lonero, Disability Claims Manager, approved Ms. Goletz for Long Term Disability for the first 24 months. A-68. On June 24, 2002, Prudential informed Ms. Goletz that her LTD benefits would be cut off effective October 29, 2002. A-71. At that point, Prudential had Ms. Goletz medical records and an opinion by Dr. Rowe that she could not work. The claims manager wrote:

After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of *any gainful occupation* for which you are reasonably fitted by education training or experience. The above definition, which indicates '[a]fter 24 months of payments…' applies to your claim effective October 30, 2002. Our review included medical records provided by Dr. Rowe. After a thorough evaluation of the information provided, we have determined that although you continue to experience knee and wrist pain, the medical documentation does not support an impairment preventing you from performing the necessary and substantial functions of any occupation. We find that you maintain the functional ability to perform in a sedentary occupation that does not require repetitive handwork. Therefore, your claim will be closed with benefits payable through October 29, 2002." A-71.

On July 29, 2002, Ms. Goletz appealed this decision to the Appeals Review Unit for the first time. She wrote:

I have attached two copies one of a letter from a specialist Dr. Tamesis. & the other is a form from Dr. Rowe which verify my inability to work do to my disability. Due to the rheumatoid arthritis I have pain in my hands, ankles, wrists, knees and legs. My hands and ankles swell on a daily basis…A-75.

She stated that she had a hard time sitting, standing or walking and the medication was greatly affecting her. A-75.

Prudential's claim managers noted their analysis and other things in SOAP Notes. A-45-66.  In August 16, 2002 in the Soap notes, the claims manager noted that both of Goletz' physicians, Dr. Rowe and Dr. Tamesis, opined that Ms. Goletz could not work. A-57.  The claims manager noted:

> EE (Employee) appeals indicating painful arthritis, hand swelling, and neck pain.  Included with appeal is WSF completed by Dr. Rowe indicating that ee cannot work because of pain and spasms of cervical spine.  Dr. Rowe indicates that ee is limited in ability to sit, stand, walk and lift. Also submitted is letter for rheumatologist, Dr. Tamesis indicating that the has been treating ee since 2-01 for inflammatory polyarthritis which he opines prevent ee from working. A-57.

In a letter dated August 19, 2002, the Prudential wrote to Plaintiff Goletz that, "[w]e are currently performing a thorough evaluation of the information currently within your file.  Should there be an additional information you would like to submit, please forward it to our office promptly." A-78.

On September 5, 2002, claims manager, Michelle Pence, reviewed the recent medical records with Dr. Patrick Foye. A-56.  In this note, the claims manager noted, "PLAN: IME would be helpful—comprehensive musculoskeletal IME with either ortho, rheumatologist or rehab dr first need MRI and any diagnostic testing." A-56.

In its September 30, 2002 letter, Prudential requested Ms. Goletz to be examined by another doctor. A-80.  Instead of an orthopedic or rheumatologist, Prudential scheduled an appointment with Dr. Peter Bandera, a physiatrist. A-207.  Dr. Bandera is not a treating physician for Ms. Goletz. A-211.  On October 30, 2002, Dr. Bandera met with Ms. Goletz for about 15 minutes. A-75.  Dr. Bandera's report briefly summarized her condition and his impressions. A-213.  Dr. Bandera's report did not directly discuss or analyze her treating

doctor's opinions, he merely noted them in the history portion of his report. A-211-13. Dr. Bandera did not give any explanation why he disagreed with her Dr. opinions other than the objective evidence did not support them. A-213. Dr. Bandera described what type of work he thought she was capable of performing. A-213. Dr. Bandera did not discuss how he came to his conclusion, other than the statement that:

> In reference to her multiple complaints, her current objective finding noted during examination was trace swelling of the hands and left extensor hand tendonitis. She has multiple subjective complaints, which do not correlate objectively. It is felt she can execute at least light duty capacity…. A-213.

Dr. Bandera went on to describe work restrictions like she should defer "high impact activities," and that she would have problems to manipulate small objects like "coins". A-213. On November 18, 2002, Claim Manager, Eugene Rakmanov, noted only that Dr. Bandera, "determined that ee (employee) is capable of performing sedentary to light work w/ R&L of: defer from high impact activities, reduced/very little manipulation of small objects, EE has hx. (history) of CTS, would also consider no more than occasional keyboarding." A-58. On November 20, 2002, a claims manager noted what jobs Ms. Goletz could do with Dr. Bandera's restrictions. A-59.

On November 21, 2002, Eugene Rakmanov noted that there was a file review by Dr. Foye and an exam by Dr. Bandera. A-60. Mr. Rakmanov did not note what if Dr. Foye gave any opinion, nor did the claims manager discuss Plaintiff's treating doctor notes that she could not work. A-60. The claims manager summarized Dr. Bandera's report, including the portion that Ms. Goletz sat through the, "examination and interview in a calm manner." A-60.

Also, Mr. Rakmanov did not address any of Ms. Goletz reports of pain in her July 29, 2005 letter. A-60. Mr. Rakmanov concluded that, "[w]hile she may continue to report symptoms of pain and discomfort, medical evidence in the file, including recent PE

("physical exam") from IME, does not support ee's inability to perform a/o ("any occupation"). Therefore, would recommend to uphold initial decision to term claim." A-60.

On November 27, 2002, Prudential again denied Ms. Goletz LTD benefits. A-83. In the November 27, 2002 denial letter, Prudential wrote most of what Mr. Rakmanov had noted in the SOAP notes on November 21, 2003. A-83. Prudential wrote, "[w]e received your appeal letter on August 1, 2002, along with additional records form Dr. Schwartz and Dr. Tamesis [sic]. To help us get a better understanding of your functioning ability, we scheduled you for an] independent Medical Examination (IME) with Dr. Bandera..." A-83. Prudential had actually received by Dr. Rowe, an orthopedist who works in the same office as Dr. Schwartz. Prudential based its decision solely on Dr. Bandera's report. A-246. Prudential wrote:

> Dr. Bandera concludes that you have multiple complaints, which do not correlate objectively. Given your physical examination and review of your medical records Dr. Bandera opined that you have the ability to perform at least a light duty job. Dr. Bandera indicates that you may be restricted to lifting and carrying five to ten pounds frequently and should defer high impact activities. He also opines that from functional perspective you may have a mildly reduced ability to manipulate small objects such as coins. A-83.

In addition, Prudential conducted a Transferable Skills Analysis based solely on the restrictions and limitations outlined by Dr. Bandera. A-59.

In her February 2003 letter, Ms. Goletz made a second appeal for LTD benefits. A-86 In the letter, Ms. Goletz stated that her condition had worsened. A-86. She wrote "now knowing that the cause is my rheumatoid arthritis, the pain in which I carry thru out my joints, back, neck, and legs." A-86. She also informed Prudential that she only met with Dr. Bandera for fifteen minutes and that he was not a specialist like Dr. Rowe and Dr. Tamesis. A-86.

Ms. Goletz submitted letters and additional records from her treating physicians, Dr. Tamesis and Dr. Rowe. A-86, A-250-51. In Dr. Tamesis' January 8, 2003 letter, he stated

that he had been treating Ms Goletz since February 2001 for rheumatoid arthritis. A-250. "This is a severe disabling inflammatory arthritis that results in multiple joint swelling and destruction of the joints. This markedly limits her actives of daily living, most especially those that require repetitive movements…" A-250. Dr. Tamesis opined that until the disease could be controlled that Ms. Goletz was disabled and could not work. A-250. Dr. Rowe's letter stated that Ms. Goletz had been under his care and that he had performed surgery on her knee. A-251. Upon the request of Prudential, Dr. Tamesis and Dr. Rowe each sent an additional report in May 2003 to Prudential stating she could not work. A-252-53.

Despite receiving these letters from her treating physicians, Prudential again denied Ms. Goletz' request for LTD benefits on May 12, 2003. A-93. Despite Dr. Tamesis statement that she could not work due to inflammatory arthritis, Prudential seemed more concerned with the fact that Dr. Tamesis narrative did not provide "any comment regarding the IME that was forwarded to his office." A-94. Also, Prudential gave little to no weight to Dr. Rowe's May 8, 2004 narrative in which he opined that Ms. Goletz was unable to work. In the May 12, 2003 denial letter, Prudential stated, "we provided your physicians an opportunity to comment on the IME report that was performed, and your physicians either declined to respond or submitted narratives that do not address comments related to the IME that was performed." A-95. Prudential specifically wanted her treating physicians to comment on the IME in order to over come the denial. A-95.

In a letter on May 23, 2003, Ms. Goletz attorney, John Grady, appealed Prudential's decision to deny the benefits for a decision. A-97. On September 19, 2003, Ms. Goletz' attorney asked Prudential to defer any decision until after Ms. Goletz received her decision on her social security case. A-100 Ultimately, Ms. Goletz' received a favorable decision and it was forwarded to Prudential in December 2003. A-226.

Her attorney also sent a narrative from Dr. Tamesis dated August 27, 2003, which contradicted Dr. Bandera's conclusion that Ms. Goletz could not work. A-254. Dr. Tamesis wrote that, "Dr. Bandera indicated in his report that Ms. Goletz suffers from negative inflammatory arthritis, which is incorrect. Her correct diagnosis is seronegative rheumatoid arthritis." A-254. He also questioned the weight of Dr. Bandera's "one-time evaluation" when Ms. Goletz was receiving chronic steroid therapy. A-254. Dr. Tamesis' wrote:

> At the time of Ms. Goletz' October 30, 2002 evaluation with Dr. Bandera, she was receiving treatment of chronic steroid therapy including Methotrexate, a potent immunosuppressive agent. Prior to the use of these immunosuppressive agents, there was significant joint synovitis and soft tissue swelling of her hands, which have showed some improvement with therapy. Despite the use of various analgesics, her pains remain significant. Dr. Bandera provided his opinion based on the evaluation of a patient that had been receiving potent immunosuppressive treatment. A-254.

Dr. Tamesis also specifically stated that Ms. Goletz' subjective symptoms "certainly correlate with her objective findings." A-254. This statement is in direct contravention with Dr. Bandera's October 30, 2002 report. A-211, A-254-55. More importantly, Dr. Tamesis elaborated on how Ms. Goletz was disabled. A254-55. He stated that Ms. Goletz was unable to sit for long periods of time, lift anything over 10 pounds, and that Ms. Goletz was in chronic pain, "despite use of various analgesics" A-254-55.

On December 2, 2003, Ms. Goletz, through her attorney, sent another letter to Prudential, which included a copy of the favorable Social Security hearing decision. A-102. Ms. Goletz' attorney wrote, "[b]ased upon the records of the Social Security Administration which has a more severe standard of disability and based upon the medical records I have supplied, I would again ask Prudential to re-examine its finding of non-disability." A-102.

On December 9th, Prudential responded to Ms. Goletz attorney's request by submitting the case to an Appeals Committee to evaluate the information submitted. A-64. Dr. Foye conducted a separate file review. A-611. Dr. Foye is a doctor who has never examined, nor

13

treated Ms. Goletz. Dr. Patrick Foye is a consultant for Prudential and is paid $300 an hour. A-576. Dr. Foye has been involved with Ms. Goletz' case since at least August 2002. A-56. Prudential failed to disclose his previous involvement and only stated that he was involved an external file review in the denial letter. A-105-06. He completed a report on December 30, 2003, but because Prudential did not send the entire file he wrote an addendum on February 10, 2004. A-65. Dr. Foye's reports reviewed all of her medical records that were in Prudential's file. A-220-24. Prudential used Dr. Foye's file review as the basis of its final denial of benefits.

In the March 15, 2004 denial letter, Prudential wrote that Ms. Goletz was capable of performing the duties of another gainful occupation. A-106. There, Prudential summarized the information the previous denial letters. A-104-06. Prudential did not engage in any discussion of how it credited certain evidence or how it reconciled Dr. Bandera's and Dr. Foye's analysis with that of Goletz' own specialized treating physicians. A-105-06. Prudential wrote,

> Dr. Foye's notes that Ms. Goletz' recurrent inflammation/synovitis would be expected to create difficulty for her if she was required to perform repetitive hand activities on a frequent or continuous basis. However, Dr. Foye notes that she would most likely be capable performing an occupation with only occasional repetitive hand activities. Dr. Foye also notes that Ms. Goletz may have difficulty with repetitive overhead activities due to chronic neck and shoulder pain. Dr. Foye opinions that with these limitations and restrictions Ms. Goleta [sic] would be expected to be able to work in a full time capacity. A-106.

However, Prudential failed to include Dr. Foye's favorable comments in the final denial letter. A-106. Dr. Foye also stated, "I recommend considering vocational assessment to determine if such work is actually available to her in the workplace, and whether this would represent gainful employment to her." A-224. Dr. Foye defined the term "occasionally" in regards to repetitive hand activities as "less than 1/3 of the workday". A-224. In addition, Prudential did not mention that Dr. Foye questioned the IME conducted by Dr. Bandera by writing, "even when she was taking these anti-inflammatory and immunosuppressive medication, there was some physical exam evidence of bilateral hand swelling and left wrist

tenderness, even as documented by Dr. Bandera." A-233. Dr. Foye wrote, "From the combination of the physical exam findings by Dr. Tamesis and also by the evaluation by Dr. Bandera, and also the blood work result, overall it does appear most likely that claimant does have some type of inflammatory poly-arthritis, although she is seronegative for rheumatoid arthritis…" A-223.

Prudential did not conduct a new vocational assessment as recommended by Dr. Foye. A-59, A-66. Instead, Prudential used a previous assessment conducted on the restrictions by Dr. Bandera in 2002. A-66.  Prudential never mentioned Dr. Tamesis August 27, 2003 letter stating that Dr. Bandera's assessments were incorrect. A-105-06.  However, Prudential did again cite Dr. Bandera's report as a basis for its final denial letter. A-105.

In the March 15, 2004 letter, Prudential wrote that it had received the Social Security Disability Benefit Award letter and at the same time she was "waiting on the status of your appeal." A-106.  In noting it received the award letter, Prudential wrote, "Prudential determines eligibility for LTD benefits based on the terms of the Group Policy, separate from the criteria used by the Social Security Administration…" A-106.  Prudential admitted in the interrogatories that, "Prudential considers Social Security determinations as one factor in its evaluations, but does not consider them to be determinative." A-578.

The Administrative Law Judge, ("ALJ") noted that Ms. Goletz testified about her pain and condition. "Claimant descried her right elbow as painful as if the bones are rubbing together. The hand still goes numb or tingles. She drops things, lacks ability to pinch or hold objects. Her hands are always swollen, weak, with knuckle swelling. She must hold things with both hands, e.g. a pen, a plate." A-231.  He also noted that her hands were swollen. A-231.  The Social Security Administration Law Judge found her testimony to be credible, he stated, "[i]n reaching this conclusion, the undersigned has considered the claimant's own subjective allegations and has found them generally credible in light of supporting medical evidence." A-231.

15

## SUMMARY OF THE ARGUMENT

1)      Prudential's decision under the heightened arbitrary and capricious standard should be given little to no deference given self-serving behavior of Prudential. *Sanderson v. The Continental Casualty Corp.*, 279 F. Supp.2d 466, 473 (D. Del 2003).

2)      The administrator's actions were arbitrary and capricious in that Prudential abused its discretion by acting in a self-serving manner when it gave plaintiff's reliable evidence little to no consideration at all.  "[T]he Supreme Court in *Nord* specifically recognized that,  'plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Sanderson v. Continental Casualty Corp.*, 2003 WL 22078075 (D. Del), citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 123 U.S. 1965, 1972 (2003).  It is clear that Prudential did just that by ignoring the favorable SSA decision, doctor's opinions, and credible subjective complaints.

3)      Prudential acted in a self-serving manner by selectively using and seeking evidence that supported a denial.  *Sanderson v. The Continental Casualty Corp.*, 279 F. Supp.2d 466, 475 (D. Del 2003).  Prudential's timing of the requests for Dr. Bandera and Dr. Foye's reports should be questioned, as they were only after the appeal began and when all evidence favored Ms. Goletz.  Then, Prudential focused solely on the limited evidence that that she may have been able to work at any occupation, while ignoring evidence that was favorable to her position.

4)      Prudential cannot rely on Dr. Bandera's report because it is incorrect in that there was objective evidence to support her complaints of pain. In addition,

Prudential improperly failed to acknowledge or credit Ms. Goletz subjective complaints despite the objective evidence that she suffered from inflammatory polyarthritis. Courts do not want administrators to discount subjective complaints when there is objective evidence to support it. *Mitchell v. Prudential Health Care Plan*, 2002 WL 1284947 *10 (D.Del.), see also, *Sanderson*, at 476.

5)    The administrator's denial of long-term benefits was unsupported by substantial evidence, and therefore can be overturned by this court. *Orvosh v. Program of Group Ins. For Salaried Employees of Volkswagen of Am.,* 222 F.2d 123 (3d Cir. 2000). Prudential claimed that opinions of treating doctors, Social Security Decisions, and a claimant's subjective complaints are all factors. Even though all of this evidence supported plaintiff's position, Prudential arbitrary decided that she was able to work at any occupation. Dr. Bandera's report is not credible. Dr. Foye's report was based on file review, not an examination and he is highly paid consultant for Prudential. Even though Dr. Foye stated she could work, he questioned if there was "actually" any work available. A-224. Therefore, this court should rule there was not substantial evidence to accept the administrator's decision to deny the plaintiff's LTD under The Plan.

# ARGUMENT

## I.   SCOPE OF THE REVIEW:

### A.  SUMMARY JUDGMENT STANDARD:

Summary Judgment is determined under Rule 56(c). Fed.R.Civ.P. 56. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." *Mitchell v. Prudential Health Care Plan*, 2002 WL 1284947 *6 (D.Del); Fed. R.Civ.P. 56(c).  It has been well established that the court must view all of the evidence in the light most favorable to the non-movant and "draw all reasonable inference in his favor." *Id.*

### B.  STANDARD OF REVIEW FOR ERISA CASES:

It is undisputed that Prudential funds the plan that it administers, and therefore, a heightened arbitrary and capricious review should be applied.  *Sanderson v. The Continental Casualty Corp.*, 279 F. Supp.2d 466, 472-73 (D. Del 2003). Prudential admitted that the standard of review is a heightened arbitrary and capricious standard of review when it did not challenge the request for admissions.  A-580.  The court should apply a sliding scale as to how much deference it will grant to the administrator. *Pinto v. Reliance Standard Life Ins.*, 214 F.3d 377, 379 (3rd Cir. 2000).  "We side with the majority of courts of appeals, which apply a sliding scale method, intensifying the degree of scrutiny to match the degree of conflict." *Id.*  The Delaware District Court commented on the heightened standard in *Russell v. The Paul Revere Life Ins. Co.*:

> When an administrator's decision is potentially clouded by a conflict of interest, such as where a ERISA plan administrator also funds the plan it administers, the conflict must be considered in assessing the amount of *deference* to be given to the administrator's decision; in those circumstances, a modified or "heightened" arbitrary and capricious standard of review is appropriate. *Russell v. The Paul Revere Life Ins. Co.*,  148 F.Supp.2d 392, 400 (D.Del. 2001).

