IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Moira Goletz, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.:  04-351 SLR |
| | ) | |
| Prudential Insurance Company | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF MOIRA GOLETZ' ANSWERING BRIEF
IN OPPOSITION TO DEFENDANT'S OPENING BRIEF**

GRADY & HAMPTON, L.L.C.
John S. Grady, Esq (009)
Laura F. Browning, Esq (4504)
6 North Bradford Street
Dover, DE  19904
(302) 678-1265

Dated:  June 24, 2005

i

# TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………………………………ii

TABLE OF CITATIONS……………………………………...…………………………iii

NATURE AND STAGE OF THE PROCEEDINGS………….……………………..…1

SUMMARY OF THE ARGUMENT……………………………………………...…………2

ARGUMENT…………………………………………………………………...……….4

    I.       SCOPE OF THE REVIEW TO BE APPLIED.………………………………….4

    II.     PRUDENTIAL DECISION WAS ARBITRARY AND CAPRICIOUS
          BECAUSE IT WAS SELF-SERVING, PROCEDURALLY FLAWED,
          AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE …………..……..6

          A.      DR. BANDERA'S REPORT IS NOT CREDIBLE AND
                 PRUDENTIAL CONTINUES TO USE IT AS A BASIS
                 TO DENY MS. GOLETZ' BENEFITS.  .…………...……..……7

          B.      PRUDENTIAL IMPROPERLY IGNORED THE FAVORABLE
                 SOCIAL SECURITY DECISION…………...………..…………….9

          C.      PRUDENTIAL IMPROPERLY SOUGHT AND RELIED
                 ON DR. FOYE'S "EXTERNAL FILE VIEW":…………………...…11

          D.      PRUDENTIAL IGNORED HER TREATING PHYSICIAN'S
                 CREDIBLE EVIDENCE……...……………………………..………14

          E.      PRUDENTIAL DECISION WAS ARBITRARY AND
                 CAPRICIOUS IN THAT IT FAILED TO ACKNOWLEDGE
                 MS. GOLETZ' SUBJECTIVE COMPLAINTS……………..………17

          F.      PRUDENTIAL DID NOT HAVE SUBSTANTIAL
                 EVIDENCE TO SUPPORT ITS DECISION, AND THERE
                 WAS SUBSTANTIAL EVIDENCE TO SUPPORT
                 GRANTING BENEFITS UNDER THE PLAN……………………..19

CONCLUSION…………………………………………………………...………………22

ATTACHED CASES

AFFIDAVIT OF SERVICE

**TABLE OF CITATIONS**

**<u>CASES</u>**

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822,
    123 S.Ct. 1965 (2003)……………………..………..………..………..2

*Kosiba v. Merck & Co.*, 384 F.3d 58 (3rd Cir. 2004)………..………..………..……11

*Mitchell v. Prudential Health Care Plan*, 2002 WL 1284947 (D.Del)…3, 12, 13, 18, 19

*Orvosh v. Program of Group Ins. For Salaried Employees*
    *of Volkswagen of Am.,* 222 F.2d 123 (3d Cir. 2000)……………………..………3, 4, 7

*Ott v. Litton Industries, Inc.*, 2005 WL 1215958
    (M.D. Pa. May 20, 2005)……………………..………..………..……….4, 20, 21

*Pinto v. Reliance Standard Life Ins.*, 214 F.3d 377
    (3rd Cir. 2000)……………………………………………………………..4, 13

*Russell v. The Paul Revere Life Ins. Co.,* 148 F.Supp.2d 392
    (D.Del. 2001)……………………………………………………………..4, 5

*Sanderson v. The Continental Casualty Corp.*, 279 F. Supp.2d 466
    (D.Del 2003)……………………..………………4, 5, 8, 14, 15, 18, 19, 22, 23

*Sanderson v. Continental Casualty Corp.*, 2003 WL 22078075
    (D.Del)……………………………..………..………..……6, 9, 12, 17, 20, 21

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff, Moira Goletz, stopped working on May 20, 2000 because of extreme neck pain, arm pain and hand pain. Prudential granted her claim for long-term disability for the first 24 months. On June 24, 2002, Ms. Goletz was informed that her long-term disability benefits would be ceased as of October 29, 2002. On July 29, 2002, she appealed this decision with Prudential and on November 21, 2002 she was denied again her long term disability ("LTD") benefits. In February 2003, Ms. Goletz again appealed the decision and included more medical documents and on May 12, 2003 she was denied a second time. On May 23, 2003, Ms. Goletz' attorney, John Grady, appealed the previous decision again. On March 15, 2004 Prudential made its final decision to deny her LTD benefits.

An ERISA action was timely filed on June 3, 2004. On June 10, 2005, Defendant filed its motion for summary judgment, and opening brief in support. This represents Plaintiff, Moira Goletz', answering brief to defendant's opening brief, a statement of facts has been already stated in plaintiff's opening brief.

## SUMMARY OF THE ARGUMENT

1)        Defendant is correct that the standard of review is a heightened arbitrary and capricious standard. However, this Court should give Prudential's decision little to no deference because it failed to properly consider the evidence under the plan, acted in a self-serving manner, and funded the plan.

2)        Prudential incorrectly stated in its opening brief that its determination at every stage of the appeal process was made after review of new medical information. Def. Op. Br., pg. 13. Instead, the record reflected that Prudential openly ignored most if not all of her favorable evidence, which included a SSA decision, Dr. Tamesis August 2003 Report, her treating physicians favorable opinions, and her own credible complaints of pain. "[P]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Sanderson v. Continental Casualty Corp.*, 2003 WL 22078075 (D. Del), citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 123 U.S. 1965, 1972 (2003). Even Prudential's opening brief failed to acknowledge her own doctors, SSA decision and her consistent complaints of pain.

3)        Prudential in its opening brief improperly relied on Dr. Bandera's flawed report.  It is well established in the record that the report is incorrect, because there is objective evidence to support her complaints of pain.  Prudential acted in a self-serving manner by selectively using Dr. Bandera's flawed report over that of her treating physicians credible opinions.   *Sanderson v. The Continental Casualty Corp.*, 279 F. Supp.2d 466, 475 (D. Del 2003).  A-575.

4)     There was objective evidence that she suffered from inflammatory polyarthritis. Courts do not want administrators to discount subjective complaints when there is objective evidence to support it.  *Mitchell v. Prudential Health Care Plan*, 2002 WL 1284947 *10 (D.Del.), see also, *Sanderson*, at 476. Ms. Goletz' subjective complaints of pain were not considered despite being a determining factor. A-578.

5)     The administrator's denial of long-term benefits was unsupported by substantial evidence, and therefore can be overturned by this court. *Orvosh v. Program of Group Ins. For Salaried Employees of Volkswagen of Am.,* 222 F.2d 123 (3d Cir. 2000). Prudential claimed that opinions of treating doctors, Social Security Decisions, and a claimant's subjective complaints were suppose to be determining factors. A-578.   Yet, Prudential relies solely on Dr. Foye's "external file review", which was not independent. His report was not even based on a physical exam. In particular, Prudential used only portions that supported a denial, and ignored other portions that favored the plaintiff. For example, Dr. Foye wanted to know if there was actually work out there that constituted gainful employment. A-224.

# ARGUMENT

## I.     SCOPE OF THE REVIEW TO BE APPLIED.

The Defendant's have admitted that the review is a heightened arbitrary and capricious standard. This Court has ruled that a plan administrator's decision can be overturned if it is not supported by substantial evidence. *Sanderson*, 279 F.Supp.2d at 472. The Third Circuit has held that, "a plan administrator's decision will be overturned only if it is clearly not supported by the evidence in the record…" *Orvosh v. Program of Group Ins. For Salaried Employees of Volkswagen of Am.,* 222 F.2d 123 (3d Cir. 2000). The court must look at the record as a whole to determine if the plaintiff has met her burden. *Ott v. Litton Indus., Inc.* 2005 WL 1215958 (M.D. Pa May 20, 2005). Insert.

It is undisputed that Prudential funds the plan that it administers, and therefore, a heightened arbitrary and capricious review should be applied. *Sanderson v. The Continental Casualty Corp.*, 279 F. Supp.2d 466, 472-73 (D. Del 2003). There is a conflict, because Prudential has the motive to deny benefits based on the fact it will save money. A-577. The court should apply a sliding scale as to how much deference it will grant to the administrator. *Pinto v. Reliance Standard Life Ins.*, 214 F.3d 377, 379 (3rd Cir. 2000). "We side with the majority of courts of appeals, which apply a sliding scale method, intensifying the degree of scrutiny to match the degree of conflict." *Id.* The Delaware District Court commented on the heightened standard in *Russell v. The Paul Revere Life Ins. Co.*:

> When an administrator's decision is potentially clouded by a conflict of interest, such as where a ERISA plan administrator also funds the plan it administers, the conflict must be considered in assessing the amount of *deference* to be given to the administrator's decision; in those circumstances, a modified or "heightened" arbitrary and capricious standard of review is

appropriate. *Russell v. The Paul Revere Life Ins. Co.,* 148 F.Supp.2d 392, 400 (D.Del. 2001).

In applying the heightened arbitrary and capricious standard, "the court need not give complete deference to the administrator's decision to deny benefits. *See id.* The court therefore, must 'look not only at the result – whether it is supported by reasons – but at the process by which the result was achieved'". *Sanderson,* at 473. When applying the arbitrary and capricious review the court is making a, "determination of whether the plan administrator abused its discretion in reaching its decision." *Sanderson*, at 472.

In its opening brief, Prudential claimed that that there was no bias in its decision, thus the court should give them greater deference under the heightened arbitrary and capricious review. However, the record clearly demonstrated that Prudential failed to properly review and factor reliable evidence. As discussed below, Prudential continually acted in a self serving manner and chose to rely solely on the small amount of evidence that could support a denial.

The Delaware District court held that the court does not have to accept the decision, "if the administrator uses a self-serving approach to the evidence that selectively relies upon the evidence that supports a denial of benefits, but rejects the evidence that supports the granting of benefits." *Sanderson*, at 473. The *Sanderson* court found that evidence of the administrator's severe conflict and self-serving actions required the court to reject the administrator's decision and rule that it was arbitrary and capricious standard. *Sanderson*, at 477.

For the reasons stated below, Prudential acted in a self-serving manner by completely ignoring credible evidence and relying on only a small amount of evidence that would support a denial. Every time Prudential was faced with credible evidence that Ms. Goletz was unable to work at any occupation, it actively sought any evidence it could find, no

5

matter how unreliable it was to deny her claim.  Prudential also ignored a favorable Social Security decision. Prudential selectively used the reports of its consultant Dr. Patrick Foye, while it ignored the portions that questioned her ability to find gainful employment. Prudential also ignored her constant complaints of severe pain despite the overwhelming objective evidence that supported them.

Therefore this court should give little to no deference in making its decision. Prudential's decision was arbitrary and capricious.

## II.    PRUDENTIAL DECISION WAS ARBITRARY AND CAPRICIOUS BECAUSE IT WAS SELF-SERVING, PROCEDURALLY FLAWED, AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE

This court should give Prudential's decision to deny Ms. Goletz' benefits little to no deference given the fact that it completely ignored Ms. Goletz's creditable evidence, and specifically relied on flawed evidence such as Dr. Bandera's "IME.".  Prudential in its opening brief argued that it considered all documentation supplied to them and the documentation did not support a "physical or mental impairment that would prevent plaintiff from performing sedentary work." Def. Op. Br., pg. 12.  In support, Prudential claimed that its decision was supported by the record and specifically cited Dr. Bandera's report in support of this contention.  However, a review of the record shows that Prudential did not in fact consider all Ms. Goletz' credible evidence as the law requires. *Sanderson v. Continental Casualty Corp.*, 2003 WL 22078075 *2 (D. Del). Nor did it properly consider her other credible evidence that the plan uses a factor—treating doctors opinions, favorable SSA decision, objective medical evidence of poly arthritis, and complaints of pain.  A-577-58.

In its opening brief, Prudential gave no explanation on "how" or "why" they reviewed or credited evidence. Instead, Prudential gave the blanket explanation that, "[e]ach appeal submission was evaluated and determined on its own merits…" Def. Op. Br., pg. 13. What the record showed was that every time Prudential was faced with credible evidence that Ms. Goletz was unable to work at any occupation, it actively sought any evidence it could find, no matter how unreliable it was to deny her claim— like Dr. Bandera's report. Viewing all of the evidence Prudential had before it, it is clear that there was not substantial evidence for its decision. Prudential's decision was arbitrary and capricious, and the record supports Ms. Goletz.

### A. DR. BANDERA'S REPORT IS NOT CREDIBLE AND PRUDENTIAL CONTINUES TO USE IT AS A BASIS TO DENY MS. GOLETZ' BENEFITS.

In its opening brief, Prudential cited Dr. Bandera's report as a basis to uphold its decision. Def. Op. Br., pg.12. In addition, Prudential cited Dr. Bandera's report in every appeal denial letter. A-82, A-93, A-104. Prudential wrote, "In particular, an IME was performed on plaintiff by Dr. Bandera. As a result of that IME, Dr. Bandera opined that plaintiff had the ability to perform at least a light duty job." Def. Op. Br.-12. Dr. Bandera is not a treating physician and has worked for Prudential before in determinations. A-576.

In his report, Dr. Bandera incorrectly opined, "in reference to her multiple complaints, her current objective finding noted during examination was trace swelling of the hands and left extensor hand tendonitis. She has multiple subjective complaints which do not correlate objectively". A-213. It is this language that Prudential

improperly relied on through the appeals process and even in their opening brief. Def. Op. Br.-4.

The record has been well established through the medical records, Dr. Tamesis' August 2003 report, and Dr. Foye's file review that Dr. Bandera's report is incorrect, because there is objective evidence that correlated with her complaints.

In 2004, Dr. Foye wrote that, "from the combination of the physical exam findings by Dr. Tamesis and also the evaluation by Dr. Bandera, and also the blood work results, overall it does appear most likely that claimant does have some type of inflammatory poly-arthritis, although she is sero-negative for rheumatoid arthritis..." A-223-24.  This is objective evidence to support Ms. Goletz complaints, contrary to Dr. Bandera's report.  In an August 2003 report, Dr. Tamesis, her treating rheumatologist, elaborated on how Dr. Bandera's report is flawed. "Dr. Bandera indicated in his report that Ms. Goletz suffers from negative inflammatory arthritis which is incorrect. Her correct diagnosis is seronegative rheumatoid arthritis."A-254.  Dr. Tamesis wrote about how there was trace swelling despite the use of various analgesics. A-254-55.  Dr. Bandera wrote:

> At the time of Ms.Goletz' October 2002 evaluation with Dr. Bandera, she was receiving treatment of chronic steroid therapy including Methotrexate, a potent immunosuppressive agent. Prior to the use of these immunosuppressive agents, there was significant joint synovitis and soft tissue swelling of her hands, which have showed some improvement with therapy.  Despite the use of various analgesics, her pains remain significant. Dr. Bandera provided his opinion based on the evaluation of a patient that had been receiving potent immunosuppressive treatment. A-254.

Prudential had repeatedly stated in the May 2003 denial letter and process that it wanted her physicians to address Dr. Bandera's Report. A-94-95. This was clearly a red

herring, because when that information was supplied to Prudential in the Fall of 2004, it completely ignored the report by Dr. Tamesis. A-105-106. This was improper.   Even in the opening brief, Dr. Tamesis report is not cited one time, yet Prudential argued in its brief, "these physicians either declined to respond or submitted narratives that did not address the comments related to the IME that was performed." Def. Op. Brf, 12.   The record showed that he did submit a new report to them during the third appeal process. A-100, A-254.

The only logical conclusion is that Prudential was merely giving Ms. Goletz a false pretext for declining her benefits and ignoring both her physician's favorable opinions in the Spring of 2003.   Prudential may not ignore Dr. Tamesis August 2005 report, especially when it asked for it. This should not be allowed under *Sanderson*, which adds that Prudential must consider credible evidence, even treating physicians. *Sanderson*, 2003 WL 22078075 at *2. Even the procedures of the plan required that Prudential truly consider Dr. Tamesis' opinion.  A-578.  Prudential's determination was self-serving and must be found to be arbitrary and capricious.