In applying the heightened arbitrary and capricious standard, "the court need not give complete deference to the administrator's decision to deny benefits. *See id.* The court therefore, must 'look not only at the result – whether it is supported by reasons – but at the process by which the result was achieved'". *Sanderson,* at 473. When applying the arbitrary and capricious review the court is making a, "determination of whether the plan administrator abused its discretion in reaching its decision." *Sanderson*, at 472. This Court ruled that when using the heightened arbitrary and capricious standard, the court could consider all evidence that was available during the appeals process. *Id.*

More importantly, the Delaware District court held that the court does not have to accept the decision, "if the administrator uses a self-serving approach to the evidence that selectively relies upon the evidence that supports a denial of benefits, but rejects the evidence that supports the granting of benefits." *Sanderson*, at 473. The *Sanderson* court found that evidence of the administrator's severe conflict and self-serving actions required the court to reject the administrator's decision and rule that it was arbitrary and capricious standard. *Sanderson*, at 477.

## II.    PRUDENTIAL ACTED IN A SELF-SERVING MANNER AND ITS DECISION WAS ARBITRARY AND CAPRICIOUS:

Every time Prudential was faced with credible evidence that Ms. Goletz was unable to work at any occupation, it actively sought any evidence it could find, no matter how unreliable it was to deny her claim. Prudential relied on a small amount of unsubstantial and flawed evidence, while it ignored favorable credible evidence provided by her treating physicians that she was unable to work at any occupation. Prudential also ignored a favorable Social Security decision. Prudential selectively used the reports of its consultant Dr. Patrick Foye, while it ignored the portions that questioned her ability to find gainful

employment. Prudential also ignored her constant complaints of severe pain despite the overwhelming objective evidence that supported them.

Prudential did not decide her case in a neutral manner and very little deference should be given to their decision. Prudential was acting on its own behalf, because it fully funded the Plan and was trying to save money. The denial was self-serving. Therefore, this court should find that the decision was arbitrary and capricious.

### A. PRUDENTIAL'S DENIAL IN THE FIRST APPEAL WAS SELF-SERVING AND ARBITRARY AND CAPRICIOUS:

Prudential was self-serving in the consideration of the evidence during the plaintiff's first appeal. It ignored Ms. Goletz' complaints of pain and the statements from her treating doctors stating that she was unable to work at any occupation. Prudential also improperly sought out an exam by Dr. Bandera when faced with credible evidence that supported a favorable decision. Then, Prudential improperly relied on a flawed medical exam by Dr. Bandera, which failed to properly discuss her condition or how he made his opinion.

The record reflected that Ms. Goletz included two additional statements from her doctors that she could not work. A-247-250. Faced with this information, Prudential in August 2002 after a file review with Dr. Foye, decided that have another exam, which was ultimately conducted by Dr. Bandera. A-56. Prudential unilaterally accepted the decision of Dr. Bandera's report over the opinions of her treating physician reports and opinions. A-58. Prudential's own notes demonstrate that there was no consideration or evaluation of M.S. Goletz' treating physicians opinions or her subjective complaints. A-58-59. This was evidenced in the denial letter dated November 27, 2002, which did not discuss any of her other reliable evidence. A-84. In fact, Prudential stated that it received records from Dr. Swartz. A-84. Had Prudential properly considered her medical records, they would have known that the records were from Dr. Rowe, not Dr. Schwartz. This mistake shows how little

they considered Dr. Rowe's statements and records. In fact, the denial letter in detail discussed the report by Dr. Bandera. A-84. This report was flawed and should have been ignored by Prudential.

Under the report's discussion section, Dr. Bandera only briefly commented on his reasoning for his determination.  His reasoning that she could work light duty was discussed in only two sentences. A-213. He wrote, "in reference to her multiple complaints, her current objective finding noted during examination was trace swelling of the hands and left extensor hand tendonitis.  She has multiple subjective complaints which do not correlate objectively". A-213. Nowhere in Dr. Bandera's discussion did he discuss her treating physician's decisions or opinion that she cannot work. Instead, he merely noted their opinions in her history. A-211-13. Nowhere in his discussion did he discuss the inflammatory poly arthritis, her severe carpal tunnel, her strain and sprain or other problems and how they affected her ability to work.  Instead, Dr. Bandera gave the blanket finding that the objective findings noted during "examination" multiple subjective complaints, which do not correlate objectively.   Had Prudential looked at Dr. Bandera's findings closer he would have seen that he was incorrect.

First, Dr. Bandera was not her treating physician or a specialist like her own doctor, Dr. Tamesis.  Dr. Foye even later undermines Dr. Bandera's report. In 2004, Dr. Foye wrote that, "from the combination of the physical exam findings by Dr. Tamesis and also the evaluation by Dr. Bandera, and also the blood work results, overall it does appear most likely that claimant does have some type of inflammatory poly-arthritis, although she is sero-negative for rheumatoid arthritis…" A-223-24.  Dr. Tamesis noted Dr. Bandera's report was wrong. "Dr. Bandera indicated in his report that Ms. Goletz suffers from negative inflammatory arthritis which is incorrect. Her correct diagnosis is seronegative rheumatoid arthritis."A-254.  Prudential could have caught this mistake had they actually looked her medical records and July 11, 2002 letter of Dr. Tamesis. A-246.

More troubling is how Prudential made its review during this first appeal. It specifically chose Dr. Bandera's report without any other consideration of reliable evidence. This court has held that administrators may not arbitrarily refuse to credit a person's reliable evidence such as opinions of the treating physician. *Sanderson v. Continental Casualty Corp.,* 2003 WL 22078075 *2 (D.Del). Here, the record showed that Prudential did not credit any other reliable evidence other than Dr. Bandera's report. A-58. Also, Dr. Bandera does not say that her physician's opinions are unreliable. On November 11, 2002, the soap notes evidence the claims manager did not consider any evidence other than Dr. Bandera's report. A-58. On November 21, 2002, the claims wrote, "While ee may continue to report symptoms of pain and discomfort, medical evidence in file, including recent PE from IME does not support ee's inability to perform a/o. Therefore, would recommend to uphold initial decision to term claim." A-60. This is a false statement because all of the medical evidence in the file did not support the denial, because all her doctor's reports and medical records supported otherwise.

It was improper for Prudential to selectively use that evidence that supported a denial. The Delaware District Court specifically addressed the issue of administrators, like Prudential, who act in a self-serving manner in the consideration of reliable medical evidence. *Sanderson*, 279 F. Supp.2d at 474. In *Sanderson*, the insurance company, Continental, relied heavily on a report by a peer review physician who did not exam the claimant and supported the decision to terminate the benefits. *Sanderson*, at 474. The peer review physicians only focused on carpal tunnel syndrome and rheumatoid arthritis, and did not discuss her fibromyalgia. *Id.* The court found it troubling that the doctor had not examined Sanderson personally, "The court finds it suspect that Continental would have so easily accepted his report over the findings of Sanderson's treating physicians, and her own, albeit subjective complaints of pain". *Id.* In this case, the court should also find it troubling

that Prudential so easily accepted Dr. Bandera's statement, over all the other credible evidence of her treating physicians.  Also, the timing of the exam was suspicious in that it was only requested during her appeal after receiving additional reports from doctors stating she could not work. Prudential should have requested the exam before the initial denial, because Prudential already had opinions and medical records from her treating specialists that she could not work. A-243-45.

Prudential has admitted in discovery that, "[t]he treating physicians' opinion is evaluated along with any and all other information submitted or obtained. No one piece of information is determinative." A-578. Despite this admission, there is no evidence from any of Prudential's notes or letters in the first appeal that it considered her treating physician's reports or subjective complaints when making its final decision. What was evidenced was Prudential's true intention to seek out other information to deny her the complaints, while ignoring her credible evidence.

### B.  PRUDENTIAL'S DENIAL IN THE SECOND APPEAL WAS SELF-SERVING AND ARBITRARY AND CAPRICIOUS:

In Ms. Goletz' appeal of February 2003, she included new letters from both Dr. Rowe and Tamesis. A-250-51.  She included information about the drug Remicade, and its effects that can cause fatigue and other side effects. A-89. She also wrote,

> I also find it disturbing that my declination of my continued disability was decided open one fifteen minute office visit with a Dr. Bandera, a psychiatrist (sic) with whom your corporation informed me was the only doctor that was willing to accept my insurance.  Not someone who even specializes in either of the fields for which my condition has been determined. Instead of two of the most well known doctors/surgeons in the Dover area. A-86.

Despite the fact that Dr. Bandera did not discuss or contradict Dr. Rowe and Dr. Tamesis' opinion, Prudential's requested her attending physicians specifically address Dr.

Bandera's report. A-61.  Prudential acknowledged receipt of Dr. Rowe and Dr. Tamesis reports, but failed to explain why rejected their opinions, other than stating, "we provided your physicians an opportunity to comment on the IME report that was performed, and your physicians either declined to respond or submitted narratives that do not address comments related to the IME that was performed." A-94.

The Court should look to the analysis in *Sanderson* in finding Prudential's determination flawed and self-serving. *Sanderson*, at 477. The court noted that

> Continental was not free to merely disregard her treating physicians' reports and findings in this regard in favor of an outcome more to its liking.  More to the point, although Continental may have doubted the reliability of the conclusions or diagnosis of Sanderson's doctors, there is nothing in the record to indicate that Dr. Truchelut's opinion was any more supported or reliable. *Sanderson*, at 477.

Prudential gave no reason why it accepted Dr. Bandera's report over that of her own specialists**,** other than the pretext that her doctor's did not address Dr. Bandera's report.  This was wrong.  The *Sanderson* court stated that it was impermissible for Continental to use evidence which, "supported a denial of the claimant' benefits while at the same time, ignoring or failing to satisfactorily explained its rejection of, evidence supporting an award of LTD."  Sanderson, at 477.

During the second appeal, Prudential used the pretext that her doctors did not address the Dr. Bandera's report.  It did not explain why they did not accept her doctors' opinions over that of Dr. Bandera.  The *Sanderson* court also addressed this lack of explanation.  There, the court noted that, "while Continental purported to summarize the information it had before in those letter, it did not engage in any discussion of why it credited certain evidence, or how it reconciled Dr. Truchelut' analysis with that of Sanderson's own treating and examining physician." *Sanderson*, at 475.   Applied to the present case, it is clear that Prudential acted in the same self-serving manner as Continental in the Sanderson case.

In the first appeal denial letter, Prudential made no mention of the prior opinions of the doctors that Goletz could not work.  Now, on the second appeal, after receiving four additional narratives in her favor, Prudential again does not discuss why it accepted the brief report of Dr. Bandera over the opinions of her treating physicians.

On May 12, 2003, Prudential denied Ms. Goletz second appeal, but stated that she could appeal it for a third and final time.  A-95.

### C. PRUDENTIAL'S DENIAL IN THE THIRD APPEAL WAS SELF-SERVING AND ARBITRARY AND CAPRICIOUS:

On May 23, 2003, Ms. Goletz' attorney, John Grady, wrote to Prudential and appealed the denial of long-term disability benefits for a third time.  During the third appeal, Ms. Goletz' received favorable decision and a report by Dr. Tamesis directly addressing Dr. Bandera's report as requested.

The Delaware district court noted that, "ERISA plan administrators must provide the notice of denial in writing and wherein they set forth the *specific* reasons for the denial in easily understandable manner." *Sanderson v. Continental Casualty Corporation*, 2003 WL 22078075 (D.Del), citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 123 U.S. 1965, 1967 (2003).  In the May 12, 2003 denial letter, Prudential indicated that it wanted or lacked—a favorable Social Security Decision and report by her treating physician specifically addressing Bandera's exam.  A-95.

Prudential admitted that the Social Security determinations are a factor to the decision. A-578.  In Ms. Goletz' favorable Social Security Decision dated November 19, 2003, the ALJ found her credible and that she was unable to work.  The ALJ noted that she had problems doing daily activities because of the pain she experienced. A-231-32. The ALJ also noted that her hands were swollen at the hearing and moved "stiffly." A-231. In Prudential's May 2003 denial

letter, Prudential stated it was going to leave her case open to follow her Social Security Hearing, however in the next denial letter it stated, "Prudential must evaluate claims based on the terms of the Group Policy independent of the Social Security Administration." A-93, A-106. Prudential later wrote in the same denial letter, "In addition our records indicate that you are currently waiting on the status of your appeal for Social Security Disability Benefits with Administrative Law Judge. Therefore, we will keep your claim active and will follow up on the status of the hearing." A-106. Prudential wrote this in the same denial letter that stated it had received the favorable decision. A-106. This overwhelming evidence that Prudential gave SSA decision absolutely no weight. In addition, there are no notes in 2004 discussing the SSA benefits in relations to its decision to deny benefits other than the confusing statements written in the denial letter.

Secondly, Prudential had repeatedly stated in the May 2003 denial letter and process that it wanted her physicians to address Dr. Bandera's Report. A-94-95. In August 2003, Dr. Tamesis, her treating rheumatologist, addressed Dr. Bandera's report. A-254-55. Dr. Tamesis discussed how Dr. Bandera's report was flawed and why should not be considered. A-254-55. Dr. Tamesis pointed out that Dr. Bandera was incorrect in stating she suffered from negative inflammatory arthritis. A-254. Tamesis wrote, "Her correct diagnosis is seronegative rheumatoid arthritis." A-254. Dr. Tamesis also wrote, "Ms. Goletz' labs correlate with an ongoing inflammatory disease activity that can occur despite no severe swelling. Any inflammatory arthritis can also produce generalized joint pains and stiffness, such as the shoulder and hip, even in the absence of definite swelling." A-254. Prudential's own Dr. Foye supported Dr. Tamesis opinion that she suffers from inflammatory arthritis. A-223-24.

Prudential has long contended that Dr. Bandera claimed that her subjective complaints did not correlate with her objective findings. Based on Dr. Tamesis and Dr. Foye it is clear that there was overwhelming objective evidence that substantiated her subjective complaints. Even

Dr. Foye noted that with Dr. Tamesis and Dr. Bandera records and the blood work results, "overall it does appear most likely that the claimant does have some type of inflammatory poly-arthritis, although she is seronegative for rheumatoid arthritis." A-223. Despite this information, Prudential still cited Dr. Bandera's report in its final denial letter and did not discuss her complaint of pain. A-105.

When faced the favorable SSA decision and Dr. Tamesis August 2003 report, Prudential then requested what it called an "external file review". A-64. However, it was not external or independent and it had previous file reviews by Dr. Foye. A-56. Clearly, Prudential was simply seeking other evidence to deny plaintiff's LTD benefits. Prudential turned to its $300 an hour consultant, Dr. Foye. A-576. Dr. Foye had worked Goletz' case since 2002. A-56. This was the same self-serving behavior noted in the *Sanderson* case. The *Sanderson* court noted that administrator asked for a "peer review" and then relied on it heavily. The court questioned why the doctor did not contact any of Sanderson's treating physicians or even Sanderson. *Sanderson*, at 474. Here, Dr. Foye had never examined Ms. Goletz, nor did he contact any of her treating physicians.

In a similar case, the Third Circuit questioned the timing of an IME. *Kosiba v. Merck & Co.*, 384 F.3d 58, 68, cert. denied, *Merck & Co., Inc. v. Epps-Malloy*, --- S.Ct. ----, 2005 WL 192218, 73 USLW 3465, 73 USLW 3667, 73 USLW 3672 (U.S. May 16, 2005). In deciding whether or not to use a heightened arbitrary and capricious standard, the Third Circuit considered it suspicious that an IME was requested during the appeal. *Id.* The court did acknowledge that IMEs are sometimes helpful to administrators. *Kosiba*, at 68. In questioning the IME, the court held the timing the IME subjected the administrator to a higher level of scrutiny. The court stated:

> We have a claimant seeking continued LTD benefits whose treating physicians offer unequivocal support of her claims, and a plan administrator that has delegated claims administration to a large insurance company intervening—not

at the initial determination stage, but at the appeal stage—with a request for an additional medical examination to be performed by a physician of it own choosing. *Id*, at 68.

The suspicious timing of the IME in *Kosiba* was very similar to Prudential's timing of the "external" file review by Dr. Foye.  When Dr. Tamesis contradicted Dr. Bandera's report, Prudential chose then to conduct "an external file" review by its own $300 an hour, Dr. Foye.

More suspicious is the fact that Prudential selected only the portions of Dr. Foye's report that supported a denial to of the claim, while ignoring that questioned Dr. Bandera's report and whether with her restrictions there was any gainful occupation. A-223-24.

In *Mitchell v. Prudential Health Care Plan*, the court addressed the issue of when certain portions are used while other portions are simply ignored. *Mitchell v. Prudential Health Care Plan*, 2002 WL 1284947 *9 (D.Del.).  "This apparent willingness to use the helpful potions of Dr. Anthony's testimony while completely ignoring the portions that would support the continuance of benefits is some evidence that Prudential was acting in self–interest." *Mitchell*, at *9, See also *Pinto v. Reliance Standard Life Ins.*, 214 F.3d 377, 394 (3rd Cir. 2000).

In addition, Prudential did not acknowledge Dr. Foye's review undermined Dr. Bandera's findings and exam. Dr. Foye opined from the records that the recurrent inflammation/synovitis would create difficulty for her to repetitive hand activities. A-224. Dr. Foye stated that the hand activities would have to be "less than 1/3 of the workday", but Prudential did not disclose that in its denial letter. A-224, A-106.  Dr. Foye also stated that she would have problems doing repetitive overhead activities due to chronic neck pain and shoulder pain, "which might be related to her diffuse poly-arthritis." A-224.  Even though Dr. Foye stated that she would be capable would full time work with these restrictions, he questioned if there was any work available to her. A-224.  He wrote, "I recommend considering vocational

assessment to determine if such work is *actually* available to her in the workplace, and whether this would represent gainful employment to her." A-224. (Emphasis added).