**B.  PRUDENTIAL IMPROPERLY IGNORED THE FAVORABLE SOCIAL SECURITY DECISION**

In its opening brief, Prudential failed to cite why it did not consider Ms. Goletz' favorable Social Security decision.  In the May 2004 denial letter, Prudential claimed that it will keep her file open indicating that this would be evidence on whether or not Ms. Goletz was disabled under the plan. A-95. Social Security decisions are a factor in the determination process under the plan.   A-578. Yet, despite getting a favorable Social Security decision, Prudential denied her claim.  More shocking is the fact the record showed

that Prudential completely ignored her SSA evidence and did not use it as a factor to make its final decision. Ms. Goletz' SSA decision had testimony and additional medical evidence. A-226-36.   In Ms. Goletz' favorable Social Security Decision dated November 19, 2003, the ALJ found her credible and that she was unable to work.  The ALJ noted that she had problems doing daily activities because of the pain she experienced. A-231-32. The ALJ also noted that her hands were swollen at the hearing and she moved "stiffly." A-231. In Prudential's May 2003 denial letter, Prudential stated it was going to leave her case open to follow her Social Security Hearing. A-95. In the final 2004 denial letter, Prudential wrote, "Prudential must evaluate claims based on the terms of the Group Policy independent of the Social Security Administration." A-106.

In that same final denial letter Prudential also wrote, "In addition our records indicate that you are currently waiting on the status of your appeal for Social Security Disability Benefits with Administrative Law Judge. Therefore, we will keep your claim active and will follow up on the status of the hearing." A-106. Prudential wrote this in the same denial letter that stated it had received the favorable decision. A-106. This is overwhelming evidence that Prudential gave SSA decision absolutely no weight or consideration.  Therefore it violated its own procedures that SSA decisions are to be a factor. A-578. In addition, there are no notes in 2004 discussing the SSA benefits in relations to its decision to deny benefits other than the confusing statements written in the denial letter.

Again, this is just further evidence that Prudential's decision should be given little to no deference give the enormous amount of procedural flaws and conflicts of interest.  The self-dealing is apparent, and showed that Prudential's decision was arbitrary and capricious.

## C. PRUDENTIAL IMPROPERLY SOUGHT AND RELIED ON DR. FOYE'S "EXTERNAL FILE REVIEW".

In December 2003, the Administrative record supported a favorable decision for Ms. Goletz. All of her treating physicians opined that she could not work, Dr. Tamesis contradicted Dr. Bandera's report as requested, the SSA gave a favorable decision, and there was objective evidence to establish Ms. Goletz' complaints of pain. Instead of granting Ms. Goletz' benefits, Prudential sought out additional evidence to support a denial in what Prudential called an "external file review." This report was in no way independent as Dr. Foye had been consulted before on Ms. Goletz case and can only be seen as Prudential's hired gun. A-56. In a self-serving manner, Prudential was seeking *any* evidence to support its decision to deny Ms. Goletz. Thus, Prudential turned to its $300 an hour consultant, Dr. Foye. A-576.

First, the timing of this "external file review" should be questioned and cause this court to give less deference to Prudential's decision. The court should look to the recent case of *Kosiba v. Merck & Co.* 384 F.3d 58, cert. denied, *Merck & Co., Inc. v. Epps-Malloy*, ---S.Ct.----, 2005 WL 192218 (May 16, 2005). There Third Circuit questioned the timing of an IME that it was done only after the appeals process began and when her treating physicians offered their "unequivocal support of her claims." *Merck* at 68. Here, the record was in favor of Ms. Goletz, yet Prudential sought out an "external file review."

Second, this court should also find Prudential's use of Dr. Foye's report troubling. It is clear that Prudential only used the portions that would support a denial. For example, Prudential failed to acknowledge that Dr. Foye's review undermined Dr. Bandera 2002 report, by noting the objective evidence. Dr. Foye opined from the records that the recurrent inflammation/synovitis would create difficulty for her to repetitive hand activities. A-224.

11

Dr. Foye stated that the hand activities would have to be "less than 1/3 of the workday", but Prudential did not disclose that in its denial letter. A-224, A-106. This would mean on a typical 8-hour workday she would have to use her hands less than 2.6 hours a day. However, Prudential made no mention of this. Dr. Foye also stated that she would have problems doing repetitive overhead activities due to chronic neck pain and shoulder pain, "which might be related to her diffuse poly-arthritis." A-224. This was more objective evidence of her complaints of pain. Even though Dr. Foye stated that she would be capable of full time work with these and other restrictions, he questioned if there was *any* work available to her. A-224. He wrote, "I recommend considering vocational assessment to determine if such work is *actually* available to her in the workplace, and whether this would represent gainful employment to her." A-224. (Emphasis added).

This District court has found it to be self-dealing to use only the portions that support a denial that case also involved Prudential. *Mitchell v. Prudential Health Care Plan*, 2002 WL 1284947 *9 (D.Del.). There the court wrote, "This apparent willingness to use the helpful portions of Dr. Anthony's testimony while completely ignoring the portions that would support the continuance of benefits is some evidence that Prudential was acting in self-interest." *Id.* The Mitchell court stated that the court does not have to accept the decision of, "fiduciary that uses a self-serving approach that selectively relies upon the evidence that supports a denial of benefits but rejects the evidence that supports the continuation of benefits." *Mitchell*, at *8. Therefore, this court can reject Prudential's decision.

Finally, Prudential did not conduct a new vocational assessment as suggested by Dr. Foye. A-66. Instead, Prudential relied on the November 2002 vocational assessment using

Dr. Bandera's restrictions. A-66, A-58, A-106. Had Prudential acted in a neutral manner, it would have conducted a new vocational assessment as Dr. Foye suggested. Dr. Foye stated that she was capable of occasional hand activities that being less than 1/3 a workday (less than 2.6 hours a day). A-224. Whereas, the previous vocational assessment did not have this specific of a restriction. A-213. In the 2002 assessment based on Dr. Bandera's restrictions they stated it, "would consider no more than occasional keyboarding,". The report never defined occasional keyboarding. Also the 2002 assessment stated she was capable of light duty work. A-213. Dr. Foye never stated whether or not she was capable of light duty work; he only stated full time work then questioned if there was anything like that available which would be gainful employment. A-224.

Prudential acted improperly by not following the recommendations of its experts and staff. *Mitchell,* at *9. In *Mitchell,* a doctor had suggested verifying the pain in a functional capacity test. *Id.* "This failure to follow advice from its own staff fits squarely into the third factor identified in *Pinto*, and could also support a finding of self-dealing under the second factor." *Id.* citing *Pinto v. Reliance Standard Life Ins.*, 214 F.3d 377, 394 (3rd Cir. 2000) . Clearly, Prudential abused its discretion by not conducting a new vocational assessment; instead it claimed that it had already performed one. This is just proof illustrated that Prudential was acting in a self-serving manner and its decision was arbitrary and capricious.

Prudential acted improperly by first requesting Dr. Foye's report, then using only the portions that were favorable to a denial, ignoring the portions that undermined Dr. Bandera's report, ignoring the portions that questioned if there was any work out there that would constitute gainful employment given the restrictions, and then failing to conduct a new vocational assessment. Clearly, Prudential's behavior once again was self-serving and

lacked any neutrality.  Thus, Dr. Foye's report alone is not substantial evidence to deny

plaintiff's benefits. Its decision was arbitrary and capricious.


### D. PRUDENTIAL IGNORED HER TREATING PHYSICIAN'S CREDIBLE EVIDENCE.

Throughout the appeals process Ms. Goletz submitted additional opinions from her

treating physicians that she was unable to work.  The record demonstrates that Prudential

did not truly consider her treating physicians' opinions.   Under the plan, a treating

physician's opinion was to be considered in the determination process. A-578.  Also, this

court has established that administrators must consider treating physician's credible

evidence. The Court should look to the analysis in *Sanderson* in finding Prudential's

determination flawed and self-serving. *Sanderson*, at 477. The court noted that

> Continental was not free to merely disregard her treating physicians'
> reports and findings in this regard in favor of an outcome more to its
> liking.  More to the point, although Continental may have doubted the
> reliability of the conclusions or diagnosis of Sanderson's doctors, there is
> nothing in the record to indicate that Dr. Truchelut's opinion was any
> more supported or reliable.   *Sanderson*, at 477.

Prudential gave no reason why it accepted Dr. Bandera's and Dr. Foye's report

over that of her own specialists**.**  This was wrong.  The *Sanderson* court stated that it was

impermissible for Continental to use evidence which, "supported a denial of the

claimant's benefits while at the same time, ignoring or failing to satisfactorily explained

its rejection of evidence supporting an award of LTD."  Sanderson, at 477.

During the second appeal, Prudential used the pretext that her doctors did not

address Dr. Bandera's report.  Prudential even stated this in its opening brief. However,

Prudential did not explain why it did not accept her doctors' opinions over that of Dr.

Bandera.  The *Sanderson* court also addressed this lack of explanation.  There, the court noted that, "while Continental purported to summarize the information it had before in those letter, it did not engage in any discussion of why it credited certain evidence, or how it reconciled Dr. Truchelut' analysis with that of Sanderson's own treating and examining physician." *Sanderson*, at 475.  Applied to the present case, it is clear that Prudential acted in the same self-serving manner as Continental in the *Sanderson* case.

In the first denial letter, Prudential made no mention of the prior opinions of the doctors that Goletz could not work. A-71. At the time, Ms. Goletz' record showed favorable opinions by Dr. Rowe. A-243-246. The record showed that Dr. Rowe opined that she could not work in early 2002. A-53. However, despite a favorable record and Dr. Rowe's opinion, Prudential ignored it and made the blanket statement she was capable of work. A-54.  Ms. Goletz appealed and included additional statements from her doctor's stating she could not work because of pain and spasm. Dr. Rowe used Prudential's own form. A-247.  In addition, Dr. Tamesis wrote that Ms. Goletz suffered from inflammatory arthritis. A-246.

More telling is the record that showed in November 2002 the claims adjuster only considered Dr. Bandera's report in deciding to up hold its decision.  A-60. Prudential should have also considered her doctor's opinions under *Sanderson*.  In addition, Prudential stated in the report that it had received records from Dr. Schwartz.  Clearly, Prudential never read the reports because it would have known that the reports were from Dr. Rowe, who works in same office with Dr. Schwartz. A-247. Dr. Rowe signed the forms. A-247.

In the second appeal, Dr. Rowe and Dr. Tamesis sent four more reports about Ms. Goletz condition. A-250-53. Dr. Tamesis stated in his January 8, 2003 letter that she was disabled from "any occupation". In a February 18, 2003 letter, Dr. Rowe stated his diagnosis of Ms. Goletz, which included a sprain and degenerative joint disease of the left knee, triangular fibrocartilage tear of the left wrist, right elbow bursitis, cervical and thoracic strain, degenerative disc disease of the cervical spine, and lumbosacral strain. A-251. Later in the May 8, 2003 letter, Dr. Rowe stated that Ms. Goletz was using a walker and was unable to work. A-252. Then, Dr. Tamesis provided a more detailed report on May 8, 2003. He stated that he had been following her case since 2001 and that she suffered from seronegative inflammatory arthritis, generalized degenerative joint disease, and bilateral carpal tunnel syndrome. A-253. He elaborated that, "[a]ny inflammatory arthritis can also produce generalized joint pains and stiffness that can involve any joint even in the absence of definite swelling such as pains of the shoulders and hips." A-253. He stated that prior to the steroid therapy she had "significant joint synovitis and soft tissue swelling." A-253. Also, both doctors stated they would be available to discuss her case. It does not appear from the record that Prudential directly contacted Dr. Rowe or Dr. Tamesis.

Prudential did note Dr. Tamesis opinions in the second denial letter, however, it stated Tamesis and Rowe did not address Dr. Bandera's report. This was the only reason given on why they accepted Dr. Bandera's report over her own credible doctors reports.

However, the May 2003 opinions by her treating doctors addressed her ability to work at any gainful occupation, which was what Dr. Bandera's report was about. Then in August 2003, when Dr. Tamesis did specifically address Dr. Bandera's report, Prudential

completely ignored it. A-105-06. Dr. Tamesis report is discussed in the sections above, but it must be mentioned that his report addressed the fact that she could not work at any gainful occupation. He made it very clear that she was having problems with daily activities. Prudential's approach to her treating physicians' opinions is completely bias as there is no discussion about the credibility of their opinions. This is clear evidence of bias and self-dealing. In addition, there is substantial evidence to support Ms. Goletz' claim.

The plan requires that credible doctor's opinions should be considered. A-578. Prudential failed to consider them. Prudential's decision was arbitrary and capricious.

### E. PRUDENTIAL DECISION WAS ARBITRARY AND CAPRICIOUS IN THAT IT FAILED TO ACKNOWLEDGE MS. GOLETZ' SUBJECTIVE COMPLAINTS:

Prudential completely ignored Ms. Goletz' complaints of pain in its final denial letter and its opening brief. Prudential admitted that the claimant's complaints are a factor under the plan. A-578. Therefore, Prudential should have given her complaints some weight because it must give credit to reliable evidence. *Sanderson,* at *2.

Throughout the entire appeal, Ms. Goletz continually stated that she was in constant pain. The record reflects that she was on an extensive amount of medication, which included Prednisone, Remicade, Methotrexate, APA with codeine, Vicodin. A-232. In early 2001, she told a Prudential representative that she had shooting pains in her elbow and neck. A-109. She stated that the pain prevented her from sitting for long period of times. A-109, A-232. Her complaints of pain are well documented in her appeal letters to Prudential representatives, her medical records, Social Security Award letter and her doctors' opinions.

During the first two appeals, Prudential relied on Dr. Bandera's statement that, "she has multiple subjective complaints which do not correlate objectively." A-84. Both Dr. Tamesis and Dr. Foye undermined Dr. Bandera's opinion based on the fact that her blood results and physical examinations showed that she has inflammatory polyarthritis. This is objective evidence to support her subjective complaints. However, Prudential never acknowledged her subjective complaints, or gave them credit based on this objective evidence. A-105-106, A-60. In *Sanderson*, the court noted how the administrator improperly excluded evidence of her subjective complaints. "Conversely, her subjective complaints of pain appear to have been entirely discounted….[t]he court finds this strong emphasis on objective evidence to the resulting exclusion of the subjective evidence to be improper." *Sanderson*, 279 F.Supp.2d at 475.

In the final denial letter, Prudential never gave any reason why it ignored her subjective complaints of pain after both doctors stated there was objective evidence to support that pain---inflammatory polyarthritis. This is not the first time Prudential has ignored credible subjective complaints. In *Mitchell v. Prudential Health Care Plan*, there was objective MRI results that supported the claimant's allegations of severe back pain. There, the court stated that Prudential has "entirely discounted" the claimant's complaints. *Mitchell*, at *10. "The court finds that this strong emphasis on objective evidence to the resulting exclusion of subjective evidence was incorrect." *Id.* The *Mitchell* court found that there was, "no reason for Prudential to ignore the fact that the objective findings supported a diagnosis of a back injury or fibromyalgia which could produce Mitchell's subjective complaints of pain." *Id.*

Then in *Sanderson*, the court found that there was objective medical evidence to support the subjective complaints. The court in *Sanderson* found that it was wrong for the administrator to discount the complaints of pain. *Sanderson*, at 476. "There was no reason for Continental to ignore the fact that objective findings supported a diagnosis of fibromyalgia which could have produced Sanderson's subjective complaints of pain." *Id.*

Here, Prudential did ignore the complaints of pain despite the objective evidence that supported her complaints. Prudential only stated that, "[b]ased on Dr. Foye's review of the medical records, he notes that Ms. Goletz does appear to have some inflammatory poly arthritis…" A-105-06. However, nowhere in the third denial letter does Prudential acknowledge any of Ms. Goletz complaints of daily pain that would prevent her from working. In addition, her complaints of neck pain are ignored, even though she was diagnosed with cervical sprain/strain and the MRI shows degenerative disc disease. A-442.

From Prudential's notes and letters, it is clear that Prudential did not give Ms. Goletz' complaints any weight. A-64-66. Therefore this court should follow the reasoning in *Sanderson* and *Mitchell*, and rule that Prudential engaged in impermissible self-dealing. This failure to acknowledge the credible evidence is just further evidence that Prudential's decision should be give little to no deference. Therefore, under a heightened standard, Prudential's decision was arbitrary and capricious.

### F. PRUDENTIAL DID NOT HAVE SUBSTANTIAL EVIDENCE TO SUPPORT ITS DECISION, AND THERE WAS SUBSTANTIAL EVIDENCE TO SUPPORT GRANTING BENEFITS UNDER THE PLAN.

Under the heightened standard of arbitrary and capricious review, a plan administrator's decision will be overturned if it is, "without reason, unsupported by

substantial evidence or erroneous as a matter of law." *Sanderson,* at 472. In addition, the court must, "not only look at the result—whether it is supported by reason—but at the process by which the result was achieved." *Id.* Looking at the record as a whole, the process was flawed in that Prudential ignored almost all of Ms. Goletz' credible evidence. More importantly, Prudential's decision was not based on substantial evidence and Prudential offered no credible explanation as to its reasoning process.