Prudential did not conduct a new vocational assessment as suggested by Dr. Foye. A-66. Instead, Prudential relied on the November 2003 vocational assessment using Dr. Bandera's restrictions. A-66, A-58. Had Prudential acted in a neutral manner, they would have conducted a new vocational assessment as Dr. Foye suggested.  Dr. Foye stated that she was capable of occasional hand activities that being less than 1/3 a workday. A-224.  Whereas the previous vocational assessment did not have this restriction and even stated it, "would consider no more than occasional keyboarding," and stated she was capable of light duty work. A-213. Dr. Foye never stated she whether or not she was capable of light duty work, he only stated full time work, then questioned if there was anything like that available. A-224.

The court in *Mitchell* addressed this issue of not following out recommendations. *Mitchell,* at *9.  There a doctor had suggested verifying the pain in a functional capacity test. *Id.* "This failure to follow advice from its own staff fits squarely into the third factor identified in *Pinto*, and could also support a finding of self-dealing under the second factor." *Id.*   Clearly, Prudential abused its discretion by not conducting a new vocational assessment; instead it claimed that it had already performed one.  This is proof that Prudential was acting in a self-serving manner.

Prudential did not give any credit to claimant's reliable evidence—Social Security decision, subjective complaints, and treating physician's opinions.  Even though the Supreme Court ruled against giving special weight to the treating physician, the Court did rule that, "[p]lan administrators may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physicians." *Nord*, 123 S.Ct. at 1972. However this court recognized that claimants should receive credit for reliable evidence.  *Sanderson, 2003 WL 22078075* at *2.  "At no time did the Court hold that plan administrators need not provide any

29

justification for rejecting evidence supporting a claimant's disability, particularly when it is clear, as it is here, that the administrators were engaged in a selective and self-serving review of the evidence." *Sanderson*, at *2.  See also, *Mitchell*, at *9-10.

During the third appeal, Prudential abused its discretion and refused to acknowledge Ms. Goletz' reliable evidence.  The record demonstrates that Prudential only sought out Dr. Foye's "external file review" when it had overwhelming credible evidence that Ms. Goletz was disabled.  The Prudential went to its own $300 paid consultant. Prudential's self-dealing was further demonstrated in its selection of helpful portions of Dr. Foye's report, while failing to disclose portions that support granting LTD benefits. Prudential also failed to conduct a new vocational assessment, failed to acknowledge Dr. Tamesis Aug 27, 2003 report, failed to properly consider the Social Security decision as a factor, and failed to give any acknowledgement to Ms. Goletz' subjective complaints.  Therefore, Prudential acted in self-serving manner and their decision was arbitrary and capricious.

### III.   PRUDENTIAL DECISION WAS ARBITRARY AND CAPRICIOUS IN THAT IT FAILED TO ACKNOWLEDGE MS. GOLETZ' SUBJECTIVE COMPLAINTS:

As stated above, this court has held that administrators must give credit to reliable evidence. *Sanderson,* at *9.  Throughout the entire appeal, Ms. Goletz continually stated that she was in constant pain. The record reflects that she was on an extensive amount of medication, which included Prednisone, Remicade, Methotrexate, APA with codeine, Vicodin. A-232.  In early 2001, she told Prudential representative that she got shooting pains in her elbow and neck. A-109. She stated that the pain prevented her from sitting for long period of times. A-109, A-232. Her complaints of pain are well documented in her appeal letters to Prudential representatives, her medical records, Social Security Award letter and her doctor's opinions.

During the first two appeals, Prudential relied on Dr. Bandera's statement that, "she has multiple subjective complaints which do not correlate objectively." A-84. Both Dr. Tamesis and Dr. Foye undermined Dr. Bandera's opinion based on the fact that her blood results and physical examinations showed that she has inflammatory arthritis. This would objectively support her subjective complaints. However, Prudential never acknowledged her subjective complaints, or gave them credit based on this objective evidence. A-105-106, A-60. In *Sanderson*, the court noted how the administrator improperly excluded evidence of her subjective complaints. "Conversely, her subjective complaints of pain appear to have been entirely discounted….[t]he court finds this strong emphasis on objective evidence to the resulting exclusion of the subjective evidence to be improper." *Sanderson*, 279 F.Supp.2d at 475.

In the final denial letter, Prudential never gave any reason why it ignored her subjective complaints of pain after both doctors stated there was objective evidence to support that pain---inflammatory polyarthritis. This is not the first time Prudential has ignored credible subjective complaints. In *Mitchell v. Prudential Health Care Plan*, there was objective MRI results that supported the claimant's allegations of severe back pain. There, the court stated that Prudential has "entirely discounted" the claimant's complaints. *Mitchell*, at *10. "The court finds that this strong emphasis on objective evidence to the resulting exclusion of subjective evidence was incorrect." *Id.* The *Mitchell* court found that there was, "no reason for Prudential to ignore the fact that the objective findings supported a diagnosis of a back injury or fibromyalgia which could produce Mitchell's subjective complaints of pain." *Id.*

Then in *Sanderson*, the court found that there was objective medical evidence to support the subjective complaints. The court in *Sanderson* found that it was wrong for the administrator to discount the complaints of pain. *Sanderson*, at 476. "There was no reason for Continental to ignore the fact that objective findings supported a diagnosis of fibromyalgia which could have produced Sanderson's subjective complaints of pain." *Id.*

31

Prudential only stated that, "[b]ased on Dr. Foye's review of the medical records, he notes that Ms. Goletz does appear to have some inflammatory poly arthritis…" A-105-06. However, nowhere in the third denial letter does Prudential acknowledge any of Ms. Goletz complaints of daily pain that would prevent her from working. These complaints are simply ignored. In addition, her complaints of neck pain are ignored, even though she was diagnosed with cervical sprain/strain and the MRI shows degenerative disc disease. A-442.

Despite admitting that, "Ms. Goletz' subjective complaints were one of the many factors considered in the determination. No specific (weight) was assigned to this or any other factor." A-578. From Prudential's notes and letters, it is clear that Prudential did not give Ms. Goletz' complaints any weight. A-64-66. Therefore this court should following the reasoning in *Sanderson* and *Mitchell*, and rule that Prudential engaged in impermissible self-dealing. Therefore, under a heightened arbitrary standard, Prudential's decision was arbitrary and capricious.

IV.    **PRUDENTIAL'S DECISION WAS ARBITRARY AND CAPRICIOUS AND NOT SUPPORTED BY SUBSTANTIAL EVIDENCE**

A.    **SCOPE OF REVIEW:**

The Defendant's have admitted that the review is a heightened arbitrary and capricious standard. This Court has ruled that a plan administrator's decision can be overturned if it is not supported by substantial evidence. *Sanderson*, 279 F.Supp.2d at 472. The Third Circuit has held that, "a plan administrator's decision will be overturned only if it is clearly not supported by the evidence in the record…" *Orvosh v. Program of Group Ins. For Salaried Employees of Volkswagen of Am.,* 222 F.2d 123 (3d Cir. 2000). The court must look at the record as a whole to determine if the plaintiff has met her burden. *Ott v. Litton Indus., Inc.* 2005 WL 1215958 (M.D. Pa May 20, 2005).

**B.**     **PRUDENTIAL DECISION TO DENY BENEFITS WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.**

Looking at the record as a whole, there was not substantial evidence in the administrative record to support the administrator's decision. The record reflects that her physician's have contended that Ms. Goletz was unable to work before the date of October 24, 2002. Prudential cannot rely on the exam conducted by Dr. Bandera as it has been undermined by both Dr. Tamesis and Dr. Foye when the file review as conducted. Dr. Bandera's report is not credible. Even though Dr. Foye opinioned that she could work, he even questioned if there was any gainful occupation available to her. A-224. Dr. Foye did not state that she was unable to work at "any gainful occupation". A-224. The record reflects that Prudential did not conduct a new vocational assessment. In addition, Dr. Foye did acknowledge that the evidence showed had inflammatory polyarthritis. This would support Ms. Goletz' complaints of extreme pain in her joints, and hands. Prudential has stated that subjective complaints are factor in the decision process. As discussed above, Ms. Goletz had numerous complains of pain and stated the part of the reason she could not work was because of the pain. The evidence in the record overwhelming supports her complaints of severe pain.

In addition, the record shows that Ms. Goletz received a favorable Social Security decision. Prudential has admitted that this is a factor to consider. A-578. However, it is clear that Prudential never considered the decision in its final decision. A-66. The ALJ noted that the plaintiff "appeared to move very stiffly and had swollen hands." A-231. The ALJ found her testimony credible. A-232. Also, the record shows that an enormous amount of medication that Ms. Goletz has had to endure. She would receive cortisone injections.

Finally, all of Ms. Goletz' treating physicians have opined that she could not work and she was disabled. This has been discussed in depth. Under *Sanderson*, Prudential had to credit her reliable evidence, which included treating physician's opinions. *Sanderson*, 2003 WL

22078075 at *2. Prudential only based its decision on Dr. Bandera and Dr. Foye. It has been well stabled that Dr. Bandera's report is flawed because he incorrectly opined that there was not any objective evidence to support her subjective complaints. *Supra*. This has been thoroughly discussed above. Dr. Foye's report only consisted of file review, not an exam. In addition, as Prudential's $300 an hour consultant, and he never opines that she was not able to any gainful occupation, only that with restrictions she could work. Finally, he questioned if such work was "actually" available to her. A-224.

This court should follow *Ott v. Litton Industries, Inc.* in deciding to overturn Prudential's decision and award Ms. Goletz her benefits. *Ott v. Litton Industries, Inc.*, 2005 WL 1215958 (M.D. Pa. May 20, 2005). There the court overturned the administrator's decision while reviewing a case under a heightened arbitrary and capricious review. *Ott*, at *11, *19. The *Ott* court stated that, "Although the Supreme Court has held that courts may not require ERISA plan administrators to defer to doctors who have treated a claimant over those who merely review her medical files, the court may sill evaluate the weight of each doctor's opinion on the extent of his or her treatment history with the patient and specialization or lack thereof." *Ott*, at *18. The *Ott* court rejected two assessments by two doctor's that reviewed the claimant's filed and ruled that she was able to work. The *Ott* case differed in that the claimant claimed she had fibromyalgia and the two reviewing doctor's completely rejected it. The *Ott* court criticized the administrator for relying on this contention that plaintiff lacked "objective evidence". The court in *Ott* ultimately rejected both reviewing physician's opinions. "The utilization by Defendants of two physicians who never examined Plaintiff, but simply refused to accept the fibromyalgia diagnosis and thus rejected disability due to fibromyalgia on the basis of Plaintiff's medical file, was arbitrary and capricious…" *Ott*, at *19. However, in this case, it is clear that there was objective evidence to establish the inflammatory polyarthritis as the blood tests and notes of swelling clearly established it. Even though Dr. Foye acknowledged that

34

finding, his opinion is undermined in that he has not read her other complaints of pain, and is not her treating physician. In *Ott*, the court reversed the administrator's decision and found summary judgment for the plaintiff.

In the current case, Prudential did not have substantial evidence to deny plaintiff's LTD benefits. Looking at the record as a whole, all of the other evidence—the Social Security decision, Complaints of Pain and discomfort, opinions of treating doctors, and medical records support the fact that she was unable to hold any gainful occupation.

## <u>Conclusion</u>

Wherefore, this court should grant summary judgment in favor of plaintiff, Moira Goletz, because the decision was arbitrary and capricious and not supported by substantial evidence. The plaintiff has supplied credible evidence of that she was unable to work at any occupation. This evidence included opinions of Dr. Tamesis and Dr. Rowe, a favorable SSA decision, credible complaints of severe pain, and a creditable medical history. Prudential relied on Dr. Bandera report, which is not credible or substantial, nor did it explain why it ignored Dr. Tamesis report. Prudential has not provided any evidence to find that Ms. Goletz is not reliable in her complaints of pain. Their reliance on their paid consultant is misplaced as he has never examined her and Prudential only choose portions of his report that were helpful to them. Therefore, this court should find there was no substantial evidence.

In addition, this court should find their decision was arbitrary and capricious and deny their summary judgment. This court should rule that Prudential acted in a self-serving manner. In the alternative, this court should remand this decision back to Prudential to properly address Ms. Goletz's overwhelming amount of credible evidence.

GRADY & HAMPTON, LLC

  /S/ Laura F. Browning
John S. Grady, Esq. (I. D. No. 009)
jgrady@gradyhampton.com
Laura F. Browning, Esq. (I.D. No.4504)
lbrowning@gradyhampton.com
6 North Bradford Street
Dover, DE  19904
(Tel. 302-678-1265)
*Attorneys for plaintiff*

DATED:  June 10, 2005

<u>ATTACHED UNREPORTED CASES</u>

2002 WL 1284947 (D.Del.)

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
Mary M. MITCHELL, Plaintiff,
v.
PRUDENTIAL HEALTH CARE PLAN, a foreign insurance company, Defendant.
No. Civ.A. 01-331 GMS.
June 10, 2002.

*MEMORANDUM AND ORDER*

SLEET, J.
I. INTRODUCTION
 *1 On April 6, 2001, the plaintiff, Mary Mitchell, filed suit against Prudential in the Superior Court for the State of Delaware (Kent County). On May 21, 2001, the case was removed from state court to the United States District Court for the District of Delaware. (D.I.1.) The plaintiff's amended complaint, filed on June 15, 2001, alleges violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq. (D.I.9.) Specifically, Mitchell asserts that she was improperly denied disability benefits by Prudential, the provider of benefits under Mitchell's benefits plan. Presently before the court is the defendant's motion for summary judgment which argues that the plan language gives Prudential discretion to deny benefits, thereby requiring this court to employ an arbitrary and capricious standard of review. Prudential urges the court to find that its decision to deny benefits was not arbitrary or capricious because the medical evidence available at that time supported a finding that Mitchell was not permanently disabled.

The plaintiff responds that Prudential is not given discretion under the plan, and asks the court to review the decision *de novo.* In the alternative, Mitchell argues that even if the court declines to review the decision *de novo,* it must employ a "heightened" arbitrary and capricious standard because Prudential funds the plan and is the plan's fiduciary. In any event, Mitchell asserts that Prudential's motion fails under any standard of review because it selectively chose to focus on the medical opinions that were favorable to Prudential while ignoring medical evidence that suggested Mitchell might be permanently disabled. Prudential responds that none of the medical information that supports Ms. Mitchell's claim was presented before the initial denial of benefits.

Upon review of the relevant documents and case law, the court finds that the defendant is not entitled to summary judgment. The court is persuaded by the defendant's contention that Prudential is implicitly granted discretion under the Plan and therefore, an arbitrary and capricious standard of review must be employed. However, because Prudential both funds the plan and determines eligibility for benefits, the court must employ a "heightened" arbitrary and capricious standard of review. Under the "heightened" arbitrary and capricious standard of review, the court finds that Prudential's decision to deny benefits to Mitchell was arbitrary and capricious based

upon Prudential's self-serving use and analysis of the available evidence. The court will therefore deny the defendant's motion for summary judgment on this claim and remand to Prudential with instructions to take action consistent with this opinion.

II. FACTS

Mary Mitchell was employed by Milford Memorial Hospital ("Milford") in Delaware as an operating room technician. Milford sponsored an employee benefits plan. Prudential is the insurer and underwriter of the plan. The plan names Milford as the Plan Administrator (D.I. 35 at A96.) Prudential is referred to as the provider of benefits. (*Id.* at A97.) Prudential was also responsible for determining eligibility for benefits.

*2 In October 1996, Mitchell applied for disability benefits with Prudential, citing, *inter alia,* back pain, leg pain, and sciatic pain. She was 51 years old at the time. In connection with this request for benefits, she asked Dr. Richard DuShuttle to submit an attending physician's statement ("APS") on her behalf. Mitchell first complained to Dr. DuShuttle about pain in the left hip with radiating pain in the groin and right buttock on June 18, 1996. Dr. DuShuttle requested a bone scan which indicated that Mitchell might have degenerative arthritis in the left foot and left wrist. Dr. DuShuttle's MRI of the lumbar spine also indicated mild degenerative disc disease, mild spinal canal stenosis, and minimal right line disc protrusion in the lower lumbar region. Based on these evaluations, Dr. DuShuttle's APS dated October 23, 1996 indicated that Mitchell was capable of performing light duty work four hours each day. (*Id.* at A128-29).

Prudential initially denied Mitchell's claim for benefits on October 29, 1996. (*Id.* at A130.) Prudential's policy for determining benefits stated:

Total Disability exists when Prudential determines that all of these conditions are met:

(1) Due to sickness or accidental injury, both of these are true:

(a) You are not able to perform, for wage or profit, the material and substantial duties of your occupation.

(b) After the Initial Duration of a period of Total Disability, you are not able to perform for wage or profit the material and substantial duties of any job for which you are reasonably fitted by your education, training or experience. The Initial Duration is shown in the Schedule of Benefits.

(2) You are not working at any job for wage or profit.

(3) You are under the regular care of a doctor.

(*Id.* at A74; A130.) In October 1996, Prudential denied benefits because it believed that Mitchell was currently employed at a local bowling alley. However, this was later found to be untrue and Mitchell was initially awarded benefits effective November 28, 1996. (*Id.* at A139-40.) The benefits were scheduled to terminate on November 28, 1998, the end of Mitchell's "Initial Duration" period. (*Id.* at A264.)

During Mitchell's Initial Duration period, Prudential continued to request medical information regarding her condition. Prudential sent a questionnaire to Dr. Harvey Lee, one of Mitchell's treating physicians. On February 19, 1997, Dr. Lee's responses indicated that Mitchell could not sit or stand for more than fifteen minutes at a time and could lift no more than fifteen to twenty pounds. (*Id.* at A132-33.) Dr. Lee indicated that there were no objective findings to support this conclusion. However, Dr. Lee also indicated that Mitchell was being treated for her back problems and it was "unlikely" that she would be able to work while this treatment continued. (*Id.*)

Prudential also arranged for Mitchell to be evaluated by Dr. Tutse Towne in May 1997. Dr. Towne's May 12, 1997 letter stated:

*3 Based on my examination today, Mrs. Mitchell should be able to lift at least 10-15 pounds without any difficulty. She should also be able to twist from side to side. Furthermore, she should be able to perform [a] sedentary occupation full time, as long as her job description is flexible enough to minimize prolonged sitting or prolonged standing.