Prudential still cited Dr. Bandera's report for support. However, as discussed above this report cannot be relied upon due to the fact that Ms. Goletz did have objective evidence and Dr. Bandera misdiagnosed Ms. Goletz. The only other evidence that would support Prudential's decision is Dr. Foye's report. Problems with this report have been discussed in greater detail sections above and in plaintiff's opening brief. It should be noted that Dr. Foye's report was sought only after a favorable evidence was received by Prudential. Given her restrictions, Dr. Foye questioned if there actually was any gainful employment available to her. Prudential did not do a new assessment as requested by Dr. Foye. This is just more evidence of Prudential's procedural bias. Also, Dr. Foye pointed out that she could only use her hands for less than 1/3 or 2.6 hours a day. Dr. Foye also confirmed that she had inflammatory polyarthritis. This is a disease that has been established to cause great pain. In addition, Dr. Foye never actually examined Ms. Goletz. Based solely on this report, Prudential inaccurately claimed it has substantial evidence.

This court should follow *Ott v. Litton Industries, Inc.* in deciding to overturn Prudential's decision and award Ms. Goletz her benefits. *Ott v. Litton Industries, Inc.*, 2005 WL 1215958 (M.D. Pa. May 20, 2005). There the court overturned the administrator's decision while reviewing a case under a heightened arbitrary and capricious review. *Ott*, at

20

*11, *19.  The *Ott* court stated that, "Although the Supreme Court has held that courts may not require ERISA plan administrators to defer to doctors who have treated a claimant over those who merely review her medical files, the court may sill evaluate the weight of each doctor's opinion on the extent of his or her treatment history with the patient and specialization or lack thereof."  *Ott*, at *18.  The *Ott* court rejected two assessments by two doctor's that reviewed the claimant's filed and ruled that she was able to work.  The *Ott* case differed in that the claimant claimed she had fibromyalgia and the two reviewing doctor's completely rejected it.  The *Ott* court criticized the administrator for relying on this contention that plaintiff lacked "objective evidence".  The court in *Ott* ultimately rejected both reviewing physician's opinions.  "The utilization by Defendants of two physicians who never examined Plaintiff, but simply refused to accept the fibromyalgia diagnosis and thus rejected disability due to fibromyalgia on the basis of Plaintiff's medical file, was arbitrary and capricious…" *Ott*, at *19. However, in this case, it is clear that there was objective evidence to establish the inflammatory polyarthritis as the blood tests and notes of swelling clearly established it.

Next, Prudential ignored Ms. Goletz credible evidence. Under *Sanderson*, this would be considered erroneous as Prudential is suppose to give credit to reliable evidence. *Sanderson*, at *2.  Under the Plan itself, Prudential was suppose to credit the SSA decision, her complaints, her medical records, and her doctor's reports. A-578.  As discussed above, Prudential did not do that and ignored this overwhelming evidence. The only logical reason was that all of that evidence favored granting Ms. Goletz.

Look at the record as a whole, Prudential's decision was arbitrary and capricious, because it was without reason, lacked substantial evidence, failed to follow the proper

procedures under the plan, and was erroneous under the law.   Under *Ott* and the *Sanderson* cases, this court should overturn Prudential's decision.

## Conclusion

Wherefore, this court should deny Prudential's request for summary judgment because it was arbitrary and capricious in that it was self serving, lacked reason, unsupported by substantial evidence, violated policy procedures by not properly factoring evidence, and is erroneous as a matter of law. Also, this court should give little to no deference to Prudential's decision because of its self-serving approach to the evidence and procedural bias.   Thus, this court should grant Plaintiff's motion for summary judgment based on the fact that there is more than substantial evidence to prove she was disabled under the factors for determination.   In the alternative, this court should go forward to a trial on the record in that a genuine issue of fact has been established, or remand this case back to Prudential for proper evaluation.

GRADY & HAMPTON, LLC

  /S/ Laura F. Browning
John S. Grady, Esq. (I. D. No. 009)
jgrady@gradyhampton.com
Laura F. Browning, Esq. (I.D. No.4504)
lbrowning@gradyhampton.com
6 North Bradford Street
Dover, DE  19904
(Tel. 302-678-1265)
*Attorneys for plaintiff*

DATED:  June 24, 2005

## ATTACHED UNREPORTED CASES

2002 WL 1284947 (D.Del.)

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
Mary M. MITCHELL, Plaintiff,
v.
PRUDENTIAL HEALTH CARE PLAN, a foreign insurance company, Defendant.
No. Civ.A. 01-331 GMS.
June 10, 2002.

*MEMORANDUM AND ORDER*

SLEET, J.
I. INTRODUCTION
*\*1* On April 6, 2001, the plaintiff, Mary Mitchell, filed suit against Prudential in the Superior Court for the State of Delaware (Kent County). On May 21, 2001, the case was removed from state court to the United States District Court for the District of Delaware. (D.I.1.) The plaintiff's amended complaint, filed on June 15, 2001, alleges violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq. (D.I.9.) Specifically, Mitchell asserts that she was improperly denied disability benefits by Prudential, the provider of benefits under Mitchell's benefits plan. Presently before the court is the defendant's motion for summary judgment which argues that the plan language gives Prudential discretion to deny benefits, thereby requiring this court to employ an arbitrary and capricious standard of review. Prudential urges the court to find that its decision to deny benefits was not arbitrary or capricious because the medical evidence available at that time supported a finding that Mitchell was not permanently disabled.

The plaintiff responds that Prudential is not given discretion under the plan, and asks the court to review the decision *de novo.* In the alternative, Mitchell argues that even if the court declines to review the decision *de novo,* it must employ a "heightened" arbitrary and capricious standard because Prudential funds the plan and is the plan's fiduciary. In any event, Mitchell asserts that Prudential's motion fails under any standard of review because it selectively chose to focus on the medical opinions that were favorable to Prudential while ignoring medical evidence that suggested Mitchell might be permanently disabled. Prudential responds that none of the medical information that supports Ms. Mitchell's claim was presented before the initial denial of benefits.

Upon review of the relevant documents and case law, the court finds that the defendant is not entitled to summary judgment. The court is persuaded by the defendant's contention that Prudential is implicitly granted discretion under the Plan and therefore, an arbitrary and capricious standard of review must be employed. However, because Prudential both funds the plan and determines eligibility for benefits, the court must employ a "heightened" arbitrary and capricious standard of review. Under the "heightened" arbitrary and capricious standard of review, the court finds that Prudential's decision to deny benefits to Mitchell was arbitrary and capricious based upon Prudential's self-serving use and analysis of the available evidence. The court will therefore deny the defendant's motion for summary judgment on this claim and remand to Prudential with instructions to take action consistent with this opinion.

II. FACTS
Mary Mitchell was employed by Milford Memorial Hospital ("Milford") in Delaware as an operating room technician. Milford sponsored an employee benefits plan. Prudential is the insurer and underwriter of the plan. The plan names Milford as the Plan Administrator (D.I. 35 at A96.) Prudential is referred to as the provider of benefits. (*Id.*

24

at A97.) Prudential was also responsible for determining eligibility for benefits.

*2 In October 1996, Mitchell applied for disability benefits with Prudential, citing, *inter alia,* back pain, leg pain, and sciatic pain. She was 51 years old at the time. In connection with this request for benefits, she asked Dr. Richard DuShuttle to submit an attending physician's statement ("APS") on her behalf. Mitchell first complained to Dr. DuShuttle about pain in the left hip with radiating pain in the groin and right buttock on June 18, 1996. Dr. DuShuttle requested a bone scan which indicated that Mitchell might have degenerative arthritis in the left foot and left wrist. Dr. DuShuttle's MRI of the lumbar spine also indicated mild degenerative disc disease, mild spinal canal stenosis, and minimal right line disc protrusion in the lower lumbar region. Based on these evaluations, Dr. DuShuttle's APS dated October 23, 1996 indicated that Mitchell was capable of performing light duty work four hours each day. (*Id.* at A128-29).

Prudential initially denied Mitchell's claim for benefits on October 29, 1996. (*Id.* at A130.) Prudential's policy for determining benefits stated:

Total Disability exists when Prudential determines that all of these conditions are met:

(1) Due to sickness or accidental injury, both of these are true:

(a) You are not able to perform, for wage or profit, the material and substantial duties of your occupation.

(b) After the Initial Duration of a period of Total Disability, you are not able to perform for wage or profit the material and substantial duties of any job for which you are reasonably fitted by your education, training or experience. The Initial Duration is shown in the Schedule of Benefits.

(2) You are not working at any job for wage or profit.

(3) You are under the regular care of a doctor.

(*Id.* at A74; A130.) In October 1996, Prudential denied benefits because it believed that Mitchell was currently employed at a local bowling alley. However, this was later found to be untrue and Mitchell was initially awarded benefits effective November 28, 1996. (*Id.* at A139-40.) The benefits were scheduled to terminate on November 28, 1998, the end of Mitchell's "Initial Duration" period. (*Id.* at A264.)

During Mitchell's Initial Duration period, Prudential continued to request medical information regarding her condition. Prudential sent a questionnaire to Dr. Harvey Lee, one of Mitchell's treating physicians. On February 19, 1997, Dr. Lee's responses indicated that Mitchell could not sit or stand for more than fifteen minutes at a time and could lift no more than fifteen to twenty pounds. (*Id.* at A132-33.) Dr. Lee indicated that there were no objective findings to support this conclusion. However, Dr. Lee also indicated that Mitchell was being treated for her back problems and it was "unlikely" that she would be able to work while this treatment continued. (*Id.*)

Prudential also arranged for Mitchell to be evaluated by Dr. Tutse Towne in May 1997. Dr. Towne's May 12, 1997 letter stated:

*3 Based on my examination today, Mrs. Mitchell should be able to lift at least 10-15 pounds without any difficulty. She should also be able to twist from side to side. Furthermore, she should be able to perform [a] sedentary occupation full time, as long as her job description is flexible enough to minimize prolonged sitting or prolonged standing.

(*Id.* at A144.)

Dr. Garrett Herring, Mitchell's treating chiropractor, also submitted an APS dated May 26, 1998. Dr. Herring's APS noted that Mitchell's daily activities consisted of "[n]ormal activities of daily living w/restrictions being [sic] no extended duration due to pain." (*Id.* at A147.) Dr. Herring opined that if Mitchell could find a job that satisfied her wish for no increased pain with increased activity, "she might be able to work." (*Id.*)

Mitchell also submitted another APS from Dr. Lee which was dated June 17, 1998. Dr. Lee's second APS reiterated the diagnosis of lower back pain. (*Id.* at A148.) However, when asked about Mitchell's prospects for returning to work, Dr. Lee indicated that she was "unable to do any prolonged activity, manual or physical." (*Id.*)

Mitchell was seen by Dr. Tonwe again in November 1998. Dr. Towne's second evaluation dated November 2, 1998 again diagnosed Mitchell with chronic back pain.

Dr. Tonwe repeated his earlier conclusion about Mitchell's ability to work, stating, "It is my opinion that her condition is such that she should be able to work with some restrictions." (*Id.* at A150.) In a follow-up note dated November 9, 1998, Dr. Tonwe stated that Mitchell was "disabled from her own occupation at this time, but she is not disabled from any occupation." (*Id.* at A151.)

On November 25, 1998, Prudential wrote Mitchell to advise her that her disability benefits would be terminated effective November 27, 1998. In reaching this decision, Prudential acknowledged that Mitchell complained of back pain, arthritis, and fibromyalgia. [FN1] Prudential stated that although Drs. Lee and Herring both indicated that Mitchell could not perform strenuous activity, they did not conclude that she could not work. Prudential also mentioned Dr. Tonwe's conclusion that Mitchell should be able to work. Based on this information, Prudential stated:

> FN1. Although this is the first reference the court found to fibromyalgia in the record, Mitchell apparently mentioned fibromyalgia in one of her previous claims forms.

While we understand that you are experiencing pain which does require ongoing treatment, your condition is not so severe as to render you totally disabled from any occupation. Although your condition may prevent you from perform [sic] your own occupation and other occupations which require prolonged physical activity, you could perform a job which allows you to change positions as needed to relieve your pain. (*Id.* at A153.)

By letter dated February 16, 1999, Mitchell advised Prudential that she wanted to appeal the decision. In her letter, she stated that did not have adequate notice of the termination of benefits. She also explained, in great detail, that she was experiencing substantial pain that limited her ability to function. She stated that although she could do some limited laundry work (as long as she did not lift baskets), she could not vacuum, make beds, iron, scrub or sweep, and that there were several days when she could not do anything at all due to pain. (*Id.* at A156.) She referred to an evaluation by Barker Therapy and Rehabilitation. The physical therapist noted that "Mary [Mitchell] continues with weakness and pain and loss of function and may benefit from continued physical therapy to achieve maximum functional benefit." (*Id.* at A166.)

*4 In response to Mitchell's letter, Prudential stated it would review the information Mitchell submitted, and encouraged her to submit any further information. On March 12, 1999, Prudential advised Mitchell that it was upholding its decision to terminate her benefits. The letter did not mention Dr. Lee or Dr. Herring. However, it did mention the results of the November 9, 1998 evaluation of Dr. Tonwe. Prudential did consider the physical therapy records from Barker Therapy. Prudential noted that Barker's evaluation indicated that Mitchell was "limited in [her] ability to bend, lift/carry, and grip." (*Id.* at A171.) However, Prudential stated that even with these limitations, Mitchell should be able to function in sedentary or light activities. Thus, Prudential affirmed its decision, but extended the benefits denial date to March 31, 1999 to compensate for any lack of notice. Prudential also advised Mitchell of her right to appeal their determination. Mitchell advised Prudential of her desire to appeal the decision in a letter dated June 11, 1999. In her letter, Mitchell reiterated her complaints of pain and informed Prudential that she was unable to sleep and was frequently fatigued. (*Id.* at A174.) On July 9, 1999, Prudential advised Mitchell that her file would be reviewed again and that she should submit any information that she wanted to be considered. Mitchell replied that there was no further information that she wished to include. Therefore, on July 22, 1999, Prudential advised her that second appeal was denied. (*Id.* at A193-95.)

On November 22, 1999, Mitchell requested a further and final appeal of the decision. She attached two APS forms with her request. A May 5, 1999 APS by Dr. Lee repeated the diagnosis of severe lower back pain. In the APS, Dr. Lee reiterated that Mitchell was

"unable to sit, stand, walk, or run for [an] extended period of time." (*Id.* at A183.) In particular, Dr. Lee noted that Mitchell could not stand for more than 15 minutes. He stated that due to the chronic lower back pain, Mitchell was "unable to do any meaningful regular activity" and would also be "unable to return to work." (*Id.* at A184.) However, an APS from Dr. Herring dated June 17, 1999 indicated that although Mitchell's back problems were "permanent," and she was "unable to perform activities of daily living without] severe pain," she should be able to perform sedentary work. (*Id.* at A176.)

On December 13, 1999, Prudential advised Mitchell that it could not complete its evaluation of her appeal without the additional medical information she previously indicated that she would provide. On August 7, 2000, Mitchell responded and indicated that she still suffered from severe back pain and fibromyalgia, which claimed she had "continued to get worse in the past 1 1/2 years." (*Id.* at A208.) She also indicated that she had gone to Dr. Charles Wagner for a second opinion, and enclosed the doctor's evaluation. In a letter dated July 17, 2000, Dr. Wagner stated that Mitchell had fibromyalgia and Lyme Disease. Dr. Wagner stated that Mitchell therefore had a "chronic disability" and was "unable to hold down a job." (*Id.* at A210.) Dr. Wagner further stated, "Physical examination confirms chronic fibromyalgia with point tenderness, muscle fatigue on minor exertion." (*Id.*) Dr. Wagner concluded, "The patient has remained the same since 1996. She cannot maintain a job in her, or other, professions." (*Id.*)

*5 During the appeal process, Prudential sent the entire Mitchell file to Dr. William Anthony for review and analysis. Dr. Anthony summarized the medical history and noted that the bone scan and the MRI showed degenerative arthritis and mild degenerative disc disease, respectively. Additionally, Dr. Anthony noted that the patient appeared to suffer from several maladies, most recently Lyme disease. When asked if there was medical evidence on file to support an impairment that would render Mitchell unable to perform any job since April 1, 1999, Dr. Anthony stated, "[T]here are numerous subjective statements in this chart, but there are no definite evaluations of the patient which would suggest that objectively Ms. Mitchell would be unable to perform the duties of *any job* since 04/01/99." (*Id.* at A224.) Despite his finding that there were no objective statements to support Mitchell's claims, Dr. Anthony noted that "however, there is a very concerning letter from Charles G. Wagner, M.D. dated 07/01/00 in which numerous subjective statements of report [sic] are made with regard to plaintiff's condition and if by physical examination or functional capacity evaluation those allegations or statements can be substantiated it would be my belief that the patient would be totally disabled from any occupation." (*Id.* at A225.) Prudential never requested such an examination. Dr. Anthony further stated that although Dr. Wagner's evaluation did not appear objective, "barring a functional capacity evaluation to the contrary we must respect Dr. Wagner's judgment in this matter." (*Id.* at A226.) Finally, although Dr. Anthony considered the opinions of both Dr. Wagner and Dr. Tonwe, he noted that Dr. Wagner's evaluation "seems to describe a patient with many more and more serious complaints than that noted in Dr. Tonwe's evaluations of 11/98." (*Id.*) Prudential also asked Dr. Joel Moorhead, a medical director at Prudential, to review the file. Dr. Moorhead stated that although the MRI appeared to show changes in the back, these changes were related to age, were not usually symptomatic, and should not prevent Mitchell from working. Dr. Moorhead did not provide any specific facts in support of these findings. Dr. Moorhead also stated that the Lyme Disease diagnosis did not appear to be well supported. He did not offer a rationale for this conclusion, however. He also noted that Dr. Tonwe and Dr. Anthony's conclusions that Mitchell could not work at any job were well supported. Dr. Moorhead did not offer any reasons for this judgment either.