(*Id.* at A144.)

Dr. Garrett Herring, Mitchell's treating chiropractor, also submitted an APS dated May 26, 1998. Dr. Herring's APS noted that Mitchell's daily activities consisted of "[n]ormal activities of daily living w/restrictions being [sic] no extended duration due to pain." (*Id.*

at A147.) Dr. Herring opined that if Mitchell could find a job that satisfied her wish for no increased pain with increased activity, "she might be able to work." (*Id.*)

Mitchell also submitted another APS from Dr. Lee which was dated June 17, 1998. Dr. Lee's second APS reiterated the diagnosis of lower back pain. (*Id.* at A148.) However, when asked about Mitchell's prospects for returning to work, Dr. Lee indicated that she was "unable to do any prolonged activity, manual or physical." (*Id.*)

Mitchell was seen by Dr. Tonwe again in November 1998. Dr. Towne's second evaluation dated November 2, 1998 again diagnosed Mitchell with chronic back pain. Dr. Tonwe repeated his earlier conclusion about Mitchell's ability to work, stating, "It is my opinion that her condition is such that she should be able to work with some restrictions." (*Id.* at A150.) In a follow-up note dated November 9, 1998, Dr. Tonwe stated that Mitchell was "disabled from her own occupation at this time, but she is not disabled from any occupation." (*Id.* at A151.)

On November 25, 1998, Prudential wrote Mitchell to advise her that her disability benefits would be terminated effective November 27, 1998. In reaching this decision, Prudential acknowledged that Mitchell complained of back pain, arthritis, and fibromyalgia. [FN1] Prudential stated that although Drs. Lee and Herring both indicated that Mitchell could not perform strenuous activity, they did not conclude that she could not work. Prudential also mentioned Dr. Tonwe's conclusion that Mitchell should be able to work. Based on this information, Prudential stated:

> FN1. Although this is the first reference the court found to fibromyalgia in the record, Mitchell apparently mentioned fibromyalgia in one of her previous claims forms.

> While we understand that you are experiencing pain which does require ongoing treatment, your condition is not so severe as to render you totally disabled from any occupation. Although your condition may prevent you from perform [sic] your own occupation and other occupations which require prolonged physical activity, you could perform a job which allows you to change positions as needed to relieve your pain.

(*Id.* at A153.)

By letter dated February 16, 1999, Mitchell advised Prudential that she wanted to appeal the decision. In her letter, she stated that did not have adequate notice of the termination of benefits. She also explained, in great detail, that she was experiencing substantial pain that limited her ability to function. She stated that although she could do some limited laundry work (as long as she did not lift baskets), she could not vacuum, make beds, iron, scrub or sweep, and that there were several days when she could not do anything at all due to pain. (*Id.* at A156.) She referred to an evaluation by Barker Therapy and Rehabilitation. The physical therapist noted that "Mary [Mitchell] continues with weakness and pain and loss of function and may benefit from continued physical therapy to achieve maximum functional benefit." (*Id.* at A166.)

**\*4** In response to Mitchell's letter, Prudential stated it would review the information Mitchell submitted, and encouraged her to submit any further information. On March 12, 1999, Prudential advised Mitchell that it was upholding its decision to terminate her benefits. The letter did not mention Dr. Lee or Dr. Herring. However, it did mention the results of the November 9, 1998 evaluation of Dr. Tonwe. Prudential did consider the physical therapy records from Barker Therapy. Prudential noted that Barker's evaluation indicated that Mitchell was "limited in [her] ability to bend, lift/carry, and grip." (*Id.* at A171.) However, Prudential stated that even with these limitations, Mitchell should be able to function in sedentary or light activities. Thus, Prudential affirmed its decision, but extended the benefits denial date to March 31, 1999 to compensate for any lack of notice. Prudential also advised Mitchell of her right to appeal their determination. Mitchell advised Prudential of her desire to appeal the decision in a letter dated June 11, 1999. In her letter, Mitchell reiterated her complaints of pain and informed Prudential

that she was unable to sleep and was frequently fatigued. (*Id.* at A174.) On July 9, 1999, Prudential advised Mitchell that her file would be reviewed again and that she should submit any information that she wanted to be considered. Mitchell replied that there was no further information that she wished to include. Therefore, on July 22, 1999, Prudential advised her that second appeal was denied. (*Id.* at A193-95.)

On November 22, 1999, Mitchell requested a further and final appeal of the decision. She attached two APS forms with her request. A May 5, 1999 APS by Dr. Lee repeated the diagnosis of severe lower back pain. In the APS, Dr. Lee reiterated that Mitchell was "unable to sit, stand, walk, or run for [an] extended period of time." (*Id.* at A183.) In particular, Dr. Lee noted that Mitchell could not stand for more than 15 minutes. He stated that due to the chronic lower back pain, Mitchell was "unable to do any meaningful regular activity" and would also be "unable to return to work." (*Id.* at A184.) However, an APS from Dr. Herring dated June 17, 1999 indicated that although Mitchell's back problems were "permanent," and she was "unable to perform activities of daily living without] severe pain," she should be able to perform sedentary work. (*Id.* at A176.)

On December 13, 1999, Prudential advised Mitchell that it could not complete its evaluation of her appeal without the additional medical information she previously indicated that she would provide. On August 7, 2000, Mitchell responded and indicated that she still suffered from severe back pain and fibromyalgia, which claimed she had "continued to get worse in the past 1 1/2 years." (*Id.* at A208.) She also indicated that she had gone to Dr. Charles Wagner for a second opinion, and enclosed the doctor's evaluation. In a letter dated July 17, 2000, Dr. Wagner stated that Mitchell had fibromyalgia and Lyme Disease. Dr. Wagner stated that Mitchell therefore had a "chronic disability" and was "unable to hold down a job." (*Id.* at A210.) Dr. Wagner further stated, "Physical examination confirms chronic fibromyalgia with point tenderness, muscle fatigue on minor exertion." (*Id.*) Dr. Wagner concluded, "The patient has remained the same since 1996. She cannot maintain a job in her, or other, professions." (*Id.*)

*5 During the appeal process, Prudential sent the entire Mitchell file to Dr. William Anthony for review and analysis. Dr. Anthony summarized the medical history and noted that the bone scan and the MRI showed degenerative arthritis and mild degenerative disc disease, respectively. Additionally, Dr. Anthony noted that the patient appeared to suffer from several maladies, most recently Lyme disease. When asked if there was medical evidence on file to support an impairment that would render Mitchell unable to perform any job since April 1, 1999, Dr. Anthony stated, "[T]here are numerous subjective statements in this chart, but there are no definite evaluations of the patient which would suggest that objectively Ms. Mitchell would be unable to perform the duties of *any job* since 04/01/99." (*Id.* at A224.) Despite his finding that there were no objective statements to support Mitchell's claims, Dr. Anthony noted that "however, there is a very concerning letter from Charles G. Wagner, M.D. dated 07/01/00 in which numerous subjective statements of report [sic] are made with regard to plaintiff's condition and if by physical examination or functional capacity evaluation those allegations or statements can be substantiated it would be my belief that the patient would be totally disabled from any occupation." (*Id.* at A225.) Prudential never requested such an examination. Dr. Anthony further stated that although Dr. Wagner's evaluation did not appear objective, "barring a functional capacity evaluation to the contrary we must respect Dr. Wagner's judgment in this matter." (*Id.* at A226.) Finally, although Dr. Anthony considered the opinions of both Dr. Wagner and Dr. Tonwe, he noted that Dr. Wagner's evaluation "seems to describe a patient with many more and more serious complaints than that noted in Dr. Tonwe's evaluations of 11/98." (*Id.*) Prudential also asked Dr. Joel Moorhead, a medical director at Prudential, to review the file. Dr. Moorhead stated that although the MRI appeared to show changes in the back, these changes were related to age, were not usually symptomatic, and should not prevent Mitchell from working. Dr. Moorhead did not provide any specific facts in support of these findings. Dr. Moorhead also stated that the Lyme Disease diagnosis did

not appear to be well supported. He did not offer a rationale for this conclusion, however. He also noted that Dr. Tonwe and Dr. Anthony's conclusions that Mitchell could not work at any job were well supported. Dr. Moorhead did not offer any reasons for this judgment either.

On January 29, 2001, Prudential advised Mitchell that it had reviewed her claim and decided not to reinstate her benefits. Prudential first summarized all of the medical evidence in the file, including Ms. Mitchell's descriptions of her pain and limitations. Prudential then stated:

The documentation submitted on appeal reflects that Ms. Mitchell has been diagnosed with Lyme Disease and has been under the care of Dr. Shoemaker. The diagnosis of Lyme disease does not appear to be well-established. There is no indication of inflammatory arthritis and a normal neurological exam. Additionally, the diagnosis of Lyme Disease appears to be made in July 2000 from Dr. Wagner. Any new development of a disorder would not be covered as Ms. Mitchell's claim terminated effective April 1, 2000.

 *6 Ms. Mitchell and her physicians have indicated that Ms. Mitchell's conditions prevent her from performing the duties of a sedentary occupation. Based on our review of the information in the file, we have determined that at the time LTD benefits were terminated, documentation does not support a Totally Disabling condition that would render Ms. Mitchell unable from performing [sic] job duties [in] a position classified as sedentary. The 1996 MRI of the lumbar spine shows degenerative changes on lumbar spine which are age-related changes. The imaging findings are not sufficiently severe enough to prevent returning to another occupation.

Dr. Tonwe opined that Ms. Mitchell would be able to perform sedentary work. Dr. Anthony opined that the documentation did not support an impairment that would prevent Ms. Mitchell from performing the duties of another occupation.

(*Id.* at A265-65.) Prudential's statement that the Lyme disease diagnosis was not well established echoes Dr. Moorhead's findings, but Prudential did not address the fibromyalgia aspect of the claim. Moreover, Prudential never addressed Dr. Anthony's statements that Mitchell's condition might have deteriorated since seeing Dr. Tonwe or that if her subjective complaints of pain were objectively verified (i.e. through a functional capacity test), she would be totally disabled from any occupation. Based on this reasoning, Prudential determined that Mitchell could perform sedentary work, specifically as a hospital admitting nurse. After a request for further review was denied, Mitchell filed this action.

III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Turner v. Schering-Plough Corp., 901 F.2d 335, 340-41 (3d Cir.1990).* The movant bears the burden of proving that there are no genuine issues of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp ., 475 U.S. 574, 586 n. 10 (1986).* A dispute is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-movant, and a fact is material if it might effect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)* Finally, on any motion for summary judgment, the court must view the evidence in a light most favorable to the non-movant and draw all reasonable inferences in his favor. *Wetzel v. Tucker, 139 F.3d 380, 383 n. 2 (3d Cir.1998).* With these principles in mind, the court will consider the appropriate standard of review to be applied in this case.

IV. DISCUSSION

A. The Standard of Review

When considering a plan administrator or fiduciary's denial of benefits under ERISA, district courts are generally instructed to employ *de novo* review. *See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).* However, where plan terms grant discretion to the plan administrator or fiduciary to determine a claimant's eligibility for

benefits, the decision is subject to review under an "arbitrary and capricious" standard (i.e., a determination of whether the plan administrator abused its discretion in reaching its decision). *See Mitchell v. Eastman Kodak Co., 113 F.3d 433, 437 (3d Cir.1997).* Where discretion is reserved, the court may overturn the decision only if it is " 'without reason, unsupported by substantial evidence or erroneous as a matter of law." ' *Abnathya v. Hoffman-LaRoche, Inc., 2 F.3d 40, 45 (3d Cir.1993)* (citations omitted). However, where the fiduciary's decision is potentially clouded by a conflict of interest, such as where a plan administrator also funds the plan it administers, the conflict must be considered in assessing the amount of deference to be given to the administrator's decision. *See Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 387 (3d Cir.2000).* Thus, in those circumstances, a modified or "heightened" arbitrary and capricious standard of review is appropriate. *See id. at 390-92.*

*\*7* Mitchell urges the court to apply a *de novo* standard of review because (1) Prudential is not the plan administrator and (2) the terms of the plan do not confer discretion upon Prudential. The court is not persuaded by either contention. First, Prudential need not be a plan administrator for its decision to be subject to an arbitrary and capricious standard of review. The Supreme Court has stated that "A denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator *or fiduciary* discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone, 489 U.S. at 115* (emphasis added). Although Prudential was not the plan administrator, it was a fiduciary of the plan. The applicable federal regulations in effect during Mitchell's claim and appeal state, "To the extent that benefits under an employee benefit plan are provided or administered by an insurance company … that company shall be the 'appropriate named fiduciary' for purposes of this section." *29 C.F.R. § 2560.503-1 (2000). [FN2]* As an insurance company providing benefits, Prudential was an "appropriate named fiduciary" under the applicable regulations. Thus, under the *Firestone* analysis, given Prudential's status as a fiduciary, the plan's failure to name Prudential as the plan administrator does not require the court to employ *de novo* review.

> FN2. The 2001 revisions to this section of the CFR do not contain this language. However, the revised section only applies to claims filed after January 1, 2002. *See* 29 CFR § 2560.501-3(o)(1) (2001). Since
>
> Mitchell's claim predates the revised language, the court will be guided by use the language in effect during her claim and appeal.

Mitchell further argues that the plan terms do not give Prudential discretion. The plan states that "Total disability exists when Prudential determines that all of these conditions are met …" The court agrees with the plaintiff that this language does not explicitly confer discretion upon Prudential. However, "although an express reservation of discretion is preferred, discretion may reasonably be inferred from the policy language." *Russell v. Paul Revere Life Ins. Co., 148 F.Supp.2d 392, 400 (D.Del.2001)* (collecting cases). Thus, the fact that the grant is not explicit will not prevent the court from considering whether Prudential has been given discretion under the plan. The defendant argues that the use of the word "determines" is sufficient to confer discretion upon Prudential. The defendant submits that the normal meaning of the word determine is "to settle a controversy about … to come to a decision concerning as the result of investigation or reasoning … to settle or decide by choice of possible alternatives." (D.I. 34 at 18 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY n.p. (1986))). The plaintiff responds that although the defendant's definition is not incorrect, determine can also mean "to reach a decision, as after consideration or calculation," and calculation, such as in math, does not necessarily

confer discretion. (D.I. 37 at 11 (quoting WEBSTER'S II NEW RIVERSIDE DICTIONARY n.p. (1984))). [FN3]

> FN3. The plaintiff further asserts that even if discretion need not be explicitly given, words such as "proof satisfactory" or "substantial proof" must appear in the plan before such discretion can be inferred. The court disagrees. Although many courts have used this language to support a finding of discretion, see *Russell,* 148 F.Supp.2d at 400 (collecting cases), this is by no means the only language from which a grant of discretion can be inferred. See, e.g., *Ernest v. Plan Administrator of the Textron Insured Benefits Plan,* 124 F.Supp.2d 884, 890-91 (M.D.Pa.2000) (finding discretion in the absence of "proof satisfactory or substantial proof language"); *Westover v. Metropolitan Life Ins. Co.,* 771 F.Supp. 1172, 1174 (M.D.Fla.1991) (same).

The court finds that under either definition, the usual meaning of the word "determines" implies the exercise of discretion. The definitions supplied by both parties suggest that a determination is reached only after deliberation of some sort. The ability to think or deliberate prior to making a decision is the touchstone of discretion. The court therefore finds that the plan language is sufficient to confer discretion upon Prudential. See *Eley v. Boeing Co.,* 945 F.2d 276, 278 n. 2 (9th Cir.1991) (finding discretion where plan language stated, "The Company shall *determine* the eligibility of a person for benefits under the plan ...")(emphasis added). Since Prudential has discretion, *de novo* review is inappropriate. Therefore, the court will review Prudential's decision under an arbitrary and capricious standard.

*8 However, as previously stated, there are two types of arbitrary and capricious review--the standard level of review and a "heightened" standard of review that may be employed where there is a conflict of interest. See *Russell,* 148 F.Supp.2d at 400. Such a conflict may arise where the fiduciary also funds the plan. See *Pinto,* 214 F.3d at 387 ("We are persuaded that heightened scrutiny is required when an insurance company is both plan administrator and funder.") In the present case, Prudential both funds the plan and determines eligibility for benefits. Thus, Prudential's actions must be subjected to the "heightened" arbitrary and capricious standard of review. [FN4] The court will now consider whether Prudential's decision was arbitrary and capricious under this standard.

> FN4. The defendant agrees that this is the appropriate standard of review. ("In light of the fact that Prudential both funds the Plan and administers claims under the Plan, this court may apply a "heightened" arbitrary and capricious standard of review.) (D.I. 39 at 9.)

B. Application to the Facts

Under a standard arbitrary and capricious review, the court would be limited to determining whether the fiduciary's decision was without reason, unsupported by evidence, or erroneous as a matter of law. *See id.* at 393. The fiduciary's decision would be entitled to substantial deference. *See id.* Under the "heightened" arbitrary and capricious standard, however, the court need not give complete deference to the fiduciary's decision to deny benefits. *See id.* Indeed, rather than simply determining whether the result was supported by rational facts, the court must consider the process by which the result was achieved. *See id.* The court may consider all evidence available to Prudential during the entire appeals process. See *Mitchell,* 113 F.3d at 440 ("[T]he relevant record on appeal is the evidence before the Administrator at the time of his

final denial …").

The Third Circuit has suggested that the presence of certain factors can cause a court to find fault with a fiduciary's process. A fiduciary's decision process may not be entitled to deference if it reverses an earlier decision without receiving any additional medical information. *See id.* Additionally, the court need not accept the decision of a fiduciary that uses a self-serving approach to the evidence that selectively relies upon the evidence that supports a denial of benefits but rejects the evidence that supports the continuation of benefits. *See id.* Finally, along similar lines, if the fiduciary appears unwilling to listen to advice from its staff that recommends continuation of benefits, the decision may be questioned. *See id.*

In the present case, the first factor is not an issue because Prudential solicited further medical information from Mitchell at each stage of the appeal. However, the second factor which instructs the court to consider whether the fiduciary was self-serving in its consideration of the evidence is more problematic. In its final denial of benefits, Prudential appeared to give more weight to the evidence that favored the refusal of benefits. For instance, Prudential accorded great weight to Dr. Tonwe and Dr. Anthony's conclusions that Mitchell could work. In contrast to its reliance on the findings of its own doctors, Prudential mentioned, but did not fully discuss, credit, or reconcile the contrary opinions of other doctors such as Dr. Lee and Dr. Wagner who concluded that Mitchell was disabled from any occupation. Prudential also relied heavily (if not solely) upon Dr. Moorhead's findings regarding the reliability of the medical diagnoses. (It is worth noting that Drs. Tonwe, Anthony, and Moorhead were all connected to Prudential in some manner.)