On January 29, 2001, Prudential advised Mitchell that it had reviewed her claim and decided not to reinstate her benefits. Prudential first summarized all of the medical evidence in the file, including Ms. Mitchell's descriptions of her pain and limitations. Prudential then stated:

The documentation submitted on appeal reflects that Ms. Mitchell has been diagnosed with Lyme Disease and has been under the care of Dr. Shoemaker. The diagnosis of Lyme disease does not appear to be well-established. There is no indication of inflammatory arthritis and a normal neurological exam. Additionally, the diagnosis of Lyme Disease appears to be made in July 2000 from Dr. Wagner. Any new development of a disorder would not be covered as Ms. Mitchell's claim terminated effective April 1, 2000.

*6 Ms. Mitchell and her physicians have indicated that Ms. Mitchell's conditions prevent her from performing the duties of a sedentary occupation. Based on our review of the information in the file, we have determined that at the time LTD benefits were terminated, documentation does not support a Totally Disabling condition that would render Ms. Mitchell unable from performing [sic] job duties [in] a position classified as sedentary. The 1996 MRI of the lumbar spine shows degenerative changes on lumbar spine which are age-related changes. The imaging findings are not sufficiently severe enough to prevent returning to another occupation.

Dr. Tonwe opined that Ms. Mitchell would be able to perform sedentary work. Dr. Anthony opined that the documentation did not support an impairment that would prevent Ms. Mitchell from performing the duties of another occupation.

(*Id.* at A265-65.) Prudential's statement that the Lyme disease diagnosis was not well established echoes Dr. Moorhead's findings, but Prudential did not address the fibromyalgia aspect of the claim. Moreover, Prudential never addressed Dr. Anthony's statements that Mitchell's condition might have deteriorated since seeing Dr. Tonwe or that if her subjective complaints of pain were objectively verified (i.e. through a functional capacity test), she would be totally disabled from any occupation. Based on this reasoning, Prudential determined that Mitchell could perform sedentary work, specifically as a hospital admitting nurse. After a request for further review was denied, Mitchell filed this action.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56(c)*; *see also Turner v. Schering-Plough Corp., 901 F.2d 335, 340-41 (3d Cir.1990).* The movant bears the burden of proving that there are no genuine issues of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10 (1986).* A dispute is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-movant, and a fact is material if it might effect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)* Finally, on any motion for summary judgment, the court must view the evidence in a light most favorable to the non-movant and draw all reasonable inferences in his favor. *Wetzel v. Tucker, 139 F.3d 380, 383 n. 2 (3d Cir.1998).* With these principles in mind, the court will consider the appropriate standard of review to be applied in this case.

## IV. DISCUSSION

## A. The Standard of Review

When considering a plan administrator or fiduciary's denial of benefits under ERISA, district courts are generally instructed to employ *de novo* review. *See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).* However, where plan terms grant discretion to the plan administrator or fiduciary to determine a claimant's eligibility for benefits, the decision is subject to review under an "arbitrary and capricious" standard (i.e., a determination of whether the plan administrator abused its discretion in reaching its decision). *See Mitchell v. Eastman Kodak Co., 113 F.3d 433, 437 (3d Cir.1997).* Where discretion is reserved, the court may overturn the decision only if it is " 'without reason, unsupported by substantial evidence or erroneous as a matter of law." ' *Abnathya v. Hoffman-LaRoche, Inc., 2 F.3d 40, 45 (3d Cir.1993)* (citations omitted). However, where the fiduciary's decision is potentially clouded by a conflict of interest, such as where a plan administrator also funds the plan it administers, the

conflict must be considered in assessing the amount of deference to be given to the administrator's decision. *See Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 387 (3d Cir.2000). Thus, in those circumstances, a modified or "heightened" arbitrary and capricious standard of review is appropriate. *See id.* at 390-92.

*\*7* Mitchell urges the court to apply a *de novo* standard of review because (1) Prudential is not the plan administrator and (2) the terms of the plan do not confer discretion upon Prudential. The court is not persuaded by either contention. First, Prudential need not be a plan administrator for its decision to be subject to an arbitrary and capricious standard of review. The Supreme Court has stated that "A denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator *or fiduciary* discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone*, 489 U.S. at 115 (emphasis added). Although Prudential was not the plan administrator, it was a fiduciary of the plan. The applicable federal regulations in effect during Mitchell's claim and appeal state, "To the extent that benefits under an employee benefit plan are provided or administered by an insurance company ... that company shall be the 'appropriate named fiduciary' for purposes of this section." 29 C.F.R. § 2560.503-1 (2000). [FN2] As an insurance company providing benefits, Prudential was an "appropriate named fiduciary" under the applicable regulations. Thus, under the *Firestone* analysis, given Prudential's status as a fiduciary, the plan's failure to name Prudential as the plan administrator does not require the court to employ *de novo* review.

> FN2. The 2001 revisions to this section of the CFR do not contain this language. However, the revised section only applies to claims filed after January 1, 2002. *See* 29 CFR § 2560.501-3(o)(1) (2001). Since
>
> Mitchell's claim predates the revised language, the court will be guided by use the language in effect during her claim and appeal.

Mitchell further argues that the plan terms do not give Prudential discretion. The plan states that "Total disability exists when Prudential determines that all of these conditions are met ..." The court agrees with the plaintiff that this language does not explicitly confer discretion upon Prudential. However, "although an express reservation of discretion is preferred, discretion may reasonably be inferred from the policy language." *Russell v. Paul Revere Life Ins. Co.*, 148 F.Supp.2d 392, 400 (D.Del.2001) (collecting cases). Thus, the fact that the grant is not explicit will not prevent the court from considering whether Prudential has been given discretion under the plan. The defendant argues that the use of the word "determines" is sufficient to confer discretion upon Prudential. The defendant submits that the normal meaning of the word determine is "to settle a controversy about ... to come to a decision concerning as the result of investigation or reasoning ... to settle or decide by choice of possible alternatives." (D.I. 34 at 18 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY n.p. (1986))). The plaintiff responds that although the defendant's definition is not incorrect, determine can also mean "to reach a decision, as after consideration or calculation," and calculation, such as in math, does not necessarily confer discretion. (D.I. 37 at 11 (quoting WEBSTER'S II NEW RIVERSIDE DICTIONARY n.p. (1984))). [FN3]

> FN3. The plaintiff further asserts that even if discretion need not be explicitly given, words such as "proof satisfactory" or "substantial proof" must appear in the plan before such discretion can be inferred. The court disagrees. Although many courts have used this language to support a

finding of discretion, *see Russell,* 148 F.Supp.2d at 400 (collecting cases), this is by no means the only language from which a grant of discretion can be inferred. *See, e.g., Ernest v. Plan Administrator of the Textron Insured Benefits Plan,* 124 F.Supp.2d 884, 890-91 (M.D.Pa.2000) (finding discretion in the absence of "proof satisfactory or substantial proof language"); *Westover v. Metropolitan Life Ins. Co.,* 771 F.Supp. 1172, 1174 (M.D.Fla.1991) (same).

The court finds that under either definition, the usual meaning of the word "determines" implies the exercise of discretion. The definitions supplied by both parties suggest that a determination is reached only after deliberation of some sort. The ability to think or deliberate prior to making a decision is the touchstone of discretion. The court therefore finds that the plan language is sufficient to confer discretion upon Prudential. *See Eley v. Boeing Co.,* 945 F.2d 276, 278 n. 2 (9th Cir.1991) (finding discretion where plan language stated, "The Company shall *determine* the eligibility of a person for benefits under the plan ...")(emphasis added). Since Prudential has discretion, *de novo* review is inappropriate. Therefore, the court will review Prudential's decision under an arbitrary and capricious standard.

***8** However, as previously stated, there are two types of arbitrary and capricious review--the standard level of review and a "heightened" standard of review that may be employed where there is a conflict of interest. *See Russell,* 148 F.Supp.2d at 400. Such a conflict may arise where the fiduciary also funds the plan. *See Pinto,* 214 F.3d at 387 ("We are persuaded that heightened scrutiny is required when an insurance company is both plan administrator and funder.") In the present case, Prudential both funds the plan and determines eligibility for benefits. Thus, Prudential's actions must be subjected to the "heightened" arbitrary and capricious standard of review. [FN4] The court will now consider whether Prudential's decision was arbitrary and capricious under this standard.

> FN4. The defendant agrees that this is the appropriate standard of review. ("In light of the fact that Prudential both funds the Plan and administers claims under the Plan, this court may apply a "heightened" arbitrary and capricious standard of review.) (D.I. 39 at 9.)

B. Application to the Facts

Under a standard arbitrary and capricious review, the court would be limited to determining whether the fiduciary's decision was without reason, unsupported by evidence, or erroneous as a matter of law. *See id.* at 393. The fiduciary's decision would be entitled to substantial deference. *See id.* Under the "heightened" arbitrary and capricious standard, however, the court need not give complete deference to the fiduciary's decision to deny benefits. *See id.* Indeed, rather than simply determining whether the result was supported by rational facts, the court must consider the process by which the result was achieved. *See id.* The court may consider all evidence available to Prudential during the entire appeals process. *See Mitchell,* 113 F.3d at 440 ("[T]he relevant record on appeal is the evidence before the Administrator at the time of his final denial ...").

The Third Circuit has suggested that the presence of certain factors can cause a court to find fault with a fiduciary's process. A fiduciary's decision process may not be entitled to deference if it reverses an earlier decision without receiving any additional medical information. *See id.* Additionally, the court need not accept the decision of a fiduciary that uses a self-serving approach to the evidence that selectively relies upon the evidence that supports a denial of benefits but rejects the evidence that supports the

continuation of benefits. *See id.* Finally, along similar lines, if the fiduciary appears unwilling to listen to advice from its staff that recommends continuation of benefits, the decision may be questioned. *See id.*

In the present case, the first factor is not an issue because Prudential solicited further medical information from Mitchell at each stage of the appeal. However, the second factor which instructs the court to consider whether the fiduciary was self-serving in its consideration of the evidence is more problematic. In its final denial of benefits, Prudential appeared to give more weight to the evidence that favored the refusal of benefits. For instance, Prudential accorded great weight to Dr. Tonwe and Dr. Anthony's conclusions that Mitchell could work. In contrast to its reliance on the findings of its own doctors, Prudential mentioned, but did not fully discuss, credit, or reconcile the contrary opinions of other doctors such as Dr. Lee and Dr. Wagner who concluded that Mitchell was disabled from any occupation. Prudential also relied heavily (if not solely) upon Dr. Moorhead's findings regarding the reliability of the medical diagnoses. (It is worth noting that Drs. Tonwe, Anthony, and Moorhead were all connected to Prudential in some manner.)

*\*9* Although Prudential may have doubted the reliability of the conclusions or diagnoses of Mitchell's doctors, there is nothing in the record to indicate that the opinions of the Prudential physicians were any more supported or reliable. The court notes that unlike Mitchell's doctors, neither Dr. Anthony nor Dr. Moorhead treated or examined Mitchell-- they merely reviewed her medical records. Dr. Moorhead's conclusions regarding the reliability of Mitchell's Lyme Disease and back pain diagnoses are conclusory and completely unsupported by any testing or findings. Although Dr. Tonwe did examine Mitchell, Prudential did not consider the fact that his last examination took place in 1998, more than two years prior to the final denial. Given the staleness of Dr. Tonwe's diagnosis and the fact that medical conditions can worsen over time, Dr. Wagner's more recent diagnosis was entitled to more weight than Prudential accorded it. Since none of the evidence in the file was of surpassing reliability, there was no rational reason to simply give more weight to the Prudential physician's conclusions without a thorough and fully supported discussion of why the conclusions of Mitchell's doctors should be rejected. [FN5]

> FN5. The court notes that Prudential implies that certain irregularities or abnormalities with Dr. Herring's June 17, 1999 APS led it to question that document. The court need not consider this argument because that particular APS had very little bearing on the final denial of benefits and even less bearing on the court's analysis regarding self-dealing.

Stronger evidence of Prudential's "self-dealing" is found in its treatment of Dr. Anthony's adverse conclusions. Although Dr. Anthony suggested that Dr. Tonwe's examination results might be stale and Dr. Wagner's conclusions should be accorded some deference as a result, Prudential never mentioned or explained this finding in its final denial. It was completely ignored. Similarly disregarded was Dr. Anthony's statement that if Mitchell's subjective complaints of pain were verified, she would be disabled from all occupations. Prudential never explained why it was rejecting this conclusion. In fact, this conclusion is not even mentioned in the denial letter. Conversely, Dr. Anthony's conclusion that Mitchell could work is prominently featured and relied upon in the termination of benefits. This apparent willingness to use the helpful portions of Dr. Anthony's testimony while completely ignoring the portions that would support the continuance of benefits is some evidence that Prudential was acting in self-interest. *See Pinto,* 214 F.3d at 394 (noting that crediting one helpful portion of the doctor's testimony while discrediting unhelpful portions "raise[d] likelihood of self-dealing").

Not only did Prudential fail to address Dr. Anthony's assertions regarding Mitchell's

subjective complaints of pain, Prudential did not follow his suggestion that Mitchell's pain might be verified through a functional capacity test. This failure to follow advice from its own staff fits squarely into the third factor identified in *Pinto,* and could also support a finding of self-dealing under the second factor.

In its denial, Prudential also noted that there was no evidence to support a disability "at the time" benefits were denied. This appears to refer to the fact that the Lyme Disease diagnosis was first made in June 2000. Nevertheless, Prudential ignored the fact that Dr. Wagner diagnosed Mitchell with Lyme Disease *and* fibromyalgia. Although Prudential is correct that the Lyme Disease diagnosis first appeared in the record in 2000, Prudential itself mentioned the possibility of fibromyalgia as early as its November 1998 denial letter. Therefore, fibromyalgia was known "at the time" benefits were denied. Thus, to the extent that Dr. Wagner's findings were dependent upon a fibromyalgia diagnosis, it cannot be said that the fibromyalgia was a new impairment or disability. However, Prudential never considered or rejected the possibility that Mitchell's symptoms might be related to the fibromyalgia. Prudential's unwillingness to consider this possibility is further evidence of self-dealing.

*\*10* The court further notes that Prudential placed considerable weight on the lack of "objective evidence" to support Mitchell's complaints of pain. Conversely, Mitchell's subjective complaints of pain, while mentioned, were entirely discounted. For instance, although Prudential relied on Dr. Moorhead's finding that the MRI showed only non-symptomatic, age related changes, Prudential did not consider how Mitchell's subjective complaints of pain contradicted this conclusion. The court finds that this strong emphasis on objective evidence to the resulting exclusion of the subjective evidence was incorrect. In this determination the court draws guidance from precedent in the area of social security. *See Torix v. Ball Corp., 862 F.2d 1428, 1431 (10th Cir.1988)* (noting that although social security cases are not precedential in the ERISA context, they can be used for guidance). The social security disability regulations require that subjective complaints of pain be given great weight as long as there is objective evidence of some condition that could reasonably produce such pain. *See Krizon v. Barnhard,* ---- F.Supp.2d --- (W.D.Pa. Apr. 23, 2002), *currently reported at* 2002 WL 662267, at *9.

In the present case, there was objective medical evidence in the form of an MRI to support Mitchell's back pain diagnosis. Although subjective complaints of pain may be disregarded if the objective findings are contradicted by medical evidence, *see id.,* in the present case every doctor confirmed that the MRI showed a disturbance in the lower back. The only doctor who challenged the MRI was Dr. Moorhead who stated that the back problems were consistent with age and should be asymptomatic. Not only is Dr. Moorhead alone in this conclusion but given his ties to Prudential, his failure to examine the patient, and the lack of support for his conclusions, his analysis should not have been accorded such great weight. Additionally, Dr. Wagner stated, *"Physical examination* confirms chronic fibromyalgia with point tenderness, muscle fatigue on minor exertion." (D.I. 35 at A210.) (emphasis added). [FN6] The record contains no evidence contradicting this diagnosis. Thus, there was no reason for Prudential to ignore the fact that the objective findings supported a diagnosis of a back injury or fibromyalgia which could produce Mitchell's subjective complaints of pain.