*\*9* Although Prudential may have doubted the reliability of the conclusions or diagnoses of Mitchell's doctors, there is nothing in the record to indicate that the opinions of the Prudential physicians were any more supported or reliable. The court notes that unlike Mitchell's doctors, neither Dr. Anthony nor Dr. Moorhead treated or examined Mitchell-- they merely reviewed her medical records. Dr. Moorhead's conclusions regarding the reliability of Mitchell's Lyme Disease and back pain diagnoses are conclusory and completely unsupported by any testing or findings. Although Dr. Tonwe did examine Mitchell, Prudential did not consider the fact that his last examination took place in 1998, more than two years prior to the final denial. Given the staleness of Dr. Tonwe's diagnosis and the fact that medical conditions can worsen over time, Dr. Wagner's more recent diagnosis was entitled to more weight than Prudential accorded it. Since none of the evidence in the file was of surpassing reliability, there was no rational reason to simply give more weight to the Prudential physician's conclusions without a thorough and fully supported discussion of why the conclusions of Mitchell's doctors should be rejected. [FN5]

> FN5. The court notes that Prudential implies that certain irregularities or abnormalities with Dr. Herring's June 17, 1999 APS led it to question that document. The court need not consider this argument because that particular APS had very little bearing on the final denial of benefits and even less bearing on the court's analysis regarding self-dealing.

Stronger evidence of Prudential's "self-dealing" is found in its treatment of Dr. Anthony's adverse conclusions. Although Dr. Anthony suggested that Dr. Tonwe's examination results might be stale and Dr. Wagner's conclusions should be accorded some deference as a result, Prudential never mentioned or explained this finding in its final denial. It was completely ignored. Similarly disregarded was Dr. Anthony's statement that if Mitchell's subjective complaints of pain were verified, she would be disabled from all occupations. Prudential never explained why it was rejecting this conclusion. In fact, this conclusion is not even mentioned in the denial letter. Conversely, Dr. Anthony's conclusion that Mitchell could work is prominently featured

and relied upon in the termination of benefits. This apparent willingness to use the helpful portions of Dr. Anthony's testimony while completely ignoring the portions that would support the continuance of benefits is some evidence that Prudential was acting in self-interest. *See Pinto,* 214 F.3d at 394 (noting that crediting one helpful portion of the doctor's testimony while discrediting unhelpful portions "raise[d] likelihood of self-dealing").

Not only did Prudential fail to address Dr. Anthony's assertions regarding Mitchell's subjective complaints of pain, Prudential did not follow his suggestion that Mitchell's pain might be verified through a functional capacity test. This failure to follow advice from its own staff fits squarely into the third factor identified in *Pinto,* and could also support a finding of self-dealing under the second factor.

In its denial, Prudential also noted that there was no evidence to support a disability "at the time" benefits were denied. This appears to refer to the fact that the Lyme Disease diagnosis was first made in June 2000. Nevertheless, Prudential ignored the fact that Dr. Wagner diagnosed Mitchell with Lyme Disease *and* fibromyalgia. Although Prudential is correct that the Lyme Disease diagnosis first appeared in the record in 2000, Prudential itself mentioned the possibility of fibromyalgia as early as its November 1998 denial letter. Therefore, fibromyalgia was known "at the time" benefits were denied. Thus, to the extent that Dr. Wagner's findings were dependent upon a fibromyalgia diagnosis, it cannot be said that the fibromyalgia was a new impairment or disability. However, Prudential never considered or rejected the possibility that Mitchell's symptoms might be related to the fibromyalgia. Prudential's unwillingness to consider this possibility is further evidence of self-dealing.

*\*10* The court further notes that Prudential placed considerable weight on the lack of "objective evidence" to support Mitchell's complaints of pain. Conversely, Mitchell's subjective complaints of pain, while mentioned, were entirely discounted. For instance, although Prudential relied on Dr. Moorhead's finding that the MRI showed only non-symptomatic, age related changes, Prudential did not consider how Mitchell's subjective complaints of pain contradicted this conclusion. The court finds that this strong emphasis on objective evidence to the resulting exclusion of the subjective evidence was incorrect. In this determination the court draws guidance from precedent in the area of social security. *See Torix v. Ball Corp.,* 862 F.2d 1428, 1431 (10th Cir.1988) (noting that although social security cases are not precedential in the ERISA context, they can be used for guidance). The social security disability regulations require that subjective complaints of pain be given great weight as long as there is objective evidence of some condition that could reasonably produce such pain. *See Krizon v. Barnhard,* ---- F.Supp.2d --- (W.D.Pa. Apr. 23, 2002), *currently reported at* 2002 WL 662267, at \*9.

In the present case, there was objective medical evidence in the form of an MRI to support Mitchell's back pain diagnosis. Although subjective complaints of pain may be disregarded if the objective findings are contradicted by medical evidence, *see id.,* in the present case every doctor confirmed that the MRI showed a disturbance in the lower back. The only doctor who challenged the MRI was Dr. Moorhead who stated that the back problems were consistent with age and should be asymptomatic. Not only is Dr. Moorhead alone in this conclusion but given his ties to Prudential, his failure to examine the patient, and the lack of support for his conclusions, his analysis should not have been accorded such great weight. Additionally, Dr. Wagner stated, *"Physical examination* confirms chronic fibromyalgia with point tenderness, muscle fatigue on minor exertion." (D.I. 35 at A210.) (emphasis added). [FN6] The record contains no evidence contradicting this diagnosis. Thus, there was no reason for Prudential to ignore the fact that the objective findings supported a diagnosis of a back injury or fibromyalgia which could produce Mitchell's subjective complaints of pain.

---

FN6. The court notes that although Dr. Wagner's refers to "physical examination," the record contains no reference to any objective tests he

used to make the fibromyalgia diagnosis. However, medical literature indicates that, at present, there are no tests available to diagnose this condition. *See* WebMdHealth, *Fibromyalgia--Topic Overview,* at http://my.webmd.com/encyclopedia/article/1673.50846 (last visited May 17, 2002) ("Fibromyalgia can be difficult to diagnose because its symptoms are similar to many other disorders and diseases. There are no lab tests to diagnose fibromyalgia. It is often diagnosed after other conditions have been ruled out."). The diagnosis is consistent with Mitchell's symptoms of fatigue and sleeplessness and was made during a time consistent with her report of those symptoms. *See id.* Therefore, the court does not find it fatal that no objective tests verified the fibromyalgia diagnosis.

For all of the above reasons, the court finds that Prudential impermissibly used evidence that supported the denial of Mitchell's benefits while ignoring or failing to satisfactorily explain its rejection of evidence supporting reinstatement of Mitchell's benefits. Based on these actions, the court finds that Prudential engaged in impermissible self-dealing in its consideration of the evidence. The court therefore finds that under a "heightened" arbitrary and capricious standard, Prudential's decision was arbitrary and capricious.

V. CONCLUSION

For all of the above reasons, the court finds that Prudential's decision to terminate Mitchell's benefits was arbitrary and capricious due to the self-serving nature of Prudential's decision-making process. Therefore, the court will remand this case to Prudential for further proceedings consistent with this opinion.

*\*11* NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. The Defendant's Motion for Summary Judgment (D.I.33) is DENIED.

2. This matter is remanded to Prudential, the claims administrator, to take further action consistent with this opinion.

D.Del.,2002.

Mitchell v. Prudential Health Care Plan

2002 WL 1284947 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:01CV00331 (Docket) (May. 21, 2001)

END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1215958 (M.D.Pa.)

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
M.D. Pennsylvania.
Jeanette OTT, Plaintiff
v.
LITTON INDUSTRIES, INC., sponsor and administrator of the Litton Industries,
Inc. Employees' Health/Long-Term Disability Plan et al., Defendants.
No. 4:04-CV-763.
May 20, 2005.

Jonathan E. Butterfield, Murphy, Butterfield & Holland, P.C., Williamsport, PA, for Plaintiff.

Vincent Candiello, Morgan, Lewis & Bockius LLP, Harrisburg, PA, for Defendants.

MEMORANDUM AND ORDER

JONES, J.

 *1 THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

Pending before the Court is a Motion for Summary Judgment (doc. 19) filed by Plaintiff Jeanette Ott ("Plaintiff") on March 1, 2005. We also have before us a Motion for Summary Judgment (doc. 20) filed by Defendants Litton Industries, Inc. Employees' Health/Long Term Disability Plan and Unum Life Insurance Company of American (collectively "Defendants") on March 1, 2005.

For the reasons that follow, we will grant Plaintiff's Motion for Summary Judgment and deny Defendants' Motion for Summary Judgment.

*PROCEDURAL HISTORY:*

On April 8, 2004 Plaintiff filed a complaint against Litton Industries, Inc. ("Litton") and Unum Life Insurance Company of America ("Unum") in the United States District Court for the Middle District of Pennsylvania arising under the provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* (*See* Rec. Doc. 1). In Count I of the complaint, Plaintiff contended that Defendants failed to pay long-term disability benefits owed to Plaintiffs and Count II asserted a claim under Pennsylvania's Insurance Bad Faith Statute, 42 Pa.C.S. § 8371.

On September 20, 2004, with consent of defense counsel, Plaintiff filed an amended complaint, within which Plaintiff amended the names of the parties, alleged that subsequent to the filing of the complaint Defendants had issued an unfavorable decision regarding Plaintiff's disability benefit claim, and dropped the bad faith claim previously asserted. (*See* Rec. Doc. 14). Plaintiff named Litton Industries, Inc., Employees' Long-Term Disability Plan ("the Plan") and Unum as defendants (collectively "Defendants"). An answer was filed to the amended complaint on October 4, 2004. (*See* Rec. Doc. 15).

Discovery in the above-captioned action closed on February 18, 2005. On March 1, 2005, both parties filed Motions for Summary Judgment, which have been briefed by the parties. The instant Motions are therefore ripe for disposition.

*STANDARD OF REVIEW:*

Summary judgment is appropriate if "there is no genuine issue as to any material fact

and … the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56*©); *see also Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir.1990)*. The party moving for summary judgment bears the burden of showing "there is no genuine issue for trial." *Young v. Quinlan, 960 F.2d 351, 357 (3d Cir.1992)*. Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences which a fact finder could draw from them. *Peterson v. Lehigh Valley Dist. Council, 676 F.2d 81, 84 (3d Cir.1982)*.

Initially, the moving party has a burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corporation v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)*. This may be met by the moving party pointing out to the court that there is an absence of evidence to support an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325.

 *2* Federal Rule of Civil Procedure 56 provides that, where such a motion is made and properly supported, the non-moving party must then show by affidavits, pleadings, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue for trial. *Fed. R. Civ. P. 56(e)*. The United States Supreme Court has commented that this requirement is tantamount to the non-moving party making a sufficient showing as to the essential elements of their case that a reasonable jury could find in its favor. *Celotex Corp., 477 U.S. at 322-23*.

It is important to note that "the non-moving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact." *Pastore v. Bell Tel. Co. of Pa., 24 F.3d 508, 511 (3d Cir.1994)* (citation omitted). However, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc. ., 974 F.2d 1358, 1363 (3d Cir.1992)*, *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993) (citations omitted).

Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)* (emphasis in original). "As to materiality, the substantive law will identify which facts are material." *Id.* at 248. A dispute is considered to be genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

*STATEMENT OF RELEVANT FACTS:*

We initially note that we will, where necessary, view the facts and all inferences to be drawn therefrom, in the light most favorable to the nonmoving party in our analysis of the pending motions.

As of May 2, 2000, Plaintiff was an employee of Litton and was eligible to participate in the Plan. On or about May 2, 2000, Plaintiff was involved in a motor vehicle accident that caused or aggravated the following conditions: fibromyalgia, degenerative joint disease, back and neck muscle spasms, bursitis, chronic pain, including migraine headaches, and depression secondary to the chronic pain. Following the applicable elimination period, Plaintiff began receiving long-term disability benefits in the amount of $1098 .23 per month on or about November 2, 2000. By letter dated April 4, 2002, the Plan's administrative agent, Metropolitan Life Insurance Company ("MetLife") informed Plaintiff that the first 24-months of disability would end on November 1, 2002, and that MetLife would begin reviewing her claim for long-term disability ("LTD") benefits based upon whether she was precluded from performing "any job for which [she was] reasonably qualified based on [her] training, education and experience." (Defs.' SMF at ¶ 10).

 *3* By letter dated February 24, 2003, MetLife informed Plaintiff that her benefits ceased as of November 1, 2002 because her claim did not meet the criteria for continued benefits under the Plan. The letter advised Plaintiff that she had 180 days after receipt of the denial letter to file an appeal for the termination of her benefits. By letter addressed to MetLife and dated August 1, 2003, Plaintiff's attorney appealed the

denial of Plaintiff's claim. MetLife sent Plaintiff a letter on August 6, 2003, advising her that MetLife would rule on her appeal within 45 days of its receipt of the appeal, taking an additional 45 days if there were special circumstances requiring additional time for MetLife to complete the review, and if MetLife notified Plaintiff of the special circumstances in writing. By e-mail dated November 12, 2003, in response to a status inquiry, MetLife informed Plaintiff's attorney that its appeals unit determined Plaintiff's claim should be reinstated. The November 12, 2003 e-mail read as follows:

Our appeals unit determined that Ms. Ott's long-term disability claim was to be reinstated. As the disability carrier changed effective July 1, 2003 to Unum Provident, it was sent to them to reinstate as this is an advise to pay group it would need to go to the new carrier. I sent the file September 17, 2003. Per your voice mail advising that they have not received it, I have requested the file be printed again. I will FedEx this to them so that we have a way of tracking this. If you have further questions, please contact me. Rhonda Sangonette.

*See* Rec. Doc. 22, Ex. Q.

By e-mail dated January 14, 2004, Unum informed Plaintiff's attorney that review of Plaintiff's claim was continuing. Unum further informed Plaintiff's attorney that it would begin issuing LTD benefits as of January 1, 2004, and continue to pay benefits until Unum made a final determination on Plaintiff's claim. The e-mail addressed to Plaintiff's attorney reads, in pertinent part, as follows:

Until we have made a final determination on [Jeanette Ott's] eligibility for benefits, we will begin issuing benefits effective 1/1/04 and continue the monthly benefit until a final determination has been made. This payment or any possible future payments, until we advise you otherwise, are being made under Reservation of Rights. This means that payment cannot be construed as an admission of present or future liability, and we reserve the right to enforce any and all provisions of the plan.

*See* Rec. Doc. 23, Ex. S.

Plaintiff states that as time passed and no final decision from Unum on the appeal was forthcoming, Plaintiff filed the instant action on April 8, 2004. Thereafter, on June 22, 2004, Unum issued a letter stating that Plaintiff's appeal was denied and her benefits were being terminated. Unum found Plaintiff to be ineligible for benefits beyond November 2, 2002. Additionally, the letter explains that Plaintiff failed to provide information sufficient to support the conclusion that she was unable to perform all sedentary jobs. Plaintiff characterizes the appeal denial as a denial on the basis of reports of two physicians who had never examined or even spoke to Plaintiff, and a rejection of the opinions of Plaintiff's family physician, her psychiatrist, and her orthopedist, to the effect that Plaintiff was incapable of any sort of work. Plaintiff also submits that the denial rejected the diagnoses of Plaintiff's neurologist, rheumatologist, and pain management specialist.

*DISCUSSION:*

**\*4** In her Motion for Summary Judgment, Plaintiff argues that Defendants' failure to decide her appeal from the termination of her disability claim in the time limits established by ERISA and Defendants' own policies allows the Court to review Plaintiff's disability status *de novo*. Plaintiff contends that the undisputed facts establish that the Plan Administrator violated Plaintiff's rights under ERISA by illegally delaying its decision on Plaintiff's appeal from the termination of her LTD benefits. (Pl.'s Mot. Summ. J. at ¶ 2). Plaintiff asserts that having been advised that, following her appeal, her claim was reinstated, Defendants are estopped from denying her appeal. *Id.* at ¶ 3. Moreover, Plaintiff submits that the undisputed facts indicate that the Plan Administrator abused its discretion in terminating Plaintiff's disability benefits, in that she is incapable of performing any gainful work. *Id.* at ¶ 4.

Defendants counter by arguing in their Motion for Summary Judgment that there is no material issue of disputed fact on the question of whether Plaintiff is entitled to LTD benefits after November 2, 2002, under the terms of the Plan. (Defs.' Mot. Summ. J. at ¶ 3). Additionally, Defendants assert that an action to recover plan benefits under ERISA should be judicially reviewed under an arbitrary and capricious standard when,

as in this case, the Plan expressly reserves discretionary authority to determine eligibility for benefits or to construe the terms of the Plan to the Plan Administrator, and the Plan provides its Administrator with authority to delegate its duties. Defendants assert that Unum's decision that Plaintiff was not entitled to LTD benefits on or after November 2, 2002 was not arbitrary and capricious.

A. *Applicable Standard of Review*

Under ERISA, a court reviewing an administrator's decision to deny benefits is by default reviewed *de novo,* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine the employee's eligibility or construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Stratton v. E.I. DuPont De Nemours & Co.,* 363 F.3d 250, 253 (3d Cir.2004). If a plan provides discretionary authority to the administrator or fiduciary, then a reviewing court applies a form of arbitrary and capricious review. *Firestone Tire & Rubber Co.,* 489 U.S. at 111-12, 115; *see Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 437 (3d Cir.1997). Discretionary authority can be provided for by express or implied language in the benefit plan. *Luby v. Teamsters Health, Welfare, & Pension Trust,* 944 F.2d 1176, 1180 (3d Cir.1991). Whether that arbitrary and capricious review is heightened in any way depends on the presence of potentially conflicted ERISA fiduciaries and is determined on a sliding scale that we will discuss in further detail below. *Pinto v. Reliance Standard Life Ins. Co.,* 214 F.3d 377, 379 (3d Cir.2000).