FN6. The court notes that although Dr. Wagner's refers to "physical examination," the record contains no reference to any objective tests he used to make the fibromyalgia diagnosis. However, medical literature indicates that, at present, there are no tests available to diagnose this condition. *See* WebMdHealth, *Fibromyalgia--Topic Overview, at* http://my.webmd.com/encyclopedia/article/1673.50846 (last visited May 17, 2002) ("Fibromyalgia can be difficult to diagnose because its symptoms are similar to many other disorders and diseases. There are no lab tests to diagnose fibromyalgia. It is often diagnosed after other conditions

have been ruled out."). The diagnosis is consistent with Mitchell's symptoms of fatigue and sleeplessness and was made during a time consistent with her report of those symptoms. *See id.* Therefore, the court does not find it fatal that no objective tests verified the fibromyalgia diagnosis.

For all of the above reasons, the court finds that Prudential impermissibly used evidence that supported the denial of Mitchell's benefits while ignoring or failing to satisfactorily explain its rejection of evidence supporting reinstatement of Mitchell's benefits. Based on these actions, the court finds that Prudential engaged in impermissible self-dealing in its consideration of the evidence. The court therefore finds that under a "heightened" arbitrary and capricious standard, Prudential's decision was arbitrary and capricious.

V. CONCLUSION

For all of the above reasons, the court finds that Prudential's decision to terminate Mitchell's benefits was arbitrary and capricious due to the self-serving nature of Prudential's decision-making process. Therefore, the court will remand this case to Prudential for further proceedings consistent with this opinion.

*11* NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. The Defendant's Motion for Summary Judgment (D.I.33) is DENIED.

2. This matter is remanded to Prudential, the claims administrator, to take further action consistent with this opinion.

D.Del.,2002.

Mitchell v. Prudential Health Care Plan

2002 WL 1284947 (D.Del.)

### Motions, Pleadings and Filings (Back to top)

• 1:01CV00331 (Docket) (May. 21, 2001)

END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1215958 (M.D.Pa.)

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
M.D. Pennsylvania.
Jeanette OTT, Plaintiff
v.
LITTON INDUSTRIES, INC., sponsor and administrator of the Litton Industries,
Inc. Employees' Health/Long-Term Disability Plan et al., Defendants.
No. 4:04-CV-763.
May 20, 2005.

Jonathan E. Butterfield, Murphy, Butterfield & Holland, P.C., Williamsport, PA, for Plaintiff.
Vincent Candiello, Morgan, Lewis & Bockius LLP, Harrisburg, PA, for Defendants.

MEMORANDUM AND ORDER

JONES, J.

*1 THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

Pending before the Court is a Motion for Summary Judgment (doc. 19) filed by Plaintiff Jeanette Ott ("Plaintiff") on March 1, 2005. We also have before us a Motion for Summary Judgment (doc. 20) filed by Defendants Litton Industries, Inc. Employees' Health/Long Term Disability Plan and Unum Life Insurance Company of American (collectively "Defendants") on March 1, 2005.

For the reasons that follow, we will grant Plaintiff's Motion for Summary Judgment and deny Defendants' Motion for Summary Judgment.

*PROCEDURAL HISTORY:*

On April 8, 2004 Plaintiff filed a complaint against Litton Industries, Inc. ("Litton") and Unum Life Insurance Company of America ("Unum") in the United States District Court for the Middle District of Pennsylvania arising under the provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* (*See* Rec. Doc. 1). In Count I of the complaint, Plaintiff contended that Defendants failed to pay long-term disability benefits owed to Plaintiffs and Count II asserted a claim under Pennsylvania's Insurance Bad Faith Statute, 42 Pa.C.S. § 8371.

On September 20, 2004, with consent of defense counsel, Plaintiff filed an amended complaint, within which Plaintiff amended the names of the parties, alleged that subsequent to the filing of the complaint Defendants had issued an unfavorable decision regarding Plaintiff's disability benefit claim, and dropped the bad faith claim previously asserted. (*See* Rec. Doc. 14). Plaintiff named Litton Industries, Inc., Employees' Long-Term Disability Plan ("the Plan") and Unum as defendants (collectively "Defendants"). An answer was filed to the amended complaint on October 4, 2004. (*See* Rec. Doc. 15). Discovery in the above-captioned action closed on February 18, 2005. On March 1, 2005, both parties filed Motions for Summary Judgment, which have been briefed by the parties. The instant Motions are therefore ripe for disposition.

*STANDARD OF REVIEW:*

Summary judgment is appropriate if "there is no genuine issue as to any material fact and … the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©); *see also Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir.1990).* The party moving for summary judgment bears the burden of showing "there is no genuine issue for trial." *Young v. Quinlan, 960 F.2d 351, 357 (3d Cir.1992).* Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences which a fact finder could draw from them. *Peterson v. Lehigh Valley Dist. Council, 676 F.2d 81, 84 (3d Cir.1982).*

Initially, the moving party has a burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corporation v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).* This may be met by the moving party pointing out to the court that there is an absence of evidence to support an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325.

*2 Federal Rule of Civil Procedure 56 provides that, where such a motion is made and properly supported, the non-moving party must then show by affidavits, pleadings, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The United States Supreme Court has commented that this requirement is tantamount to the non-moving party making a sufficient showing as to the essential elements of their case that a reasonable jury could find in its favor. *Celotex Corp., 477 U.S. at 322-23.*

It is important to note that "the non-moving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of

material fact." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 511 (3d Cir.1994) (citation omitted). However, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc. .*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993) (citations omitted).

Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(emphasis in original). "As to materiality, the substantive law will identify which facts are material." *Id.* at 248. A dispute is considered to be genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

STATEMENT OF RELEVANT FACTS:

We initially note that we will, where necessary, view the facts and all inferences to be drawn therefrom, in the light most favorable to the nonmoving party in our analysis of the pending motions.

As of May 2, 2000, Plaintiff was an employee of Litton and was eligible to participate in the Plan. On or about May 2, 2000, Plaintiff was involved in a motor vehicle accident that caused or aggravated the following conditions: fibromyalgia, degenerative joint disease, back and neck muscle spasms, bursitis, chronic pain, including migraine headaches, and depression secondary to the chronic pain. Following the applicable elimination period, Plaintiff began receiving long-term disability benefits in the amount of $1098 .23 per month on or about November 2, 2000. By letter dated April 4, 2002, the Plan's administrative agent, Metropolitan Life Insurance Company ("MetLife") informed Plaintiff that the first 24-months of disability would end on November 1, 2002, and that MetLife would begin reviewing her claim for long-term disability ("LTD") benefits based upon whether she was precluded from performing "any job for which [she was] reasonably qualified based on [her] training, education and experience." (Defs.' SMF at ¶ 10).

 *3 By letter dated February 24, 2003, MetLife informed Plaintiff that her benefits ceased as of November 1, 2002 because her claim did not meet the criteria for continued benefits under the Plan. The letter advised Plaintiff that she had 180 days after receipt of the denial letter to file an appeal for the termination of her benefits. By letter addressed to MetLife and dated August 1, 2003, Plaintiff's attorney appealed the denial of Plaintiff's claim. MetLife sent Plaintiff a letter on August 6, 2003, advising her that MetLife would rule on her appeal within 45 days of its receipt of the appeal, taking an additional 45 days if there were special circumstances requiring additional time for MetLife to complete the review, and if MetLife notified Plaintiff of the special circumstances in writing. By e-mail dated November 12, 2003, in response to a status inquiry, MetLife informed Plaintiff's attorney that its appeals unit determined Plaintiff's claim should be reinstated. The November 12, 2003 e-mail read as follows:

Our appeals unit determined that Ms. Ott's long-term disability claim was to be reinstated. As the disability carrier changed effective July 1, 2003 to Unum Provident, it was sent to them to reinstate as this is an advise to pay group it would need to go to the new carrier. I sent the file September 17, 2003. Per your voice mail advising that they have not received it, I have requested the file be printed again. I will FedEx this to them so that we have a way of tracking this. If you have further questions, please contact me. Rhonda Sangonette

*See* Rec. Doc. 22, Ex. Q.

By e-mail dated January 14, 2004, Unum informed Plaintiff's attorney that review of Plaintiff's claim was continuing. Unum further informed Plaintiff's attorney that it would begin issuing LTD benefits as of January 1, 2004, and continue to pay benefits until Unum made a final determination on Plaintiff's claim. The e-mail addressed to Plaintiff's attorney reads, in pertinent part, as follows:

Until we have made a final determination on [Jeanette Ott's] eligibility for benefits, we

will begin issuing benefits effective 1/1/04 and continue the monthly benefit until a final determination has been made. This payment or any possible future payments, until we advise you otherwise, are being made under Reservation of Rights. This means that payment cannot be construed as an admission of present or future liability, and we reserve the right to enforce any and all provisions of the plan.

*See* Rec. Doc. 23, Ex. S.

Plaintiff states that as time passed and no final decision from Unum on the appeal was forthcoming, Plaintiff filed the instant action on April 8, 2004. Thereafter, on June 22, 2004, Unum issued a letter stating that Plaintiff's appeal was denied and her benefits were being terminated. Unum found Plaintiff to be ineligible for benefits beyond November 2, 2002. Additionally, the letter explains that Plaintiff failed to provide information sufficient to support the conclusion that she was unable to perform all sedentary jobs. Plaintiff characterizes the appeal denial as a denial on the basis of reports of two physicians who had never examined or even spoke to Plaintiff, and a rejection of the opinions of Plaintiff's family physician, her psychiatrist, and her orthopedist, to the effect that Plaintiff was incapable of any sort of work. Plaintiff also submits that the denial rejected the diagnoses of Plaintiff's neurologist, rheumatologist, and pain management specialist.

*DISCUSSION:*

*\*4* In her Motion for Summary Judgment, Plaintiff argues that Defendants' failure to decide her appeal from the termination of her disability claim in the time limits established by ERISA and Defendants' own policies allows the Court to review Plaintiff's disability status *de novo.* Plaintiff contends that the undisputed facts establish that the Plan Administrator violated Plaintiff's rights under ERISA by illegally delaying its decision on Plaintiff's appeal from the termination of her LTD benefits. (Pl.'s Mot. Summ. J. at ¶ 2). Plaintiff asserts that having been advised that, following her appeal, her claim was reinstated, Defendants are estopped from denying her appeal. *Id.* at ¶ 3. Moreover, Plaintiff submits that the undisputed facts indicate that the Plan Administrator abused its discretion in terminating Plaintiff's disability benefits, in that she is incapable of performing any gainful work. *Id.* at ¶ 4.

Defendants counter by arguing in their Motion for Summary Judgment that there is no material issue of disputed fact on the question of whether Plaintiff is entitled to LTD benefits after November 2, 2002, under the terms of the Plan. (Defs.' Mot. Summ. J. at ¶ 3). Additionally, Defendants assert that an action to recover plan benefits under ERISA should be judicially reviewed under an arbitrary and capricious standard when, as in this case, the Plan expressly reserves discretionary authority to determine eligibility for benefits or to construe the terms of the Plan to the Plan Administrator, and the Plan provides its Administrator with authority to delegate its duties. Defendants assert that Unum's decision that Plaintiff was not entitled to LTD benefits on or after November 2, 2002 was not arbitrary and capricious.

A. *Applicable Standard of Review*

Under ERISA, a court reviewing an administrator's decision to deny benefits is by default reviewed *de novo,* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine the employee's eligibility or construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Stratton v. E.I. DuPont de Nemours & Co.,* 363 F.3d 250, 253 (3d Cir.2004).* If a plan provides discretionary authority to the administrator or fiduciary, then a reviewing court applies a form of arbitrary and capricious review. *Firestone Tire & Rubber Co.,* 489 U.S. at 111-12, 115; *see Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 437 (3d Cir.1997). Discretionary authority can be provided for by express or implied language in the benefit plan. *Luby v. Teamsters Health, Welfare, & Pension Trust,* 944 F.2d 1176, 1180 (3d Cir.1991). Whether that arbitrary and capricious review is heightened in any way depends on the presence of potentially conflicted ERISA fiduciaries and is determined on a sliding scale that we will discuss in further detail below. *Pinto v. Reliance Standard Life Ins. Co.,* 214 F.3d 377, 379 (3d Cir.2000).

*\*5* The scope of discovery depends upon the standard of review. In the Third Circuit, "a

district court exercising de novo review over an ERISA determination between beneficiary claimants is not limited to the evidence before the Fund's Administrator." *Luby,* 944 F.2d at 1184-85. In sharp contrast, the record available to a court conducting an arbitrary and capricious review is the record made before the plan administrator, which cannot be supplemented during litigation. *See Kosiba v. Merck & Co.,* 384 F.3d 58, 67 n. 5 (3d Cir.2004)(*citing Mitchell,* 113 F.3d at 440). Nevertheless, when a reviewing court is deciding whether to employ the arbitrary and capricious standard or a more heightened standard of review, it may consider evidence of potential biases and conflicts of interest that are not found in the administrator's record. *Id.*

I. *Arbitrary & Capricious Review*

As we previously explained, under ERISA, a court reviewing an administrator's decision to deny benefits is by default conducting an analysis *de novo,* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine the employee's eligibility or construe the terms of the plan." *Firestone Tire & Rubber Co.,* 489 U.S. at 115; *Stratton,* 363 F.3d at 253. Additionally, if a plan provides discretionary authority to the administrator or fiduciary, then a reviewing court applies a form of arbitrary and capricious review. *Firestone Tire & Rubber Co.,* 489 U.S. at 111-12, 115; *see Mitchell,* 113 F.3d at 437.

To determine the proper standard of review, we must begin with the language of the Plan. In this case, as Defendants submit, the Plan expressly provides the Plan Administrator with discretionary authority to interpret the Plan and to decide any and all matters arising from the Plan. Moreover, the Plan provides its Administrator with authority to delegate its duties.

The Plan states, in pertinent part, as follows:

The Plan is administered by the Plan Administrator, a named Fiduciary under the Plan. The Plan Administrator acts in the sole interest of the Plan participants and their beneficiaries.

The Plan Administrator has the discretion to interpret the Plan and to decide any and all matters arising from the Plan. The Plan Administrator has delegated Metropolitan Life Insurance Company to have sole power and duty to review and determine claims filed under the Plan and the power and duty to process all claims and appeals and to provide other administrative services.

*See* Rec. Doc. 22, Ex. A (emphasis added). In the case *sub judice,* the Plan Administrator first delegated its authority to MetLife and as of July 1, 2003, Unum became the Plan Administrator. On the basis of the Plan's plain language, we conclude that the Plan provided the Plan Administrator with the authority to make decisions with respect to eligibility. Accordingly, we will review the decision regarding Plaintiff's claim for LTD benefits under the arbitrary and capricious standard of review on the basis of the administrative record before Unum at the time of the decision to deny Plaintiff's claim. *See Kosiba,* 384 F.3d at 67 n. 5 (*citing Mitchell,* 113 F.3d at 440).

**\*6** Plaintiff argues that Defendants' failure to decide her appeal from the termination of her disability claim within the time limits established by ERISA and Defendants' own policies allows the Court to review Plaintiff's disability status *de novo.* We disagree for the reasons that follow and find the cases cited by Plaintiff in support thereof to be factually distinguishable from this case.

The only precedential decision cited by Plaintiff in support of her contention that a *de novo* standard of review should be employed is *Gritzer v. TBS, Inc.,* 275 F.3d 291 (3d Cir.2002). In *Gritzer,* the Third Circuit Court of Appeals explained that it was called upon "to determine the appropriate standard of review where a pension plan allows for discretion but discretion is not exercised." *Id.* at 293. After several unsuccessful inquiries, appellants filed a claim letter with the plan administrator to which the administrator failed to respond within 90 days. An important distinguishing factor between *Gritzer* and this case is that in *Gritzer,* appellants' claim was thereby "deemed denied." *Id.* at 294. Based on that denial, appellants filed suit. "Nearly five months later, Westinghouse finally responded to appellants' claim and denied it on the merits for essentially the same reasons that Westinghouse invokes here." *Id.* The Third Circuit

Court of Appeals explained that there was no analysis or reasoning to which the trial court could have deferred under the arbitrary and capricious standard, as on the basis of the applicable plan, the appeal was "deemed denied" after the plan administrator failed to respond within 90 days. *Id.* at 294. The Third Circuit emphasized that had discretion in fact been exercised in the course of denying benefits, the applicable standard would have been arbitrary and capricious; however, it reviewed the denial of benefits *de novo* based upon "the trustee's failure to act or to exercise his or her discretion." *Id.* at 296.