*\*5* The scope of discovery depends upon the standard of review. In the Third Circuit, "a district court exercising de novo review over an ERISA determination between beneficiary claimants is not limited to the evidence before the Fund's Administrator." *Luby,* 944 F.2d at 1184-85. In sharp contrast, the record available to a court conducting an arbitrary and capricious review is the record made before the plan administrator, which cannot be supplemented during litigation. *See Kosiba v. Merck & Co.,* 384 F.3d 58, 67 n. 5 (3d Cir.2004)(*citing Mitchell,* 113 F.3d at 440). Nevertheless, when a reviewing court is deciding whether to employ the arbitrary and capricious standard or a more heightened standard of review, it may consider evidence of potential biases and conflicts of interest that are not found in the administrator's record. *Id.*

I. *Arbitrary & Capricious Review*

As we previously explained, under ERISA, a court reviewing an administrator's decision to deny benefits is by default conducting an analysis *de novo,* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine the employee's eligibility or construe the terms of the plan." *Firestone Tire & Rubber Co.,* 489 U.S. at 115; *Stratton,* 363 F.3d at 253. Additionally, if a plan provides discretionary authority to the administrator or fiduciary, then a reviewing court applies a form of arbitrary and capricious review. *Firestone Tire & Rubber Co.,* 489 U.S. at 111-12, 115; *see Mitchell,* 113 F.3d at 437.

To determine the proper standard of review, we must begin with the language of the Plan. In this case, as Defendants submit, the Plan expressly provides the Plan Administrator with discretionary authority to interpret the Plan and to decide any and all matters arising from the Plan. Moreover, the Plan provides its Administrator with authority to delegate its duties.

The Plan states, in pertinent part, as follows:

The Plan is administered by the Plan Administrator, a named Fiduciary under the Plan. The Plan Administrator acts in the sole interest of the Plan participants and their beneficiaries.

The Plan Administrator has the discretion to interpret the Plan and to decide any and all matters arising from the Plan. The Plan Administrator has delegated Metropolitan Life Insurance Company to have sole power and duty to review and determine claims filed under the Plan and the power and duty to process all claims and appeals and to provide other administrative services.

*See* Rec. Doc. 22, Ex. A (emphasis added). In the case *sub judice,* the Plan Administrator first delegated its authority to MetLife and as of July 1, 2003, Unum became the Plan Administrator. On the basis of the Plan's plain language, we conclude

that the Plan provided the Plan Administrator with the authority to make decisions with respect to eligibility. Accordingly, we will review the decision regarding Plaintiff's claim for LTD benefits under the arbitrary and capricious standard of review on the basis of the administrative record before Unum at the time of the decision to deny Plaintiff's claim. *See Kosiba, 384 F.3d at 67 n. 5 (citing Mitchell, 113 F.3d at 440).*

 *6 Plaintiff argues that Defendants' failure to decide her appeal from the termination of her disability claim within the time limits established by ERISA and Defendants' own policies allows the Court to review Plaintiff's disability status *de novo*. We disagree for the reasons that follow and find the cases cited by Plaintiff in support thereof to be factually distinguishable from this case.

The only precedential decision cited by Plaintiff in support of her contention that a *de novo* standard of review should be employed is *Gritzer v. TBS, Inc., 275 F.3d 291 (3d Cir.2002)*. In *Gritzer,* the Third Circuit Court of Appeals explained that it was called upon "to determine the appropriate standard of review where a pension plan allows for discretion but discretion is not exercised." *Id.* at 293. After several unsuccessful inquiries, appellants filed a claim letter with the plan administrator to which the administrator failed to respond within 90 days. An important distinguishing factor between *Gritzer* and this case is that in *Gritzer,* appellants' claim was thereby "deemed denied." *Id.* at 294. Based on that denial, appellants filed suit. "Nearly five months later, Westinghouse finally responded to appellants' claim and denied it on the merits for essentially the same reasons that Westinghouse invokes here." *Id.* The Third Circuit Court of Appeals explained that there was no analysis or reasoning to which the trial court could have deferred under the arbitrary and capricious standard, as on the basis of the applicable plan, the appeal was "deemed denied" after the plan administrator failed to respond within 90 days. *Id.* at 294. The Third Circuit emphasized that had discretion in fact been exercised in the course of denying benefits, the applicable standard would have been arbitrary and capricious; however, it reviewed the denial of benefits *de novo* based upon "the trustee's failure to act or to exercise his or her discretion." *Id.* at 296.

Stated differently, as the Ninth Circuit Court of Appeals explained in another case cited by Plaintiff in support of her assertion that *de novo* review is warranted, *Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Protection Plan, 349 F.3d 1098* (9th Cir.2003), the Third Circuit applied *de novo* review to the plan in *Gritzer* that otherwise granted discretion to the administration because under the plan the employee pension claim was deemed denied. *Id. at 1106.* Although courts of appeal have split on the question of whether a "deemed denied" claim is always entitled to *de novo* review, a majority of circuits have held that, absent substantial compliance with the deadlines, *de novo* review applies on the ground that inaction is not a valid exercise of expertise upon which to defer. *See Nichols v. Prudential Ins. Co. of America, 406 F.3d 98, 2005 WL 913762, *8* (2nd Cir.2005); *see, e.g., Jebian, 349 F.3d at 1106-7; Gilbertson v. Allied Signal, Inc., 328 F.3d 625, 632-33* (10th Cir.2003); *Gritzer, 275 F.3d at 295.*

 *7 Thus, the above-referenced cases are factually distinguishable from the case *sub judice,* as they are cases in which the claim at issue was "deemed denied." In this case, no claim was "deemed denied" either pursuant to applicable ERISA regulations or pursuant to the Plan. Importantly, and as submitted by Defendants, the Secretary of Labor amended the applicable ERISA regulations in 2000. The pertinent regulation, 29 C.F.R. § 2560, first promulgated in 1977, was amended in 2000 such that language stating that a claim is deemed denied on review if a claimant did not receive written notice within the relevant time period, was removed. *See Pension and Welfare Benefits Administration, 65 Fed.Reg. 70246, 70265, 70268-69 (Nov. 21, 2000); see also Jebian,* 349 F.3d at 1193, n. 5. Excised from the new regulation is the provision that transgressions of time limitations will result in the claim being "deemed denied." *See 29 C.F.R. § 2560.503-1(h) (2002); see also Jebian,* 349 F.3d at 1193, n. 5.

The 2000 amendments apply to claims filed on or after January 1, 2002. 29 C.F.R. § 2560.503-1(i)(3)(i) (2002). In this case, as we previously explained, Plaintiff began receiving LTD benefits on or about November 2, 2000. By letter dated February 24,

2003, MetLife informed Plaintiff that her benefits ceased as of November 1, 2002 because her claim did not meet the criteria for continued benefits under the Plan. By letter addressed to MetLife and dated August 1, 2003, Plaintiff's attorney appealed the denial of Plaintiff's claim. Accordingly, Plaintiff's claim for continued LTD benefits arose after the January 1, 2002 effective date of the 2000 ERISA amendments and the applicable regulations did not render Plaintiff's claim denied before Unum issued its June 24, 2004 decision. It is also important to note that unlike the plan in *Jebian,* the Plan at issue does not contain a provision that renders a claim "deemed denied" or effectively denied if the Plan Administrator fails to comply with the applicable time limitations. (*See* Rec. Doc. 22, Ex. A).

We therefore find the cases cited by Plaintiff in support of her argument, that Defendants' failure to decide Plaintiff's appeal from the termination of her disability claim in the time limits established by ERISA and Defendants' own policies allows the court to review her disability claim *de novo,* to be factually distinguishable. Accordingly, a *de novo* standard of review is not warranted in this case. As we previous explained, we will review the decision regarding Plaintiff's claim for LTD benefits under the arbitrary and capricious standard of review on the basis of the administrative record before Unum at the time of the decision to deny Plaintiff's claim. *See Kosiba,* 384 F.3d at 67 n. 5 (*citing Mitchell,* 113 F.3d at 440).

a. *"Arbitrary & Capricious" versus "Heightened Arbitrary & Capricious" Review*
Our consideration of the proper standard of review does not end with the foregoing analysis, but warrants further review for the reasons that follow. In *Pinto v. Reliance Standard Life Ins. Co.,* 214 F.3d 377 (3d Cir.2000), the Third Circuit Court of Appeals held that in reviewing an ERISA plan fiduciary's discretionary determination regarding benefits, a court must take into account the existence of the structural conflict of interest present when a financially interested entity also makes benefit determinations. *See Kosiba,* 384 F.3d at 64. In *Pinto,* the Third Circuit adopted a "sliding scale" approach, in which the district courts must "consider the nature and degree of apparent conflicts with a view to shaping their arbitrary and capricious review of the benefit determinations of discretionary decisionmakers ." *Id.* (*citing Pinto,* 214 F.3d at 393). The afore-mentioned "sliding scale method" "intensifies the degree of scrutiny to match the degree of conflict." *Id.* at 379.

*8 As the Third Circuit recently explained in *Kosiba,* Pinto offered a nonexclusive list of factors to consider in assessing whether a structural conflict of interest warranting heightened review exists. The factors a court considers in determining the degree of scrutiny to afford the administrator in the determination to terminate benefits include: "(1) the sophistication of the parties; (2) the information accessible to the parties; (3) the exact financial arrangement between the insurer and the company; and (4) the status of the fiduciary, as the company's financial or structural deterioration might negatively impact the 'presumed desire to maintain employee satisfaction." ' *Stratton,* 363 F.3d at 254 (*citing Pinto,* 214 F.3d at 392). In *Pinto* itself, the Third Circuit concluded that "heightened arbitrary and capricious review" or review "on the far end of the arbitrary and capricious 'range' ' was appropriate because Pinto's insurer both made benefits determinations and funded the benefits, and because of various procedural anomalies that tended to suggest that "whenever it was at a crossroads, [the insurer defendant] chose the decision disfavorable to Pinto." *Pinto,* 214 F.3d at 393-4.

Accordingly, under *Pinto,* a conflict of interest is presumed when an insurance company both determines eligibility for benefits and pays out those benefits from its own funds, because there exists an "active incentive to deny close claims in order to keep costs down and keep themselves competitive so that companies will choose to use them as their insurers." *Id.* at 388. [FN1]

FN1. We note that although Plaintiff argues that Unum's decision lacked impartiality in reviewing Plaintiff's disability claim and cites to *Hines v. Unum Life Ins. Co. of America,* 110 F.Supp.2d 458 (W.D.Va.2000), in

support thereof without further elaboration, Defendants assert that no evidence of partiality exists in this case. In *Hines,* Plaintiff insured sued Defendant insurer alleging that Defendant wrongfully denied her disability benefits initially, and wrongfully refused thereafter to fully and fairly review her claim in upholding the previous denial. Defendant maintained that Plaintiff's condition did not meet the policy's definitional preconditions for "total disability." The court reviewed the record under the modified abuse of discretion standard because Defendant was both the insurer and the administrator. *Id.* at 462.

In this case, as Defendants submit, Unum acts only as a third-party administrator, the employer retains final decision-making authority, and the employer uses its own funds to pay benefits. (*See* Rec. Doc. 22, Ex. L, at Section 3.7 and Addendum-i). We therefore do not find evidence of partiality or a conflict of interest of the type which the Third Circuit identified in *Pinto,* when an insurance company both determines eligibility for benefits and pays out those benefits from its own funds.

The Third Circuit instructed in *Kosiba* that structural conflicts of interest present when a financially interested entity also makes benefit determinations is not the only cause for heightened review. "Our precedents establish at least one more cause for heightened review: demonstrated procedural irregularity, bias, or unfairness in the review of the claimant's application for benefits." *Kosiba,* 384 F.3d at 66. "The Pinto panel's decision to apply heightened review turned almost as much on the procedures afforded to Pinto as it did on her insurer's financial conflict of interest." *Id.; see Pinto,* 214 F.3d at 393 ("Looking at the final decision, we see a selectivity that appears self-serving in the administrator's use of [one doctor's] expertise."); *Id.* ("inconsistent treatment of the same facts"); *Id.* at 394 (suggesting that "whenever it was at a crossroads, Reliance Standard chose the decision disfavorable to Pinto").

We will apply a moderately heightened arbitrary and capricious review to the Plan Administrator's decision based on Defendants' clear procedural violations of both applicable ERISA regulations and the Plan at issue by not providing a decision on Plaintiff's appeal until June 22, 2004 and for the reasons that follow.

It is important to initially set forth the backdrop of the applicable ERISA regulations regarding appealing adverse benefit determinations, as well as the Plan's provision governing appeals of denied claims. First, 29 C.F.R. § 2560.503-1 "Claims Procedure" provides, in pertinent part, as follows:

*\*9* In accordance with the authority of sections 503 and 505 of the Employee Retirement Income Security Act of 1974 (ERISA or the Act), 29 U.S.C. 1133, 1135, this section sets forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries (hereinafter referred to as claimants).

29 C.F.R. § 2560.503-1(a). In addition, as Plaintiff points out, § 2560.503-1(h), "Appeal of Adverse Benefit Determinations," provides within the "Disability Claims" section that the Plan Administrator shall notify a claimant of the plan's benefit determination on review within a reasonable period of time, "but not later than 45 days after receipt of the claimant's request for review by the plan, unless the plan administrator determines that special circumstances (such as the need to hold a hearing, if the plan's procedures provide for a hearing) require an extension of time for processing the claim." *See* 29 C.F.R. § 2560.503-1(h); 29 C.F.R. § 2560.503-1(f)(3), 29 C.R.F. § 2560.503-1(i)(3). If the Plan Administrator determines that an extension of time for processing is required, written notice of the extension shall be furnished to the claimant prior to the determination of the initial 45 day period. In no event shall such extension exceed a

period of 45 days from the end of the initial period. The extension notice shall indicate the special circumstances requiring an extension of time and the date by which the plan expects to render the determination on review. *See id.*

Second, the Plan at issue provides, in pertinent part, as follows:

Appeal of Denial of Claims

The Participant or beneficiary whose claim for benefits is denied by the Claims Administrator may appeal the decision denying the claim to the Claims Administrator within ninety (90) days of the receipt of such decision.

The appeal shall be addressed to the Claims Administrator in writing and shall state the reasons why he should grant the appeal. The Claims Administrator shall conduct a full and fair review of the claim and will issue his decision within sixty (60) days of receipt of the appeal unless there are special circumstances, in which case a decision will be rendered within 120 days of receipt of appeal. The Claims Administrator's decision upon appeal shall be final, conclusive and binding on all parties.

*See* Rec. Doc. 22, Ex. A, Section E at 16.

In the case *sub judice,* Plaintiff filed a timely appeal with MetLife on August 1, 2003. On August 6, 2003, Plaintiff's counsel received a letter from MetLife, which stated, in pertinent part, as follows:

We will evaluate the documentation and advise you in writing within 45 days of our determination. If there are special circumstances requiring additional time to complete our review, we may take up to an additional 45 days, but only after notifying you of the special circumstances in writing.

*See* Rec. Doc. 22, Ex. N; *see also* Defs.' SMF at ¶ 22. Within 45 days of August 6, 2003, neither Plaintiff, nor her attorney, were advised in writing of the determination. Moreover, neither Plaintiff, nor her attorney, were sent any explanation of special circumstances requiring more time.

***10** The first response Plaintiff received regarding her appeal consisted of an e-mail from Rhonda Sangonette of MetLife, which was sent on November 12, 2003, nearly 100 days after the afore-mentioned August 6, 2003 letter. (*See* Defs.' SMF at ¶ 25; *see also* Rec. Doc. 22, Ex. Q). To reiterate, the November 12, 2003 e-mail reads, as follows:

Our appeals unit determined that Ms. Ott's long-term disability claim was to be reinstated. As the disability carrier changed effective 7/1/03 to UNUM Provident, it was sent to them to reinstate as this is an advise to pay group it would need to go to the new carrier. I sent the file 9/17/03. Per your voicemail advising that they have not received it I have requested the file be printed again. I will fed ex this to them, so that we have a way of tracking this. If you have further questions please contact me.

*Id.* This provided Plaintiff with the justifiable impression that her claim had been "reinstated," and subsequently by e-mail dated January 14, 2004, Unum informed Plaintiff's attorney that review of Plaintiff's claim was continuing. [FN2] Unum further informed Plaintiff's attorney that it would begin issuing LTD benefits as of January 1, 2004, and continue to pay benefits until Unum made a final determination on Plaintiff's claim. It is appropriate to restate the substance of the January 14, 2004 e-mail addressed to Plaintiff's attorney, which reads in pertinent part as follows:

> FN2. We note that documentation submitted by Defendants reveals that MetLife retained the ability to review appeals pending at the time Unum became the Plan Administrator effective July 1, 2003. (Becker Second Aff. at ¶¶ 2-3). Once MetLife's review of an appeal concluded, it had to forward the claim file to Unum with a recommendation. *Id.* at ¶ 4. Unum received Plaintiff's claim file from MetLife with an "advise to pay," which means that MetLife recommended Unum reinstate payment of benefits to Plaintiff. *Id.* at ¶¶ 5-6. Under the terms of the Plan, Unum retained decision-making authority to review a claim upon receiving a recommendation from MetLife and Unum was not bound by any recommendation it received from MetLife. *Id.* at ¶¶ 7-8.

Until we have made a final determination on [Jeanette Ott's] eligibility for benefits, we will begin issuing benefits effective 1/1/04 and continue the monthly benefit until a final determination has been made. This payment or any possible future payments, until we advise you otherwise, are being made under Reservation of Rights. This means that payment cannot be construed as an admission of present or future liability, and we reserve the right to enforce any and all provisions of the plan.

*See* Rec. Doc. 23, Ex. S.

Plaintiff states that as time passed and no final decision from Unum on the appeal was forthcoming, Plaintiff filed the instant action on April 8, 2004. Thereafter, on June 22, 2004, nearly one year after Plaintiff filed the instant appeal, Unum issued a letter stating that Plaintiff's appeal was denied and that her benefits were being terminated. (*See* Rec. Doc. 23, Ex. AA). Unum's determination found Plaintiff to be ineligible for benefits beyond November 2, 2002.