Stated differently, as the Ninth Circuit Court of Appeals explained in another case cited by Plaintiff in support of her assertion that *de novo* review is warranted, *Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Protection Plan,* 349 F.3d 1098 (9th Cir.2003), the Third Circuit applied *de novo* review to the plan in *Gritzer* that otherwise granted discretion to the administration because under the plan the employee pension claim was deemed denied. *Id. at 1106.* Although courts of appeal have split on the question of whether a "deemed denied" claim is always entitled to *de novo* review, a majority of circuits have held that, absent substantial compliance with the deadlines, *de novo* review applies on the ground that inaction is not a valid exercise of expertise upon which to defer. *See Nichols v. Prudential Ins. Co. of America,* 406 F.3d 98, 2005 WL 913762, *8 (2nd Cir.2005); *see, e.g., Jebian,* 349 F.3d at 1106-7; *Gilbertson v. Allied Signal, Inc.,* 328 F.3d 625, 632-33 (10th Cir.2003); *Gritzer,* 275 F.3d at 295.

*7 Thus, the above-referenced cases are factually distinguishable from the case *sub judice,* as they are cases in which the claim at issue was "deemed denied." In this case, no claim was "deemed denied" either pursuant to applicable ERISA regulations or pursuant to the Plan. Importantly, and as submitted by Defendants, the Secretary of Labor amended the applicable ERISA regulations in 2000. The pertinent regulation, 29 C.F.R. § 2560, first promulgated in 1977, was amended in 2000 such that language stating that a claim is deemed denied on review if a claimant did not receive written notice within the relevant time period, was removed. *See Pension and Welfare Benefits Administration,* 65 Fed.Reg. 70246, 70265, 70268-69 (Nov. 21, 2000); *see also Jebian,* 349 F.3d at 1193, n. 5. Excised from the new regulation is the provision that transgressions of time limitations will result in the claim being "deemed denied." *See* 29 C.F.R. § 2560.503-1(h) (2002); *see also Jebian,* 349 F.3d at 1193, n. 5.

The 2000 amendments apply to claims filed on or after January 1, 2002. 29 C.F.R. § 2560.503-1(i)(3)(i) (2002). In this case, as we previously explained, Plaintiff began receiving LTD benefits on or about November 2, 2000. By letter dated February 24, 2003, MetLife informed Plaintiff that her benefits ceased as of November 1, 2002 because her claim did not meet the criteria for continued benefits under the Plan. By letter addressed to MetLife and dated August 1, 2003, Plaintiff's attorney appealed the denial of Plaintiff's claim. Accordingly, Plaintiff's claim for continued LTD benefits arose after the January 1, 2002 effective date of the 2000 ERISA amendments and the applicable regulations did not render Plaintiff's claim denied before Unum issued its June 24, 2004 decision. It is also important to note that unlike the plan in *Jebian,* the Plan at issue does not contain a provision that renders a claim "deemed denied" or effectively denied if the Plan Administrator fails to comply with the applicable time limitations. (*See* Rec. Doc. 22, Ex. A).

We therefore find the cases cited by Plaintiff in support of her argument, that Defendants' failure to decide Plaintiff's appeal from the termination of her disability claim in the time limits established by ERISA and Defendants' own policies allows the court to review her disability claim *de novo,* to be factually distinguishable. Accordingly, a *de novo* standard of review is not warranted in this case. As we previous explained, we will review the decision regarding Plaintiff's claim for LTD benefits under the arbitrary and capricious standard of review on the basis of the administrative record before Unum at the time of the decision to deny Plaintiff's claim. *See Kosiba,* 384 F.3d at 67 n. 5 (*citing Mitchell,* 113 F.3d at 440).

a. *"Arbitrary & Capricious" versus "Heightened Arbitrary & Capricious" Review*

Our consideration of the proper standard of review does not end with the foregoing

analysis, but warrants further review for the reasons that follow. In *Pinto v. Reliance Standard Life Ins. Co.,* 214 F.3d 377 (3d Cir.2000), the Third Circuit Court of Appeals held that in reviewing an ERISA plan fiduciary's discretionary determination regarding benefits, a court must take into account the existence of the structural conflict of interest present when a financially interested entity also makes benefit determinations. *See Kosiba,* 384 F.3d at 64. In *Pinto,* the Third Circuit adopted a "sliding scale" approach, in which the district courts must "consider the nature and degree of apparent conflicts with a view to shaping their arbitrary and capricious review of the benefit determinations of discretionary decisionmakers ." *Id.* (citing *Pinto,* 214 F.3d at 393). The afore-mentioned "sliding scale method" "intensifies the degree of scrutiny to match the degree of conflict." *Id.* at 379.

**\*8** As the Third Circuit recently explained in *Kosiba,* Pinto offered a nonexclusive list of factors to consider in assessing whether a structural conflict of interest warranting heightened review exists. The factors a court considers in determining the degree of scrutiny to afford the administrator in the determination to terminate benefits include: "(1) the sophistication of the parties; (2) the information accessible to the parties; (3) the exact financial arrangement between the insurer and the company; and (4) the status of the fiduciary, as the company's financial or structural deterioration might negatively impact the 'presumed desire to maintain employee satisfaction." ' *Stratton,* 363 F.3d at 254 (citing *Pinto,* 214 F.3d at 392). In *Pinto* itself, the Third Circuit concluded that "heightened arbitrary and capricious review" or review "on the far end of the arbitrary and capricious 'range' " was appropriate because Pinto's insurer both made benefits determinations and funded the benefits, and because of various procedural anomalies that tended to suggest that "whenever it was at a crossroads, [the insurer defendant] chose the decision disfavorable to Pinto." *Pinto,* 214 F.3d at 393-4. Accordingly, under *Pinto,* a conflict of interest is presumed when an insurance company both determines eligibility for benefits and pays out those benefits from its own funds, because there exists an "active incentive to deny close claims in order to keep costs down and keep themselves competitive so that companies will choose to use them as their insurers." *Id.* at 388. [FN1]

> FN1. We note that although Plaintiff argues that Unum's decision lacked impartiality in reviewing Plaintiff's disability claim and cites to *Hines v. Unum Life Ins. Co. of America,* 110 F.Supp.2d 458 (W.D.Va.2000), in support thereof without further elaboration, Defendants assert that no evidence of partiality exists in this case. In *Hines,* Plaintiff insured sued Defendant insurer alleging that Defendant wrongfully denied her disability benefits initially, and wrongfully refused thereafter to fully and fairly review her claim in upholding the previous denial. Defendant maintained that Plaintiff's condition did not meet the policy's definitional preconditions for "total disability." The court reviewed the record under the modified abuse of discretion standard because Defendant was both the insurer and the administrator. *Id.* at 462.

> In this case, as Defendants submit, Unum acts only as a third-party administrator, the employer retains final decision-making authority, and the employer uses its own funds to pay benefits. (*See* Rec. Doc. 22, Ex. L, at Section 3.7 and Addendum-i). We therefore do not find evidence of partiality or a conflict of interest of the type which the Third Circuit identified in *Pinto,* when an insurance company both determines eligibility for benefits and pays out those benefits from its own funds.

The Third Circuit instructed in *Kosiba* that structural conflicts of interest present when a

financially interested entity also makes benefit determinations is not the only cause for heightened review. "Our precedents establish at least one more cause for heightened review: demonstrated procedural irregularity, bias, or unfairness in the review of the claimant's application for benefits." *Kosiba,* 384 F.3d at 66. "The Pinto panel's decision to apply heightened review turned almost as much on the procedures afforded to Pinto as it did on her insurer's financial conflict of interest." *Id.; see Pinto,* 214 F.3d at 393 ("Looking at the final decision, we see a selectivity that appears self-serving in the administrator's use of [one doctor's] expertise."); *Id.* ("inconsistent treatment of the same facts"); *Id.* at 394 (suggesting that "whenever it was at a crossroads, Reliance Standard chose the decision disfavorable to Pinto").

We will apply a moderately heightened arbitrary and capricious review to the Plan Administrator's decision based on Defendants' clear procedural violations of both applicable ERISA regulations and the Plan at issue by not providing a decision on Plaintiff's appeal until June 22, 2004 and for the reasons that follow.

It is important to initially set forth the backdrop of the applicable ERISA regulations regarding appealing adverse benefit determinations, as well as the Plan's provision governing appeals of denied claims. First, 29 C.F.R. § 2560.503-1 "Claims Procedure" provides, in pertinent part, as follows:

*\*9* In accordance with the authority of sections 503 and 505 of the Employee Retirement Income Security Act of 1974 (ERISA or the Act), 29 U.S.C. 1133, 1135, this section sets forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries (hereinafter referred to as claimants).

29 C.F.R. § 2560.503-1(a). In addition, as Plaintiff points out, § 2560.503-1(h), "Appeal of Adverse Benefit Determinations," provides within the "Disability Claims" section that the Plan Administrator shall notify a claimant of the plan's benefit determination on review within a reasonable period of time, "but not later than 45 days after receipt of the claimant's request for review by the plan, unless the plan administrator determines that special circumstances (such as the need to hold a hearing, if the plan's procedures provide for a hearing) require an extension of time for processing the claim." *See* 29 C.F.R. § 2560.503-1(h); 29 C.F.R. § 2560.503-1(f)(3), 29 C.R.F. § 2560.503-1(i)(3). If the Plan Administrator determines that an extension of time for processing is required, written notice of the extension shall be furnished to the claimant prior to the determination of the initial 45 day period. In no event shall such extension exceed a period of 45 days from the end of the initial period. The extension notice shall indicate the special circumstances requiring an extension of time and the date by which the plan expects to render the determination on review. *See id.*

Second, the Plan at issue provides, in pertinent part, as follows:

Appeal of Denial of Claims

The Participant or beneficiary whose claim for benefits is denied by the Claims Administrator may appeal the decision denying the claim to the Claims Administrator within ninety (90) days of the receipt of such decision.

The appeal shall be addressed to the Claims Administrator in writing and shall state the reasons why he should grant the appeal. The Claims Administrator shall conduct a full and fair review of the claim and will issue his decision within sixty (60) days of receipt of the appeal unless there are special circumstances, in which case a decision will be rendered within 120 days of receipt of appeal. The Claims Administrator's decision upon appeal shall be final, conclusive and binding on all parties.

*See* Rec. Doc. 22, Ex. A, Section E at 16.

In the case *sub judice,* Plaintiff filed a timely appeal with MetLife on August 1, 2003. On August 6, 2003, Plaintiff's counsel received a letter from MetLife, which stated, in pertinent part, as follows:

We will evaluate the documentation and advise you in writing within 45 days of our determination. If there are special circumstances requiring additional time to complete our review, we may take up to an additional 45 days, but only after notifying you of the special circumstances in writing.

*See* Rec. Doc. 22, Ex. N; *see also* Defs.' SMF at ¶ 22. Within 45 days of August 6, 2003, neither Plaintiff, nor her attorney, were advised in writing of the determination. Moreover, neither Plaintiff, nor her attorney, were sent any explanation of special circumstances requiring more time.

*\*10* The first response Plaintiff received regarding her appeal consisted of an e-mail from Rhonda Sangonette of MetLife, which was sent on November 12, 2003, nearly 100 days after the afore-mentioned August 6, 2003 letter. (*See* Defs.' SMF at ¶ 25; *see also* Rec. Doc. 22, Ex. Q). To reiterate, the November 12, 2003 e-mail reads, as follows: Our appeals unit determined that Ms. Ott's long-term disability claim was to be reinstated. As the disability carrier changed effective 7/1/03 to UNUM Provident, it was sent to them to reinstate as this is an advise to pay group it would need to go to the new carrier. I sent the file 9/17/03. Per your voicemail advising that they have not received it I have requested the file be printed again. I will fed ex this to them, so that we have a way of tracking this. If you have further questions please contact me. *Id.* This provided Plaintiff with the justifiable impression that her claim had been "reinstated," and subsequently by e-mail dated January 14, 2004, Unum informed Plaintiff's attorney that review of Plaintiff's claim was continuing. [FN2] Unum further informed Plaintiff's attorney that it would begin issuing LTD benefits as of January 1, 2004, and continue to pay benefits until Unum made a final determination on Plaintiff's claim. It is appropriate to restate the substance of the January 14, 2004 e-mail addressed to Plaintiff's attorney, which reads in pertinent part as follows:

> FN2. We note that documentation submitted by Defendants reveals that MetLife retained the ability to review appeals pending at the time Unum became the Plan Administrator effective July 1, 2003. (Becker Second Aff. at ¶¶ 2-3). Once MetLife's review of an appeal concluded, it had to forward the claim file to Unum with a recommendation. *Id.* at ¶ 4. Unum received Plaintiff's claim file from MetLife with an "advise to pay," which means that MetLife recommended Unum reinstate payment of benefits to Plaintiff. *Id.* at ¶¶ 5-6. Under the terms of the Plan, Unum retained decision-making authority to review a claim upon receiving a recommendation from MetLife and Unum was not bound by any recommendation it received from MetLife. *Id.* at ¶¶ 7-8.

Until we have made a final determination on [Jeanette Ott's] eligibility for benefits, we will begin issuing benefits effective 1/1/04 and continue the monthly benefit until a final determination has been made. This payment or any possible future payments, until we advise you otherwise, are being made under Reservation of Rights. This means that payment cannot be construed as an admission of present or future liability, and we reserve the right to enforce any and all provisions of the plan.

*See* Rec. Doc. 23, Ex. S.

Plaintiff states that as time passed and no final decision from Unum on the appeal was forthcoming, Plaintiff filed the instant action on April 8, 2004. Thereafter, on June 22, 2004, nearly one year after Plaintiff filed the instant appeal, Unum issued a letter stating that Plaintiff's appeal was denied and that her benefits were being terminated. (*See* Rec. Doc. 23, Ex. AA). Unum's determination found Plaintiff to be ineligible for benefits beyond November 2, 2002.

Although Unum's June 22, 2004 letter ultimately denying Plaintiff's claim for LTD benefits provided reasons for the denial, Defendants committed clear procedural violations of the applicable ERISA regulations and the Plan at issue by not providing a decision on Plaintiff's appeal until June 22, 2004. By not issuing a decision on Plaintiff's LTD benefits until nearly one year had passed from the time of her appeal, Unum violated the following applicable provisions. First, Unum violated ERISA provisions requiring plan administrators to notify claimants of the plan's benefit determination on

review within a reasonable period of time, but not later than 45 days after receipt of the claimant's request for review by the plan, unless the plan administrator determines that special circumstances, such as the need to hold a hearing, require an extension of time for processing the claim. *See* 29 C.F.R. § 2560.503-1(h); 29 C.F.R. § 2560.503-1(f)(3), 29 C.R.F. § 2560.503-1(i)(3). Second, Unum violated the provision of the Plan at issue that states that the claims administrator shall conduct a full and fair review of the claim and will issue a decision within 60 days of receipt of the appeal unless there are special circumstances, in which case a decision will be rendered within 120 days of receipt of appeal. *See* Rec. Doc. 22, Ex. A, Section E at 16.

***11*** Clear procedural violations of the foregoing provisions and the procedural irregularities as noted require that we apply a moderately heightened arbitrary and capricious review to the Plan Administrator's decision in the case *sub judice. See Kosiba,* 384 F.3d 58, 66 (3d Cir.2004). [FN3]

> FN3. Defendants assert that Unum substantially complied with applicable ERISA regulations in that it provided a proper, detailed notification of the denial of benefits, the reasons therefor, and the avenue by which Plaintiff may seek review of the decision. Defendants maintain that any failure on the part of MetLife to properly communicate to Plaintiff during the transition of her file to Unum cannot be attributable to Defendants because MetLife is not a defendant in this case. (*See* Defs.' Br. Opp. Pl.'s Mot. Summ. J. at 8-10).
>
> We need not reach Defendants' substantial compliance argument as we have determined that Defendants' procedural violations and irregularities require that we apply a moderately heightened arbitrary and capricious standard of review.

The Third Circuit Court of Appeals has instructed that in reviewing a denial of benefits under the "arbitrary and capricious" standard, a plan administrator's decision will be overturned only if it is "clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." *Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am.,* 222 F.3d 123, 129 (3d Cir.2000)(*quoting Abnathya v. Hoffman-La Roche, Inc.,* 2 F.3d 40, 41 (3d Cir.1993)). The Third Circuit has recently instructed that a court should affirm the plan administrator's determination as long as it is supported by substantial evidence in the record, even if the record also contains substantial evidence that would support a different result. *Johnson v. UMWA Health and Retirement Funds,* 2005 U.S.App. LEXIS 2115, *8 (3d Cir.2005). "[A] court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." *Orvosh,* 222 F.3d at 129 (internal quotations omitted). Furthermore, "whether a claim decision is arbitrary and capricious requires a determination 'whether there was a reasonable basis for [the administrator's] decision, based upon the facts as known by the administrator at the time the decision was made." ' *Bader v. RHI Refractories America, Inc.,* 111 Fed. Appx. 117, 120-21 (3d Cir.2004)(*quoting Jett v. Blue Cross & Blue Shield of Ala., Inc.,* 890 F.2d 1137, 1139 (11th Cir.1989)).