Although Unum's June 22, 2004 letter ultimately denying Plaintiff's claim for LTD benefits provided reasons for the denial, Defendants committed clear procedural violations of the applicable ERISA regulations and the Plan at issue by not providing a decision on Plaintiff's appeal until June 22, 2004. By not issuing a decision on Plaintiff's LTD benefits until nearly one year had passed from the time of her appeal, Unum violated the following applicable provisions. First, Unum violated ERISA provisions requiring plan administrators to notify claimants of the plan's benefit determination on review within a reasonable period of time, but not later than 45 days after receipt of the claimant's request for review by the plan, unless the plan administrator determines that special circumstances, such as the need to hold a hearing, require an extension of time for processing the claim. *See* 29 C.F.R. § 2560.503-1(h); 29 C.F.R. § 2560.503-1(f)(3), 29 C.R.F. § 2560.503-1(i)(3). Second, Unum violated the provision of the Plan at issue that states that the claims administrator shall conduct a full and fair review of the claim and will issue a decision within 60 days of receipt of the appeal unless there are special circumstances, in which case a decision will be rendered within 120 days of receipt of appeal. *See* Rec. Doc. 22, Ex. A, Section E at 16.

*\*11* Clear procedural violations of the foregoing provisions and the procedural irregularities as noted require that we apply a moderately heightened arbitrary and capricious review to the Plan Administrator's decision in the case *sub judice*. *See Kosiba*, 384 F.3d 58, 66 (3d Cir.2004). [FN3]

> FN3. Defendants assert that Unum substantially complied with applicable ERISA regulations in that it provided a proper, detailed notification of the denial of benefits, the reasons therefor, and the avenue by which Plaintiff may seek review of the decision. Defendants maintain that any failure on the part of MetLife to properly communicate to Plaintiff during the transition of her file to Unum cannot be attributable to Defendants because MetLife is not a defendant in this case. (*See* Defs.' Br. Opp. Pl.'s Mot. Summ. J. at 8-10).

> We need not reach Defendants' substantial compliance argument as we have determined that Defendants' procedural violations and irregularities require that we apply a moderately heightened arbitrary and capricious standard of review.

The Third Circuit Court of Appeals has instructed that in reviewing a denial of benefits under the "arbitrary and capricious" standard, a plan administrator's decision will be overturned only if it is "clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." *Orvosh v.*

*Program of Group Ins. for Salaried Employees of Volkswagen of Am.,* 222 F.3d 123, 129 (3d Cir.2000)(*quoting Abnathya v. Hoffman-La Roche, Inc.,* 2 F.3d 40, 41 (3d Cir.1993)). The Third Circuit has recently instructed that a court should affirm the plan administrator's determination as long as it is supported by substantial evidence in the record, even if the record also contains substantial evidence that would support a different result. *Johnson v. UMWA Health and Retirement Funds,* 2005 U.S.App. LEXIS 2115, *8 (3d Cir.2005). "[A] court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." *Orvosh,* 222 F.3d at 129 (internal quotations omitted). Furthermore, "whether a claim decision is arbitrary and capricious requires a determination 'whether there was a reasonable basis for [the administrator's] decision, based upon the facts as known by the administrator at the time the decision was made." ' *Bader v. RHI Refractories America, Inc.,* 111 Fed. Appx. 117, 120-21 (3d Cir.2004)(*quoting Jett v. Blue Cross & Blue Shield of Ala., Inc.,* 890 F.2d 1137, 1139 (11th Cir.1989)).

Moreover, in applying the heightened arbitrary and capricious standard of review, the Third Circuit Court of Appeals has stated that courts should look not only at the result-- whether it is supported by reason--but at the process by which the result is achieved. *Sweeney v. Std. Ins. Co.,* 276 F.Supp.2d 388, 394 (E.D.Pa.2003)(*quoting Pinto,* 214 F.3d at 393). "A court should intensify the level of scrutiny it applies to an insurer's decision if they are any procedural irregularities in the decision-making process." *Id.* at 394.

B. *Denial of Benefits*

Unum's June 24, 2004 denial of benefits letter provided three bases for the denial of her claim for LTD benefits; however, only one such base for denial is at issue in this case; namely, that the medical information indicates that Plaintiff has the capacity and skills to perform another occupation. [FN4] (*See* Rec. Doc. 23, Ex. AA).

> FN4. First, it appears undisputed by the parties that Plaintiff exhausted her 24-month entitlement to benefits premised on a Mental and
>
> Nervous Disorder or Disease by November 2, 2002, which was a basis for denial of her LTD benefits. Second, the Plan requires that Plaintiff be under the regular and appropriate care of a qualified physician; however, Unum's letter stated that according to the medical records on file, Plaintiff was not under the regular care since July 2003. A March 24, 2005 submission to the Court from defense counsel states that Plaintiff supplied as an attachment to her Statement of Undisputed Material Facts a copy of a medical report from treatment she underwent in February 2004 and that this was part of Unum's claim file at the time of the June 24, 2004 decision. In light of this discrepancy, Defendants notified the Court and Plaintiff that they abandoned as a cause for the denial of benefits Plaintiff's failure to remain under the regular care of a physician.

i. *The Plan*

In determining whether the Plan Administrator's decision to deny Plaintiff LTD benefits was arbitrary and capricious, we begin with the Plan itself, since an ERISA plan administrator must "discharge his duties with respect to a plan ... in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]." *Mitchell,* 113 F.3d at 439; *see* 29 U.S.C. § 1104(a)(1)(D).

*12 The standard of disability under the Plan transitions after two years of benefit payments, which Plaintiff undisputedly received, from inability to perform one's regular occupation to the following definition of "total disability:"

[C]omplete inability of the Participant to perform any and every duty of any gainful

occupation for which he is reasonably fitted by training, education or experience. *See* Rec. Doc. 22, Ex. A. LTD benefits are not automatic and a claimant bears the burden of demonstrating that he/she qualifies for benefits. Therefore, the Plan at issue required that Plaintiff show that as of November 2, 2002, two years after she received LTD disability payments under the Plan's initial definition of "total disability," that she was completely unable to perform any and every duty of any gainful occupation for which she was reasonably fitted by training, education or experience.

ii. *Plaintiff's Record Support*

To determine whether Plaintiff carried her burden, we look to the record as a whole. *See* Mitchell, 113 F.3d at 440. As we previously explained, under the arbitrary and capricious standard of review, the "whole" record consists of that evidence that was before the administrator when he made the decision being reviewed. [FN5] *Id.; see also* Luby, 944 F.2d at 1184, n. 8.

> FN5. Defendants accurately submit that as Plaintiff's favorable
>
> outcome to her claim for Social Security Disability Insurance ("SSDI") benefits was issued on July 8, 2004, after Unum issued its June 24, 2004 decision, and was therefore not before the Plan Administrator at the time the decision was made to deny Plaintiff LTD benefits, the Court is unable to consider the SSDI decision pursuant to the arbitrary and capricious standard of review.

Plaintiff presented medical evidence in the form of letters from treating doctors, a fibromyalgia questionnaire, medical records, an MRI report, and two residual physical functional capacity assessments ("FCEs") performed by Dr. Ellis, Plaintiff's primary care physician, which she alleges demonstrate that she suffers from migraine headaches, fibromyalgia, problems in her cervical and lumbar spine, as well as depression. Plaintiff also has "moderately severe obstructive sleep apnea." Plaintiff supported her claim of disability with documentation from the following treating doctors: Dr. Calvert, her psychiatrist; Dr. Ellis, her primary care physician; Dr. DiSimone, her orthopedist; Dr. Olinsky, her neurologist; Dr. Rigal, her pain management specialist; Dr. Tuffaha, her neurosurgeon; Dr. Shenberger; her rheumatologist; and a physician assistant to Dr. Georgy, Theresa Sander.

a. *Migraine Headaches & Back Problems*

While Plaintiff did present evidence in support of her migraine headache diagnosis to MetLife, which was ultimately forwarded to the Defendants to review, including but not limited to documentation from Dr. Olinsky and Dr. Rigal, we do not find that the Defendants' decision to deny LTD benefits on that basis was arbitrary and capricious. We will now address Plaintiff's back condition. We initially note that within the letter denying Plaintiff LTD benefits, the Defendants stated that there is "no medical information to support your back condition or the severity of any other physical impairment such that would preclude you from performing full time sedentary work ... You do appear to have ongoing low back pain however; this could be treated with NSAID's, home exercises, occasional physical therapy and, periodic injections as needed. Reasonable restrictions and limitations would be: no lifting greater than 20 lbs, no prolonged standing/walking, no repetitive climbing, no repetitive or prolonged bending/stopping/twisting, and no repetitive or prolonged squatting/kneeling. Additionally, you should be permitted to change positions periodically." (*See* Rec. Doc. 23, Ex. AA).

*\*13* In support of Plaintiff's claim of LTD disability relating to problems in her cervical and lumbar spine, Plaintiff points to an x-ray taken on January 31, 2002 that reflects the following: "An altered curvature of the cervical spine and straightening and even mild reversal of the cervical lordosis. Minimal disc space narrowing at C4-C5. No

significant change when compared to 5/5/00." (*See* Rec. Doc. 26, Appendix pg. 28). Second, Plaintiff directs the Court to an MRI of her spine that reflects the following: "Signal loss consistent with early disc degeneration at L4-5. Disc herniation is not seen. There appears to be a foraminal compromise on the left at L5-S1, better demonstrated on the axial scans, relating to facet hypertrophic change, potentially compressing the S1 root. Minimal associated disc bulge at this level. No evidence of disc herniation or significant foraminal narrowing at more cephalad levels." *Id.* at pg. 41. Additionally, we do note that in a report dated July 16, 2003, Dr. Rigal provided diagnoses of (1) lumbar spondylosis, particularly L4-5 and L5-S1; (2) L5-S1 foramital stenosis; (3) left S1 radiculopathy; (4) multiple somatic complaints; and (5) chronic depression.

After having carefully reviewed Plaintiff's medical records relating to problems in her cervical and lumbar spine that were before the Plan Administrator when the decision at issue was made, we find that Defendants' denial of LTD benefits on this basis was not arbitrary and capricious. While it is apparent to the Court that Plaintiff continues to suffer from pain associated with her low back, we are in agreement with Defendants' conclusion that this pain can be decreased with treatment, including but not limited to home exercises, periodic injections, and physical therapy, if necessary. Medical records submitted from Dr. Rene R. Rigal, of the Pain Management Center at Susquehanna Health System, reveal that the trigger point injections provide significant pain relief to Plaintiff in the cervical and intrascapular region. Moreover, Plaintiff herself corroborates this by stating that a January 15, 2001 visit with Dr. Rigal "reflected a significant improvement in Plaintiff's pain due to the injection." (*See* Rec. Doc. 26, Pl.'s Statement of Undisputed Facts in Supp. Mot. Summ. J, at ¶ 9).

b. *Fibromyalgia*

We will now address Plaintiff's contention that she is entitled to LTD benefits as she is disabled due to fibromyalgia. We initially note that in the letter denying Plaintiff LTD benefits, Defendants stated the following regarding fibromyalgia: "When he [Dr. Ellis] provided a diagnosis of Fibromyalgia we found no information for review which indicates that he arrived at this diagnosis, per protocol by exclusion….Our medical department reviewed the information on file and determined that there is no medical information to support your back condition or the severity of any other physical impairment such that would preclude you from performing full time sedentary work. Since November 2002, there is no evidence to support that you are disabled due to Fibromyalgia. They noted that while Fibromyalgia has been provided as a diagnosis the file lacks an examination by which the diagnosis is typically made." (*See* Rec. Doc. 23, Ex. AA).

*\*14* In support of her claim that she is disabled due to fibromyalgia, Plaintiff asserts that in addition to her primary care physician who diagnosed her with fibromyalgia, Dr. Ellis, three specialists reached the same conclusion. Dr. Ellis' fibromyalgia diagnosis has been confirmed by Dr. Shenburger, Plaintiff's rheumatologist, Dr. Rigal, Plaintiff's pain management specialist, and Dr. Olinsky, Plaintiff's neurologist. In addition, Plaintiff argues that although Dr. Rigal treats the condition with trigger points, Plaintiff's medical records reflect that the treatment is only successful for a limited period of time. Plaintiff maintains that the denial of her appeal for LTD benefits on the basis of reports from two physicians who had never examined or even spoke to Plaintiff and who rejected the opinions of Plaintiff's family physician, psychiatrist, orthopedist to the effect that she was incapable of any sort of work, combined with the rejection of diagnoses of her neurologist, rheumatologist, and pain management specialist is arbitrary and capricious. In response, Defendants assert that it did not act arbitrarily and capriciously when it determined Plaintiff was not entitled to LTD benefits on or after November 2, 2002. Defendants argue that Unum conducted a full and fair review of all medical evidence that Plaintiff submitted, provided the medical records to two independent physicians for their review, and completed a vocational analysis based on the records. "In response, Plaintiff questions not the thoroughness of Unum's review nor the qualifications of the independent physicians who reviewed the medical records. Rather, Plaintiff offers only her opinion as to how she believes Unum should interpret her records." (Defs.' Reply Br. at 7).

At this juncture, it is necessary to provide information concerning the disease involving muscle and musculoskeletal pain known as fibromyalgia or fibrositis. As the Plaintiff accurately submits, the following two appellate courts have discussed fibromyalgia in regard to Social Security claims.

Fibromyalgia is a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and--the only symptom that discriminates between it and other diseases of a rheumatic character-- multiple tender spots, more precisely 18 fixed locations on the body … that when pressed firmly cause the patient to flinch.

*Brown v. Cont'l Cas. Co.,* 348 F.Supp.2d 358, 360 (E.D.Pa.2004)(*quoting Sarchet v. Chater,* 78 F.3d 305, 306 (7th Cir.1996) (citations omitted)). Second, the Sixth Circuit Court of Appeals described the disease by referring to medical testimony as follows:

  **\*15** Dr. Crabbs testified at the hearing that he had recently diagnosed Preston's primary impairment as fibrositis, a condition only recognized in the last several years as a disease involving muscle and musculoskeletal pain. As set forth in the two medical journal articles submitted as exhibits by Dr. Crabbs, fibrositis causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to the unremitting pain of which fibrositis patients complain. Physical examinations will usually yield normal results--a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather, it is a process of diagnosis by exclusion and testing of certain 'focal tender points' on the body for acute tenderness which is characteristic in fibrositis patients. The medical literature also indicates that fibrositis patients may have psychological disorders. The disease commonly strikes between the ages of 35 and 60 and affects women nine times more than men.

*Alvarado v. Chater,* 1997 U.S. Dist. LEXIS 903, \*2-3 (E. D.Pa.1997)(*quoting Preston v. Sec. of Health and Human Servs.,* 854 F.2d 815, 817 (6th Cir.1988)(per curiam)). Additionally, several courts have explained that having fibromyalgia can result in being disabled or having a disability that may be severe. *See e.g., Rodriguez v. McGraw-Hill Cos. Long Term Disability Plan,* 297 F.Supp.2d 676, 679 (S.D.N.Y.2004)(fibromyalgia can result in severe disability); *Green-Younger v. Barnhart,* 335 F.3d 99, 108 (2d Cir.2003)(fibromyalgia is a "disabling impairment" that can qualify an individual for disability payments even though "there are no objective tests which can conclusively confirm the disease."); *Sarchet,* 78 F.3d at 306 ("Some people may have such a severe case of fibromyalgia as to be totally disabled from working, Michael Doherty & Drian Jones, 'Fibromyalgia Syndrome (ABC of Rheumatology),' 310 British Med.J. 386 (1995); *Preston v. Secretary of Health & Human Services,* 854 F.2d 815, 818 (6th Cir.1988)(per curiam), but most do not and the question is whether Sarchet is one of the minority.").

With that backdrop, after a detailed and careful review of the record that was before the Plan Administrator at the time the decision to deny Plaintiff's LTD benefits was made, and for the reasons that follow, the Court finds that the assessments of Plaintiff's treating sources established the severity of her fibromyalgia and the limitations that such disease posed on Plaintiff's capacity to engage in substantial gainful employment. The Court further finds that the utilization by Defendants of two physicians who never examined Plaintiff, as Defendants admit, but simply rejected the fibromyalgia diagnosis made by Dr. Ellis, Plaintiff's primary care physician, which was subsequently corroborated by three specialists, Plaintiff's rheumatologist, pain management specialist, and neurologist, was arbitrary and capricious, in the Court's moderately heightened arbitrary and capricious standard of review.

  **\*16** First, we note that Defendants place particular emphasis on the fact that Dr. Ellis completed a FCE in September 2001 which provides that Plaintiff could sit for eight hours during an eight-hour, "competitive workday" on a "continuous basis" and assert that Dr. Ellis's records contain no subsequent FCE that renders the September 2001 FCE

inaccurate. In response, Plaintiff asserts that she did attempt to return to work thereafter, but was unable to get through the workday because of her pain.

The record does not reveal that Dr. Ellis completed a FCE after September 2001, nor does the record reflect that he was requested to perform one despite the fact that one of Defendants' independent physicians, Dr. Michael C. Randall, recommended in his report that if there are conflicts concerning Plaintiff's work capacity, a formal FCE may be helpful. Additionally, Dr. Ellis's medical record of April 17, 2002 and letter to Plaintiff's counsel of July 26, 2003 clearly reveal his medical opinion regarding Plaintiff, after having examined and treated her for a period of time.

First, although defense counsel omitted a critical sentence present in Dr. Ellis's April 17, 2002 medical record in submissions to the Court, the Court will fully quote the pertinent portion of the afore-mentioned medical record, as follows:

Finally, the Otts indicated today that their insurance company is stating that they will discontinue payments on her disability unless Jeanette is certified as permanently disabled. I told them I would be reluctant to declare this condition permanent, but if that is what is necessary for their insurance, we could do so. The Otts themselves have little hope that Jeanette is going to improve. *I must admit that I am not optimistic either, but I would like to avoid the psychologic effect of declaring permanent disability, e.g. essentially saying that Jeanette will never improve.*

*See* Rec. Doc. 26, pg. 31 (emphasis added). Second, Dr. Ellis's letter of July 26, 2003 addressed to Plaintiff's counsel, was written in regards to Plaintiff's request for comments on Defendants' independent physician opinion performed by Tracey Schmidt, M.D., a Medicine and Rheumatology Certified Disability Evaluator, who concluded that Plaintiff's file "appears to lack objective evidence of physical functional capacity impairment from a sedentary position full time" and that "the symptoms appear self reported and more subjective in nature." (*See* Rec. Doc. 23, Ex. J). Dr. Ellis's most recent medical opinion regarding Plaintiff's condition states that Plaintiff has chronic daily pain that "would be worsened by maintaining a regular seated position for any amount of time that would be compatible with full-time employment. I considered this possibility in the past, and even discussed the possibility of a sedentary job with Jeanette at one point. However, given her present functional level, it is my assessment that she could not tolerate prolonged siting, and that her condition would be worsened by this ... I further believe that Jeanette's condition would be worsened by any gainful employment, including a full-time sedentary position." (*See* Rec. Doc. 23, Ex. M).