Moreover, in applying the heightened arbitrary and capricious standard of review, the Third Circuit Court of Appeals has stated that courts should look not only at the result--whether it is supported by reason--but at the process by which the result is achieved. *Sweeney v. Std. Ins. Co.,* 276 F.Supp.2d 388, 394 (E.D.Pa.2003)(*quoting Pinto,* 214 F.3d at 393). "A court should intensify the level of scrutiny it applies to an insurer's decision if they are any procedural irregularities in the decision-making process." *Id.* at 394.

B. *Denial of Benefits*

Unum's June 24, 2004 denial of benefits letter provided three bases for the denial of her claim for LTD benefits; however, only one such base for denial is at issue in this case; namely, that the medical information indicates that Plaintiff has the capacity and skills to perform another occupation. [FN4] (*See* Rec. Doc. 23, Ex. AA).

> FN4. First, it appears undisputed by the parties that Plaintiff exhausted her 24-month entitlement to benefits premised on a Mental and
>
> Nervous Disorder or Disease by November 2, 2002, which was a basis for denial of her LTD benefits. Second, the Plan requires that Plaintiff be under the regular and appropriate care of a qualified physician; however, Unum's letter stated that according to the medical records on file, Plaintiff was not under the regular care since July 2003. A March 24, 2005 submission to the Court from defense counsel states that Plaintiff supplied as an attachment to her Statement of Undisputed Material Facts a copy of a medical report from treatment she underwent in February 2004 and that this was part of Unum's claim file at the time of the June 24, 2004 decision. In light of this discrepancy, Defendants notified the Court and Plaintiff that they abandoned as a cause for the denial of benefits Plaintiff's failure to remain under the regular care of a physician.

i. *The Plan*

In determining whether the Plan Administrator's decision to deny Plaintiff LTD benefits was arbitrary and capricious, we begin with the Plan itself, since an ERISA plan administrator must "discharge his duties with respect to a plan … in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]." *Mitchell,* 113 F.3d at 439; *see* 29 U.S.C. § 1104(a)(1)(D).

*\*12* The standard of disability under the Plan transitions after two years of benefit payments, which Plaintiff undisputedly received, from inability to perform one's regular occupation to the following definition of "total disability:"

[C]omplete inability of the Participant to perform any and every duty of any gainful occupation for which he is reasonably fitted by training, education or experience.

*See* Rec. Doc. 22, Ex. A. LTD benefits are not automatic and a claimant bears the burden of demonstrating that he/she qualifies for benefits. Therefore, the Plan at issue required that Plaintiff show that as of November 2, 2002, two years after she received LTD disability payments under the Plan's initial definition of "total disability," that she was completely unable to perform any and every duty of any gainful occupation for which she was reasonably fitted by training, education or experience.

ii. *Plaintiff's Record Support*

To determine whether Plaintiff carried her burden, we look to the record as a whole. *See Mitchell,* 113 F.3d at 440. As we previously explained, under the arbitrary and capricious standard of review, the "whole" record consists of that evidence that was before the administrator when he made the decision being reviewed. [FN5] *Id.; see also Luby,* 944 F.2d at 1184, n. 8.

> FN5. Defendants accurately submit that as Plaintiff's favorable
>
> outcome to her claim for Social Security Disability Insurance ("SSDI") benefits was issued on July 8, 2004, after Unum issued its June 24, 2004 decision, and was therefore not before the Plan Administrator at the time the decision was made to deny Plaintiff LTD benefits, the Court is unable to consider the SSDI decision pursuant to the arbitrary and capricious standard of review.

43

Plaintiff presented medical evidence in the form of letters from treating doctors, a fibromyalgia questionnaire, medical records, an MRI report, and two residual physical functional capacity assessments ("FCEs") performed by Dr. Ellis, Plaintiff's primary care physician, which she alleges demonstrate that she suffers from migraine headaches, fibromyalgia, problems in her cervical and lumbar spine, as well as depression. Plaintiff also has "moderately severe obstructive sleep apnea." Plaintiff supported her claim of disability with documentation from the following treating doctors: Dr. Calvert, her psychiatrist; Dr. Ellis, her primary care physician; Dr. DiSimone, her orthopedist; Dr. Olinsky, her neurologist; Dr. Rigal, her pain management specialist; Dr. Tuffaha, her neurosurgeon; Dr. Shenberger; her rheumatologist; and a physician assistant to Dr. Georgy, Theresa Sander.

a. *Migraine Headaches & Back Problems*

While Plaintiff did present evidence in support of her migraine headache diagnosis to MetLife, which was ultimately forwarded to the Defendants to review, including but not limited to documentation from Dr. Olinsky and Dr. Rigal, we do not find that the Defendants' decision to deny LTD benefits on that basis was arbitrary and capricious. We will now address Plaintiff's back condition. We initially note that within the letter denying Plaintiff LTD benefits, the Defendants stated that there is "no medical information to support your back condition or the severity of any other physical impairment such that would preclude you from performing full time sedentary work … You do appear to have ongoing low back pain however; this could be treated with NSAID's, home exercises, occasional physical therapy and, periodic injections as needed. Reasonable restrictions and limitations would be: no lifting greater than 20 lbs, no prolonged standing/walking, no repetitive climbing, no repetitive or prolonged bending/stopping/twisting, and no repetitive or prolonged squatting/kneeling. Additionally, you should be permitted to change positions periodically." (*See* Rec. Doc. 23, Ex. AA).

*\*13* In support of Plaintiff's claim of LTD disability relating to problems in her cervical and lumbar spine, Plaintiff points to an x-ray taken on January 31, 2002 that reflects the following: "An altered curvature of the cervical spine and straightening and even mild reversal of the cervical lordosis. Minimal disc space narrowing at C4-C5. No significant change when compared to 5/5/00." (*See* Rec. Doc. 26, Appendix pg. 28). Second, Plaintiff directs the Court to an MRI of her spine that reflects the following: "Signal loss consistent with early disc degeneration at L4-5. Disc herniation is not seen. There appears to be a foraminal compromise on the left at L5-S1, better demonstrated on the axial scans, relating to facet hypertrophic change, potentially compressing the S1 root. Minimal associated disc bulge at this level. No evidence of disc herniation or significant foraminal narrowing at more cephalad levels." *Id.* at pg. 41. Additionally, we do note that in a report dated July 16, 2003, Dr. Rigal provided diagnoses of (1) lumbar spondylosis, particularly L4-5 and L5-S1; (2) L5-S1 foramital stenosis; (3) left S1 radiculopathy; (4) multiple somatic complaints; and (5) chronic depression.

After having carefully reviewed Plaintiff's medical records relating to problems in her cervical and lumbar spine that were before the Plan Administrator when the decision at issue was made, we find that Defendants' denial of LTD benefits on this basis was not arbitrary and capricious. While it is apparent to the Court that Plaintiff continues to suffer from pain associated with her low back, we are in agreement with Defendants' conclusion that this pain can be decreased with treatment, including but not limited to home exercises, periodic injections, and physical therapy, if necessary. Medical records submitted from Dr. Rene R. Rigal, of the Pain Management Center at Susquehanna Health System, reveal that the trigger point injections provide significant pain relief to Plaintiff in the cervical and intrascapular region. Moreover, Plaintiff herself corroborates this by stating that a January 15, 2001 visit with Dr. Rigal "reflected a significant improvement in Plaintiff's pain due to the injection." (*See* Rec. Doc. 26, Pl.'s Statement of Undisputed Facts in Supp. Mot. Summ. J, at ¶ 9).

b. *Fibromyalgia*

We will now address Plaintiff's contention that she is entitled to LTD benefits as she is disabled due to fibromyalgia. We initially note that in the letter denying Plaintiff LTD benefits, Defendants stated the following regarding fibromyalgia: "When he [Dr. Ellis] provided a diagnosis of Fibromyalgia we found no information for review which indicates that he arrived at this diagnosis, per protocol by exclusion....Our medical department reviewed the information on file and determined that there is no medical information to support your back condition or the severity of any other physical impairment such that would preclude you from performing full time sedentary work. Since November 2002, there is no evidence to support that you are disabled due to Fibromyalgia. They noted that while Fibromyalgia has been provided as a diagnosis the file lacks an examination by which the diagnosis is typically made." (*See* Rec. Doc. 23, Ex. AA).

*\*14* In support of her claim that she is disabled due to fibromyalgia, Plaintiff asserts that in addition to her primary care physician who diagnosed her with fibromyalgia, Dr. Ellis, three specialists reached the same conclusion. Dr. Ellis' fibromyalgia diagnosis has been confirmed by Dr. Shenburger, Plaintiff's rheumatologist, Dr. Rigal, Plaintiff's pain management specialist, and Dr. Olinsky, Plaintiff's neurologist. In addition, Plaintiff argues that although Dr. Rigal treats the condition with trigger points, Plaintiff's medical records reflect that the treatment is only successful for a limited period of time. Plaintiff maintains that the denial of her appeal for LTD benefits on the basis of reports from two physicians who had never examined or even spoke to Plaintiff and who rejected the opinions of Plaintiff's family physician, psychiatrist, orthopedist to the effect that she was incapable of any sort of work, combined with the rejection of diagnoses of her neurologist, rheumatologist, and pain management specialist is arbitrary and capricious. In response, Defendants assert that it did not act arbitrarily and capriciously when it determined Plaintiff was not entitled to LTD benefits on or after November 2, 2002. Defendants argue that Unum conducted a full and fair review of all medical evidence that Plaintiff submitted, provided the medical records to two independent physicians for their review, and completed a vocational analysis based on the records. "In response, Plaintiff questions not the thoroughness of Unum's review nor the qualifications of the independent physicians who reviewed the medical records. Rather, Plaintiff offers only her opinion as to how she believes Unum should interpret her records." (Defs.' Reply Br. at 7).

At this juncture, it is necessary to provide information concerning the disease involving muscle and musculoskeletal pain known as fibromyalgia or fibrositis. As the Plaintiff accurately submits, the following two appellate courts have discussed fibromyalgia in regard to Social Security claims.

Fibromyalgia is a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and--the only symptom that discriminates between it and other diseases of a rheumatic character-- multiple tender spots, more precisely 18 fixed locations on the body … that when pressed firmly cause the patient to flinch.

*Brown v. Cont'l Cas. Co.,* 348 F.Supp.2d 358, 360 (E.D.Pa.2004)(*quoting Sarchet v. Chater,* 78 F.3d 305, 306 (7th Cir.1996) (citations omitted)). Second, the Sixth Circuit Court of Appeals described the disease by referring to medical testimony as follows:

*\*15* Dr. Crabbs testified at the hearing that he had recently diagnosed Preston's primary impairment as fibrositis, a condition only recognized in the last several years as a disease involving muscle and musculoskeletal pain. As set forth in the two medical journal articles submitted as exhibits by Dr. Crabbs, fibrositis causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to the unremitting pain of which fibrositis patients complain. Physical examinations will usually yield normal results--a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively

confirm the disease; rather, it is a process of diagnosis by exclusion and testing of certain 'focal tender points' on the body for acute tenderness which is characteristic in fibrositis patients. The medical literature also indicates that fibrositis patients may have psychological disorders. The disease commonly strikes between the ages of 35 and 60 and affects women nine times more than men.

*Alvarado v. Chater,* 1997 U.S. Dist. LEXIS 903, *2-3 (E. D.Pa.1997)(quoting *Preston v. Sec. of Health and Human Servs., 854 F.2d 815, 817* (6th Cir.1988)(per curiam)). Additionally, several courts have explained that having fibromyalgia can result in being disabled or having a disability that may be severe. *See e.g., Rodriguez v. McGraw-Hill Cos. Long Term Disability Plan, 297 F.Supp.2d 676, 679 (S.D.N.Y.2004)*(fibromyalgia can result in severe disability); *Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir.2003)*(fibromyalgia is a "disabling impairment" that can qualify an individual for disability payments even though "there are no objective tests which can conclusively confirm the disease."); *Sarchet, 78 F.3d at 306* ("Some people may have such a severe case of fibromyalgia as to be totally disabled from working, Michael Doherty & Drian Jones, 'Fibromyalgia Syndrome (ABC of Rheumatology),' 310 British Med.J. 386 (1995); *Preston v. Secretary of Health & Human Services, 854 F.2d 815, 818* (6th Cir.1988)(per curiam), but most do not and the question is whether Sarchet is one of the minority."). With that backdrop, after a detailed and careful review of the record that was before the Plan Administrator at the time the decision to deny Plaintiff's LTD benefits was made, and for the reasons that follow, the Court finds that the assessments of Plaintiff's treating sources established the severity of her fibromyalgia and the limitations that such disease posed on Plaintiff's capacity to engage in substantial gainful employment. The Court further finds that the utilization by Defendants of two physicians who never examined Plaintiff, as Defendants admit, but simply rejected the fibromyalgia diagnosis made by Dr. Ellis, Plaintiff's primary care physician, which was subsequently corroborated by three specialists, Plaintiff's rheumatologist, pain management specialist, and neurologist, was arbitrary and capricious, in the Court's moderately heightened arbitrary and capricious standard of review.

*\*16* First, we note that Defendants place particular emphasis on the fact that Dr. Ellis completed a FCE in September 2001 which provides that Plaintiff could sit for eight hours during an eight-hour, "competitive workday" on a "continuous basis" and assert that Dr. Ellis's records contain no subsequent FCE that renders the September 2001 FCE inaccurate. In response, Plaintiff asserts that she did attempt to return to work thereafter, but was unable to get through the workday because of her pain.

The record does not reveal that Dr. Ellis completed a FCE after September 2001, nor does the record reflect that he was requested to perform one despite the fact that one of Defendants' independent physicians, Dr. Michael C. Randall, recommended in his report that if there are conflicts concerning Plaintiff's work capacity, a formal FCE may be helpful. Additionally, Dr. Ellis's medical record of April 17, 2002 and letter to Plaintiff's counsel of July 26, 2003 clearly reveal his medical opinion regarding Plaintiff, after having examined and treated her for a period of time.

First, although defense counsel omitted a critical sentence present in Dr. Ellis's April 17, 2002 medical record in submissions to the Court, the Court will fully quote the pertinent portion of the afore-mentioned medical record, as follows:

Finally, the Otts indicated today that their insurance company is stating that they will discontinue payments on her disability unless Jeanette is certified as permanently disabled. I told them I would be reluctant to declare this condition permanent, but if that is what is necessary for their insurance, we could do so. The Otts themselves have little hope that Jeanette is going to improve. *I must admit that I am not optimistic either, but I would like to avoid the psychologic effect of declaring permanent disability, e.g. essentially saying that Jeanette will never improve.*

*See* Rec. Doc. 26, pg. 31 (emphasis added). Second, Dr. Ellis's letter of July 26, 2003 addressed to Plaintiff's counsel, was written in regards to Plaintiff's counsel's request for comments on Defendants' independent physician opinion performed by Tracey Schmidt, M.D., a Medicine and Rheumatology Certified Disability Evaluator, who concluded that

Plaintiff's file "appears to lack objective evidence of physical functional capacity impairment from a sedentary position full time" and that "the symptoms appear self reported and more subjective in nature." (*See* Rec. Doc. 23, Ex. J). Dr. Ellis's most recent medical opinion regarding Plaintiff's condition states that Plaintiff has chronic daily pain that "would be worsened by maintaining a regular seated position for any amount of time that would be compatible with full-time employment. I considered this possibility in the past, and even discussed the possibility of a sedentary job with Jeanette at one point. However, given her present functional level, it is my assessment that she could not tolerate prolonged siting, and that her condition would be worsened by this … I further believe that Jeanette's condition would be worsened by any gainful employment, including a full-time sedentary position." (*See* Rec. Doc. 23, Ex. M).

*\*17* In addition to Dr. Ellis's medical opinion subsequent to his September 2001 FCE, which demonstrates that he became considerably more pessimistic regarding Plaintiff's prognosis, we note that a case arising within the Eastern District of Pennsylvania has explained with regard to functional capacity examinations, that such one-time tests cannot hope to present a true picture of an illness characterized by variable symptoms. *Brown,* 348 F.Supp.2d at 360. "Others have noted the inadequacy of FCEs in determining disability in fibromyalgia cases." *Id.; see also Dorsey v. Provident Life & Accident Ins. Co.,* 167 F.Supp.2d 846, 856 (E.D.Pa.2001)(noting "evidence that an FCE is a highly questionable tool for determining whether a fibromyalgia patient is disabled").