**\*17** In addition to Dr. Ellis's medical opinion subsequent to his September 2001 FCE, which demonstrates that he became considerably more pessimistic regarding Plaintiff's prognosis, we note that a case arising within the Eastern District of Pennsylvania has explained with regard to functional capacity examinations, that such one-time tests cannot hope to present a true picture of an illness characterized by variable symptoms. *Brown,* 348 F.Supp.2d at 360. "Others have noted the inadequacy of FCEs in determining disability in fibromyalgia cases." *Id.; see also Dorsey v. Provident Life & Accident Ins. Co.,* 167 F.Supp.2d 846, 856 (E.D.Pa.2001)(noting "evidence that an FCE is a highly questionable tool for determining whether a fibromyalgia patient is disabled").

Second, we will address medical records submitted by Theresa Sander, a Certified Registered Nurser Practitioner to Dr. Georgy, on which Defendants place emphasis. Defendants argue that Ms. Sander opined that Plaintiff had the ability to bend, kneel, crawl, and climb stairs occasionally, push/pull up to ten pounds frequently, reach about her should continuously, and further noted that Plaintiff "wants to stay at home," exhibited a "lack of motivation," and "chronic depression." We note that as Plaintiff submits, that same nurse practitioner completed a functional capacity evaluation on February 11, 2004 which indicated that Plaintiff is restricted to one hour of sedentary activity in an eight hour workday, and can perform no light, medium or heavy activity in an eight hour workday. Additionally, in response to the question that asked, "Given your knowledge of the medical factors impacting the patient's functional ability, at what point do you feel that there will be a significant change in functional ability," Ms. Sander

responded, "unable to determine this. Pt has not improved for 3 1/2 years." (*See* Rec. Doc. 23, Ex. U).

We will now address the significant issue that Plaintiff raises concerning rejecting the opinions and diagnoses of Plaintiff's treating physicians and the application of two independent physicians, who as noted never examined Plaintiff but believe that she is not disabled based on a review of her file. Defendants accurately submit that the Supreme Court has held that the "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Although the Supreme Court has held that courts may not require ERISA plan administrators to defer to doctors who have treated a claimant over those who merely review her medical files, the court may still evaluate the weight of each doctor's opinion on the extent of his or her treatment history with the patient and specialization or lack thereof. *Id.* at 832; *see also Brown*, 348 F.Supp.2d at 368, n. 9.

*\*18* We are in agreement with other courts that have determined that direct contact with a patient over an extended period of time is especially important for reliable evaluation of a disease as subjective and variable as fibromyalgia, as it can allow for a more thorough examination of the patient's credibility and true range of abilities. *See id.* at 368. Although Unum's denial letter states that "there is no evidence to support that you are disabled due to Fibromyalgia" and that "They noted while Fibromyalgia has been provided as a diagnosis the file lacks an examination by which the diagnosis is typically made," Dr. Ellis, Plaintiff's primary care physician, treated Plaintiff for several years, and his fibromyalgia diagnosis was corroborated by three specialists who all examined Plaintiff, a board-certified rheumatologist, a neurologist, and a pain management specialist.

Additionally, Dr. Ellis and Dr. Calvert, Plaintiff's psychiatrist, specifically address Plaintiff's ability to work. First, Dr. Ellis extensively addressed the subject as we previously mentioned and concluded that Plaintiff's condition would be worsened by any gainful employment, including a full-time sedentary position, although we note that Defendants argue his opinion lacks an explanation as to why Plaintiff is unable to perform gainful employment. Second, after having seen Plaintiff for approximately one year, in her April 24, 2003 letter to Plaintiff's counsel, Dr. Calvert stated that she has no hesitation in saying that Plaintiff could not possibly manage to work a full-time job in any field, and even a part-time job would not be feasible. Dr. Calvert also noted that Plaintiff does not appear to be embellishing her symptoms for some secondary gain. (*See* Rec. Doc. 23, Ex. M).

In contrast to the above referenced physicians who examined and treated the Plaintiff, Defendants admit that Doctors Schmidt and Randall never examined Plaintiff in person. Defendants argue however, that Unum considered the opinions and diagnoses of Plaintiff's physicians and found that the information contained in their records supported a finding that Plaintiff did not meet the definition of total disability under the Plan or had exhausted her entitlement to psychiatric benefits.

Both Dr. Schmidt and Dr. Randall concluded that there was not evidence to support that Plaintiff was disabled due to fibromyalgia and it appears that they also concluded that Plaintiff did not suffer from fibromyalgia, despite the repeated diagnosis from her treating physicians. To the extent that Unum relied upon Plaintiff's lack of "objective evidence" of "physical functional capacity," or that her symptoms were "more subjective in nature," which all formed a basis for Dr. Schmidt's opinion, such arguments are unconvincing in light of fibromyalgia's essentially subjective nature. The previously cited case which arose in the Eastern District of Pennsylvania explained that even if an ERISA administrator may sometimes impose a requirement for "objective" medical evidence, that does not appear explicitly in a plan's terms, it would be unreasonable to do so here. *Brown*, 348 F.Supp.2d at 369. "Such a requirement would effectively preclude any fibromyalgia patient from qualifying as totally disabled on the basis of the disease." *Id.*

Moreover, the Third Circuit Court of Appeals has found it arbitrary and capricious--not merely misguided--to require objective evidence of diseases for which such evidence is simply unavailable. *Mitchell,* 113 F.3d 442-43 (reversing administrator's denial of disability benefits to chronic fatigue patient as arbitrary and capricious). Finally, because objective tests may not be able to verify a diagnosis of fibromyalgia, the reports of treating physicians, as well as the testimony of the claimant, become even more important in the calculus for making a disability determination. *See, e.g., Perl v. Barnhart,* 2005 U.S. Dist. LEXIS 3776, *10 (E.D.Pa.2005); *Green-Younger,* 335 F.3d at 108 (reversible error when ALJ discredits claimant's subjective testimony and opinion of treating physicians in favor of "objective" evidence of fibromyalgia, a disease "that eludes such measurement").

*\*19* Although generally independent medical examinations are not required, in the case *sub judice,* the utilization by Defendants of two physicians who never examined Plaintiff, but simply refused to accept the fibromyalgia diagnosis and thus rejected disability due to fibromyalgia on the basis of Plaintiff's medical file, was arbitrary and capricious given the fact that Plaintiff's primary care physician made the diagnosis, which was corroborated by three examining specialists and not subsequently altered in any way. [FN6]

> FN6. We recognize that fibromyalgia and its diagnosis are controversial areas in both law and medicine. Moreover, we do not mean to say that a plan administrator will never have a basis to question a diagnosis of fibromyalgia because of its subjective aspects. However, given the nature of fibromyalgia we conclude, as the court did in *Brown,* that a plan administrator's insistence that objective evidence concerning fibromyalgia be provided may be an impossible burden upon the patient. It appears to us that the better practice is to have a hands on independent examination of the patient, rather than a detached review of medical records.

After carefully considering the record as it was before the Plan Administrator at the time the decision to deny Plaintiff's LTD benefits was made, the Court finds that the assessments of Plaintiff's treating sources established the severity of her fibromyalgia and the limitations that such disease posed on Plaintiff's capacity to engage in substantial gainful employment. The Plan Administrator's decision to deny Plaintiff LTD benefits was not supported by substantial evidence in the record, and without substituting the Court's judgment for that of the Defendants in determining eligibility for plan benefits, the Court concludes that Plaintiff is "totally disabled" under the terms of the Plan and entitled to receive LTD benefits from Defendants. [FN7] *See Johnson,* 2005 U.S.App. LEXIS 2115, at *8-9; *see also Orvosh,* 222 F.3d at 129. We therefore find that Plaintiff has been unable "to perform any and every duty of any gainful occupation for which [s]he is reasonably fitted by training, education or experience." [FN8]

> FN7. We note that the vocational assessment conducted by Ellie J. Ettner, at Unum's direction, which concluded that three jobs existed within Plaintiff's restrictions that would permit her to earn a salary above that which she collected in LTD benefit payments is equally flawed as it utilized the restrictions and limitations as determined by Dr. Randall, who never examined Plaintiff as previously addressed, as opposed to the criterion provided by Plaintiff's treating physicians.

FN8. We reiterate that we need not reach Plaintiff's argument that Defendants are bound by the actions of MetLife, even though MetLife is not a party to this action.

Under ERISA § 502(a)(1)(B), Plaintiff may recover the monthly disability benefits she has not received since Unum terminated her benefits on November 2, 2002. [FN9] We therefore direct the parties to submit detailed calculations of Plaintiff's total damages from November 2, 2002, through May 30, 2005. Plaintiff also seeks attorney's fees and prejudgment interest on her back benefits. The Court will consider those matters further on submission of a detailed petition setting forth the reasons justifying such an award and a calculation of the specific amounts sought.

FN9. We recognize that Unum began paying Plaintiff monthly benefits under a "Reservation of Rights" from January 1, 2004 until June 31, 2004 and that Plaintiff received a fully favorable decision of her Social Security Disability claim on July 8, 2004, which may have an impact on Plaintiff's total damages.

NOW, THEREFORE, IT IS ORDERED THAT:
1. Plaintiff's Motion for Summary Judgment (doc. 19) is GRANTED.
2. Defendants shall reinstate Plaintiff's long-term disability benefits as of November 2, 2002, subject to the terms and conditions of the disability insurance policy.
3. Both parties shall have thirty (30) days from the date of this Order to submit detailed calculations of Plaintiff's total damages from November 2, 2002 through May 30, 2005.
4. Plaintiff shall have thirty (30) days from the date of this Order to file a petition for prejudgment interest, and for attorney's fees and costs.
5. Defendants' Motion for Summary Judgment (doc. 20) is DENIED.
M.D.Pa.,2005.
Ott v. Litton Industries, Inc.
2005 WL 1215958 (M.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

- 2004 WL 2276644 (Trial Pleading) Complaint (Apr. 08, 2004)
- 4:04CV00763 (Docket) (Apr. 08, 2004)
END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 22078075 (D.Del.)

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Kimberly N. SANDERSON, Plaintiff,
v.
CONTINENTAL CASUALTY CORPORATION, et al., Defendants.
No. Civ.A. 01-606GMS.
Aug. 19, 2003.

Herbert G. Feuerhake, Law Office of Herbert G. Feuerhake, for plaintiff.
Robert D. Goldberg, Biggs & Battaglia, Richard G. Elliott, Jr., Jennifer C. Bebko Jauffret,
Richards, Layton & Finger, Wilmington, DE, for defendants.

*MEMORANDUM AND ORDER*

SLEET, J.
I. INTRODUCTION
*1 On September 7, 2001, the plaintiff, Kimberly N. Sanderson ("Sanderson") filed the
above-captioned action pursuant to the Employee Retirement Income Security Act of
1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Through this action, she sought to recover
long-term disability benefits which she claimed were due under a policy of insurance
issued by Continental Casualty Company ("Continental") to her employer, Rhodia, Inc.
On February 25, 2003, the court concluded that Continental's decision to deny
Sanderson's disability benefits was arbitrary and capricious. It thus remanded the case
to Continental. ("Remand Order"). [FN1]

> FN1. For a complete recitation of the facts and procedural history of this
> case, please see *Sanderson v. Continental Ins. Co.,* 2003 WL 470539
> (D.Del. Feb.25, 2003).

Presently before the court is Continental's motion for reconsideration and a stay of the
remand order. For the following reasons, the court will deny this motion.
II. STANDARD OF REVIEW
As a general rule, motions for reconsideration should be granted only "sparingly." *Karr
v. Castle,* 768 F.Supp. 1087, 1090 (D.Del.1991). In this district, these types of motions
are granted only if appears that the court has patently misunderstand a party, has
made a decision outside the adversarial issues presented by the parties, or has made
an error not of reasoning, but of apprehension. *See, e.g., Shering Corp. v. Amgen, Inc.,*
25 F.Supp.2d 293, 295 (D.Del.1998); *Brambles USA, Inc. v. Blocker,* 735 F.Supp. 1239,
1240 (D.Del.1990) (citing *Above the Belt, Inc. v. Mel Bonhannan Roofing, Inc.,* 99
F.R.D. 101 (E.D.Va.1983)); *see also Karr,* 768 F.Supp. at 1090 (citing same).
In addition, the Third Circuit has explained that a district court should also grant a
motion for reconsideration which alters, amends, or offers relief from a judgment when:
(1) there has been an intervening change in the controlling law; (2) there is newly
discovered evidence which was not available to the moving party at the time of
judgment; or (3) there is a need to correct a legal or factual error which has resulted in
a manifest injustice. *See Max's Seafood Cafe by Lou-Ann, Inc. v. Quinteros,* 176 F.3d
669, 677 (3d Cir.1999) (relying on *North River Ins. Co. v. CIGNA Reinsurance Co.,* 52
F.3d 1194, 1218 (3d Cir.1995)).
III. DISCUSSION
The basis for Continental's current motion is the United States Supreme Court's May 27,
2003 decision in *Black & Decker Disability Plan v. Nord,* 538U.S. 822, 123 S.Ct. 1965,

155 L.Ed.2d 1034 (2003). Specifically, Continental argues that the holding in *Nord* supercedes the holding and rationale underlying the Remand Order of February 25, 2003. Because a change in controlling law is an appropriate ground upon which to base a motion for reconsideration, the court will now address Continental's allegations. Continental first contends that the Remand Order requires it to give special deference to the opinions of Sanderson's treating physicians. According to Continental, this is in contravention of the Supreme Court's recent holding that "... plan administrators are not obliged to accord special deference to the opinions of treating physicians." *Nord,* 538 U.S. at ----, 123 S.Ct. at 1967. While Continental's point is well-taken, it is apparent that Continental bases its argument both on a misreading of the court's Remand Order and an unduly narrow reading of *Nord.*

**\*2** As an initial matter, the court's Remand Order did not rely on the treating physician rule as the basis for its decision. [FN2] Indeed, the issue here is not whether Continental should have given the treating physician's opinions "substantial weight," but instead, why Continental decided to give multiple other forms of evidence no consideration at all, or conflicting consideration. *See e.g.* Remand Order at 13, n. 4 (questioning the veracity of Continental's claims that it had placed reliance on Dr. Matsumoto's findings in making its decision, when it later questioned Dr. Matsumoto's credentials); Remand Order at 14 (describing Continental's selective parsing of medical conclusions from the same doctor); Remand Order at 15, n. 6 (recognizing that Continental may have disregarded relevant evidence due to an improper reading of the Policy's requirements). Moreover, the court found that Continental had summarily dismissed Sanderson's own subjective complaints of pain and her allegations of the independently disabling condition fibromyalgia. The court's concerns are clearly in accord with the Supreme Court's admonition in *Nord* that, "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 1972.

> FN2. Were this case to turn solely on the application of the treating physician rule, as Continental suggests, there would have been no need for the court to order a remand because an application of this rule would certainly have resulted in summary judgment being awarded in Sanderson's favor.

Likewise, Continental's next argument that the court has impermissibly placed upon it an undue burden of explanation in contravention of *Nord* must also fail. *See* 123 S.Ct. at 1972. Importantly, the Supreme Court found that ERISA plan administrators must provide the notice of denial in writing and wherein they set forth the specific reasons for the denial in an easily understandable manner. *See Nord* 538 U.S. at ----, 123 S.Ct. at 1970. Thus, although Continental appears to be contending that *Nord* releases plan administrators from any duty of explanation whatsoever, that is simply not the case. Indeed, as the court discussed above, the Supreme Court in *Nord* specifically recognized that, "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." 123 S.Ct. at 1972. At no time did the Court hold that plan administrators need not provide any justification for rejecting evidence supporting a claimant's disability, particularly when it is clear, as it is here, that the administrators were engaged in a selective and self-serving review of the evidence. [FN3]

> FN3. It bears repeating that, through its Remand Order, the court is not suggesting that Continental must find Sanderson disabled. Rather, the court merely directs Continental to reach its decision on her disability after a review of the entire record before it.

IV. CONCLUSION

Because the issues in the present case far exceed the scope of the Supreme Court's holding with regard to the treating physician rule in *Nord,* the court concludes that reconsideration of its remand order is not warranted.

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Continental's Motion for Reconsideration and Stay of Order of Remand (D.I.69) is DENIED.

D.Del.,2003.

Sanderson v. Continental Cas. Corp.

2003 WL 22078075 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

- 1:01CV00606 (Docket) (Sep. 07, 2001)

END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Moira Goletz, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.:  04-351 SLR |
| | ) | |
| Prudential Insurance Company | ) | |
| | ) | |
| Defendants. | ) | |

## **AFFIDAVIT OF SERVICE**

I, Laura F. Browning, hereby attest under penalty of perjury that on June

10, 2005, I served the foregoing:

### PLAINTIFF'S OPENING BRIEF IN SUPPORT
### OF HER MOTION FOR SUMMARY JUDGMENT

by depositing two copies of said document in the United States Mail, first class,

postage prepaid, to the following addresses:

BIFFERATO, GENTILOTTI & BIDEN
George T. Lees, Esquire (#3647)
David A. Denham, Esquire
1308 Delaware Avenue
PO Box 2165
Wilmington DE  19899-2165
(302) 429-1900
*LOCAL COUNSEL*


WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
Jonathan Dryer, Esquire
The Curtis Center, Suite 1130 East
Independence Square West
Philadelphia PA  19106
(215) 627-6900
*Attorney for defendant*

GRADY & HAMPTON, LLC


__/S/ Laura F. Browning_____
John S. Grady, Esq. (I. D. No. 009)
Laura F. Browning, Esq. (I.D. No.4504)
6 North Bradford Street
Dover, DE  19904
(Tel. 302-678-1265)
jgrady@gradyhampton.com
lbrowning@gradyhampton.com
*Attorney for plaintiff*