Second, we will address medical records submitted by Theresa Sander, a Certified Registered Nurser Practitioner to Dr. Georgy, on which Defendants place emphasis. Defendants argue that Ms. Sander opined that Plaintiff had the ability to bend, kneel, crawl, and climb stairs occasionally, push/pull up to ten pounds frequently, reach about her should continuously, and further noted that Plaintiff "wants to stay at home," exhibited a "lack of motivation," and "chronic depression." We note that as Plaintiff submits, that same nurse practitioner completed a functional capacity evaluation on February 11, 2004 which indicated that Plaintiff is restricted to one hour of sedentary activity in an eight hour workday, and can perform no light, medium or heavy activity in an eight hour workday. Additionally, in response to the question that asked, "Given your knowledge of the medical factors impacting the patient's functional ability, at what point do you feel that there will be a significant change in functional ability," Ms. Sander responded, "unable to determine this. Pt has not improved for 3 1/2 years." (*See* Rec. Doc. 23, Ex. U).

We will now address the significant issue that Plaintiff raises concerning rejecting the opinions and diagnoses of Plaintiff's treating physicians and the application of two independent physicians, who as noted never examined Plaintiff but believe that she is not disabled based on a review of her file. Defendants accurately submit that the Supreme Court has held that the "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *See Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Although the Supreme Court has held that courts may not require ERISA plan administrators to defer to doctors who have treated a claimant over those who merely review her medical files, the court may still evaluate the weight of each doctor's opinion on the extent of his or her treatment history with the patient and specialization or lack thereof. *Id.* at 832; *see also Brown,* 348 F.Supp.2d at 368, n. 9.

*\*18* We are in agreement with other courts that have determined that direct contact with a patient over an extended period of time is especially important for reliable evaluation of a disease as subjective and variable as fibromyalgia, as it can allow for a more thorough examination of the patient's credibility and true range of abilities. *See id.* at 368. Although Unum's denial letter states that "there is no evidence to support that you are disabled due to Fibromyalgia" and that "They noted while Fibromyalgia has been provided as a diagnosis the file lacks an examination by which the diagnosis is

typically made," Dr. Ellis, Plaintiff's primary care physician, treated Plaintiff for several years, and his fibromyalgia diagnosis was corroborated by three specialists who all examined Plaintiff, a board-certified rheumatologist, a neurologist, and a pain management specialist.

Additionally, Dr. Ellis and Dr. Calvert, Plaintiff's psychiatrist, specifically address Plaintiff's ability to work. First, Dr. Ellis extensively addressed the subject as we previously mentioned and concluded that Plaintiff's condition would be worsened by any gainful employment, including a full-time sedentary position, although we note that Defendants argue his opinion lacks an explanation as to why Plaintiff is unable to perform gainful employment. Second, after having seen Plaintiff for approximately one year, in her April 24, 2003 letter to Plaintiff's counsel, Dr. Calvert stated that she has no hesitation in saying that Plaintiff could not possibly manage to work a full-time job in any field, and even a part-time job would not be feasible. Dr. Calvert also noted that Plaintiff does not appear to be embellishing her symptoms for some secondary gain. (*See* Rec. Doc. 23, Ex. M).

In contrast to the above referenced physicians who examined and treated the Plaintiff, Defendants admit that Doctors Schmidt and Randall never examined Plaintiff in person. Defendants argue however, that Unum considered the opinions and diagnoses of Plaintiff's physicians and found that the information contained in their records supported a finding that Plaintiff did not meet the definition of total disability under the Plan or had exhausted her entitlement to psychiatric benefits.

Both Dr. Schmidt and Dr. Randall concluded that there was not evidence to support that Plaintiff was disabled due to fibromyalgia and it appears that they also concluded that Plaintiff did not suffer from fibromyalgia, despite the repeated diagnosis from her treating physicians. To the extent that Unum relied upon Plaintiff's lack of "objective evidence" of "physical functional capacity," or that her symptoms were "more subjective in nature," which all formed a basis for Dr. Schmidt's opinion, such arguments are unconvincing in light of fibromyalgia's essentially subjective nature. The previously cited case which arose in the Eastern District of Pennsylvania explained that even if an ERISA administrator may sometimes impose a requirement for "objective" medical evidence, that does not appear explicitly in a plan's terms, it would be unreasonable to do so here. *Brown,* 348 F.Supp.2d at 369. "Such a requirement would effectively preclude any fibromyalgia patient from qualifying as totally disabled on the basis of the disease." *Id.* Moreover, the Third Circuit Court of Appeals has found it arbitrary and capricious--not merely misguided--to require objective evidence of diseases for which such evidence is simply unavailable. *Mitchell,* 113 F.3d 442-43 (reversing administrator's denial of disability benefits to chronic fatigue patient as arbitrary and capricious). Finally, because objective tests may not be able to verify a diagnosis of fibromyalgia, the reports of treating physicians, as well as the testimony of the claimant, become even more important in the calculus for making a disability determination. *See, e.g., Perl v. Barnhart,* 2005 U.S. Dist. LEXIS 3776, *10 (E.D.Pa.2005); *Green-Younger,* 335 F.3d at 108 (reversible error when ALJ discredits claimant's subjective testimony and opinion of treating physicians in favor of "objective" evidence of fibromyalgia, a disease "that eludes such measurement").

*\*19* Although generally independent medical examinations are not required, in the case *sub judice,* the utilization by Defendants of two physicians who never examined Plaintiff, but simply refused to accept the fibromyalgia diagnosis and thus rejected disability due to fibromyalgia on the basis of Plaintiff's medical file, was arbitrary and capricious given the fact that Plaintiff's primary care physician made the diagnosis, which was corroborated by three examining specialists and not subsequently altered in any way. [FN6]

> FN6. We recognize that fibromyalgia and its diagnosis are controversial areas in both law and medicine. Moreover, we do not mean to say that a plan administrator will never have a basis to question a diagnosis of

> fibromyalgia because of its subjective aspects. However, given the
> nature of fibromyalgia we conclude, as the court did in *Brown,* that a
> plan administrator's insistence that objective evidence concerning
> fibromyalgia be provided may be an impossible burden upon the patient.
> It appears to us that the better practice is to have a hands on
> independent examination of the patient, rather than a detached review
> of medical records.

After carefully considering the record as it was before the Plan Administrator at the time the decision to deny Plaintiff's LTD benefits was made, the Court finds that the assessments of Plaintiff's treating sources established the severity of her fibromyalgia and the limitations that such disease posed on Plaintiff's capacity to engage in substantial gainful employment. The Plan Administrator's decision to deny Plaintiff LTD benefits was not supported by substantial evidence in the record, and without substituting the Court's judgment for that of the Defendants in determining eligibility for plan benefits, the Court concludes that Plaintiff is "totally disabled" under the terms of the Plan and entitled to receive LTD benefits from Defendants. [FN7] *See Johnson,* 2005 U.S.App. LEXIS 2115, at *8-9; *see also Orvosh, 222 F.3d at 129*. We therefore find that Plaintiff has been unable "to perform any and every duty of any gainful occupation for which [s]he is reasonably fitted by training, education or experience." [FN8]

> FN7. We note that the vocational assessment conducted by Ellie J.
> Ettner, at Unum's direction, which concluded that three jobs existed
> within Plaintiff's restrictions that would permit her to earn a salary above
> that which she collected in LTD benefit payments is equally flawed as it
> utilized the restrictions and limitations as determined by Dr. Randall,
> who never examined Plaintiff as previously addressed, as opposed to the
> criterion provided by Plaintiff's treating physicians.

> FN8. We reiterate that we need not reach Plaintiff's argument that
> Defendants are bound by the actions of MetLife, even though MetLife is
> not a party to this action.

Under ERISA § 502(a)(1)(B), Plaintiff may recover the monthly disability benefits she has not received since Unum terminated her benefits on November 2, 2002. [FN9] We therefore direct the parties to submit detailed calculations of Plaintiff's total damages from November 2, 2002, through May 30, 2005. Plaintiff also seeks attorney's fees and prejudgment interest on her back benefits. The Court will consider those matters further on submission of a detailed petition setting forth the reasons justifying such an award and a calculation of the specific amounts sought.

> FN9. We recognize that Unum began paying Plaintiff monthly benefits
> under a "Reservation of Rights" from January 1, 2004 until June 31,
> 2004 and that Plaintiff received a fully favorable decision of her Social
> Security Disability claim on July 8, 2004, which may have an impact on
> Plaintiff's total damages.

NOW, THEREFORE, IT IS ORDERED THAT:

1. Plaintiff's Motion for Summary Judgment (doc. 19) is GRANTED.

2. Defendants shall reinstate Plaintiff's long-term disability benefits as of November 2, 2002, subject to the terms and conditions of the disability insurance policy.

3. Both parties shall have thirty (30) days from the date of this Order to submit detailed calculations of Plaintiff's total damages from November 2, 2002 through May 30, 2005.

4. Plaintiff shall have thirty (30) days from the date of this Order to file a petition for prejudgment interest, and for attorney's fees and costs.

5. Defendants' Motion for Summary Judgment (doc. 20) is DENIED.

M.D.Pa.,2005.

Ott v. Litton Industries, Inc.

2005 WL 1215958 (M.D.Pa.)

### Motions, Pleadings and Filings (Back to top)

- 2004 WL 2276644 (Trial Pleading) Complaint (Apr. 08, 2004)
- 4:04CV00763 (Docket) (Apr. 08, 2004)

END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 22078075 (D.Del.)

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Kimberly N. SANDERSON, Plaintiff,
v.
CONTINENTAL CASUALTY CORPORATION, et al., Defendants.
No. Civ.A. 01-606GMS.
Aug. 19, 2003.

Herbert G. Feuerhake, Law Office of Herbert G. Feuerhake, for plaintiff.

Robert D. Goldberg, Biggs & Battaglia, Richard G. Elliott, Jr., Jennifer C. Bebko Jauffret, Richards, Layton & Finger, Wilmington, DE, for defendants.

*MEMORANDUM AND ORDER*

SLEET, J.

I. INTRODUCTION

*\*1* On September 7, 2001, the plaintiff, Kimberly N. Sanderson ("Sanderson") filed the above-captioned action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Through this action, she sought to recover

long-term disability benefits which she claimed were due under a policy of insurance issued by Continental Casualty Company ("Continental") to her employer, Rhodia, Inc. On February 25, 2003, the court concluded that Continental's decision to deny Sanderson's disability benefits was arbitrary and capricious. It thus remanded the case to Continental. ("Remand Order"). [FN1]

> FN1. For a complete recitation of the facts and procedural history of this case, please see *Sanderson v. Continental Ins. Co.,* 2003 WL 470539 (D.Del. Feb.25, 2003).

Presently before the court is Continental's motion for reconsideration and a stay of the remand order. For the following reasons, the court will deny this motion.

II. STANDARD OF REVIEW

As a general rule, motions for reconsideration should be granted only "sparingly." *Karr v. Castle,* 768 F.Supp. 1087, 1090 (D.Del.1991). In this district, these types of motions are granted only if it appears that the court has patently misunderstood a party, has made a decision outside the adversarial issues presented by the parties, or has made an error not of reasoning, but of apprehension. *See, e.g., Shering Corp. v. Amgen, Inc.,* 25 F.Supp.2d 293, 295 (D.Del.1998); *Brambles USA, Inc. v. Blocker,* 735 F.Supp. 1239, 1240 (D.Del.1990) (citing *Above the Belt, Inc. v. Mel Bonhannan Roofing, Inc.,* 99 F.R.D. 101 (E.D.Va.1983)); *see also Karr,* 768 F.Supp. at 1090 (citing same). In addition, the Third Circuit has explained that a district court should also grant a motion for reconsideration which alters, amends, or offers relief from a judgment when: (1) there has been an intervening change in the controlling law; (2) there is newly discovered evidence which was not available to the moving party at the time of judgment; or (3) there is a need to correct a legal or factual error which has resulted in a manifest injustice. *See Max's Seafood Cafe by Lou-Ann, Inc. v. Quinteros,* 176 F.3d 669, 677 (3d Cir.1999) (relying on *North River Ins. Co. v. CIGNA Reinsurance Co.,* 52 F.3d 1194, 1218 (3d Cir.1995)).

III. DISCUSSION

The basis for Continental's current motion is the United States Supreme Court's May 27, 2003 decision in *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Specifically, Continental argues that the holding in *Nord* supercedes the holding and rationale underlying the Remand Order of February 25, 2003. Because a change in controlling law is an appropriate ground upon which to base a motion for reconsideration, the court will now address Continental's allegations. Continental first contends that the Remand Order requires it to give special deference to the opinions of Sanderson's treating physicians. According to Continental, this is in contravention of the Supreme Court's recent holding that "… plan administrators are not obliged to accord special deference to the opinions of treating physicians." *Nord,* 538 U.S. at ----, 123 S.Ct. at 1967. While Continental's point is well-taken, it is apparent that Continental bases its argument both on a misreading of the court's Remand Order and an unduly narrow reading of *Nord.*

*\*2* As an initial matter, the court's Remand Order did not rely on the treating physician rule as the basis for its decision. [FN2] Indeed, the issue here is not whether Continental should have given the treating physician's opinions "substantial weight," but instead, why Continental decided to give multiple other forms of evidence no consideration at all, or conflicting consideration. *See e.g.* Remand Order at 13, n. 4 (questioning the veracity of Continental's claims that it had placed reliance on Dr. Matsumoto's findings in making its decision, when it later questioned Dr. Matsumoto's credentials); Remand Order at 14 (describing Continental's selective parsing of medical conclusions from the same doctor); Remand Order at 15, n. 6 (recognizing that Continental may have disregarded relevant evidence due to an improper reading of the Policy's requirements). Moreover, the court found that Continental had summarily

dismissed Sanderson's own subjective complaints of pain and her allegations of the independently disabling condition fibromyalgia. The court's concerns are clearly in accord with the Supreme Court's admonition in *Nord* that, "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 1972.

> FN2. Were this case to turn solely on the application of the treating physician rule, as Continental suggests, there would have been no need for the court to order a remand because an application of this rule would certainly have resulted in summary judgment being awarded in Sanderson's favor.

Likewise, Continental's next argument that the court has impermissibly placed upon it an undue burden of explanation in contravention of *Nord* must also fail. *See* 123 S.Ct. at 1972. Importantly, the Supreme Court found that ERISA plan administrators must provide the notice of denial in writing and wherein they set forth the specific reasons for the denial in an easily understandable manner. *See Nord* 538 U.S. at ----, 123 S.Ct. at 1970. Thus, although Continental appears to be contending that *Nord* releases plan administrators from any duty of explanation whatsoever, that is simply not the case. Indeed, as the court discussed above, the Supreme Court in *Nord* specifically recognized that, "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." 123 S.Ct. at 1972. At no time did the Court hold that plan administrators need not provide any justification for rejecting evidence supporting a claimant's disability, particularly when it is clear, as it is here, that the administrators were engaged in a selective and self-serving review of the evidence. [FN3]

> FN3. It bears repeating that, through its Remand Order, the court is not suggesting that Continental must find Sanderson disabled. Rather, the court merely directs Continental to reach its decision on her disability after a review of the entire record before it.

IV. CONCLUSION

Because the issues in the present case far exceed the scope of the Supreme Court's holding with regard to the treating physician rule in *Nord,* the court concludes that reconsideration of its remand order is not warranted.

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Continental's Motion for Reconsideration and Stay of Order of Remand (D.I.69) is DENIED.

D.Del.,2003.

Sanderson v. Continental Cas. Corp.

2003 WL 22078075 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:01CV00606 (Docket) (Sep. 07, 2001)

END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

Moira Goletz,                              )
                                          )
                    Plaintiff,            )
                                          )
v.                                        )        Civil Action No.:  04-351 SLR
                                          )
Prudential Insurance Company              )
                                          )
                    Defendants.           )

## AFFIDAVIT OF SERVICE

I, Laura F. Browning, hereby attest under penalty of perjury that on June

24, 2005, I served the foregoing:

PLAINTIFF MORIA GOLETZ' ANSWERING BRIEF IN OPPOSITION

TO DEFENDANT'S OPENING BRIEF

by electronic filing via ECF/CM to:

BIFFERATO, GENTILOTTI & BIDEN
George T. Lees, Esquire (#3647)
David A. Denham, Esquire
1308 Delaware Avenue
PO Box 2165
Wilmington DE  19899-2165
(302) 429-1900
*LOCAL COUNSEL*

And by depositing two copies of said document in the United States Mail, first class,
postage prepaid, to:

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
Jonathan Dryer, Esquire
The Curtis Center, Suite 1130 East
Independence Square West
Philadelphia PA  19106
(215) 627-6900
*Attorney for defendant*

GRADY & HAMPTON, LLC


__/S/ Laura F. Browning _____
John S. Grady, Esq. (I. D. No. 009)
Laura F. Browning, Esq. (I.D. No.4504)
6 North Bradford Street
Dover, DE  19904
(Tel. 302-678-1265)
jgrady@gradyhampton.com
lbrowning@gradyhampton.com
*Attorney for plaintiff*