IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MOIRA GOLETZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 04-351-SLR |
| | ) | |
| PRUDENTIAL INSURANCE COMPANY OF | ) | |
| AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

---

John S. Grady, Esquire, of Grady & Hampton, Dover, Delaware.
Counsel for Plaintiff.

George Thomas Lees, III, Esquire, of Bifferato, Gentilotti &
Biden, Wilmington, Delaware.  Counsel for Defendant.

---

**MEMORANDUM OPINION**

Dated:  March 29, 2006
Wilmington, Delaware

ROBINSON, Chief Judge

## I.    INTRODUCTION

Plaintiff Moira Goletz ("plaintiff") filed the present action on June 3, 2004 alleging claims pursuant to the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., against The Prudential Insurance Company of America ("defendant"). (D.I. 1) She seeks recovery of long-term disability benefits allegedly due under a policy of insurance issued by defendant to her employer, clarification of her rights under the policy, and costs and attorney's fees as provided by ERISA. (Id. at ¶1) The court has jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(f). Presently before the court are the parties' cross-motions for summary judgment. (D.I. 19, 20) For the following reasons, the court denies both motions and remands the case for a decision consistent with this opinion.

## II.   BACKGROUND

### A.  Plaintiff's Employment with Bank One

Plaintiff is a 47-year-old individual with a high school education. (D.I. 26 at A-231) In 1997, she began working as a full-time employee for the First USA Bank as a Customer Service Representative.[1] She was subsequently promoted to the position of Cardmember Advocacy Specialist. (Id. at A-258) Plaintiff went on disability leave in May of 2000 due to constant pain in her neck, hands, arms, elbows, and other joints. (Id. at A-231)

---

[1] First USA Bank later became Bank One Corporation.

Plaintiff has yet to return to Bank One.  (Id. at A-258)

## B.  Bank One's Disability Insurance Policy with Defendant

On January 1, 2000, Bank One obtained a long term disability plan, Policy DG-56249-IL ("the Plan"), through defendant for its regular, salaried or commissioned employees.  (Id. at A-2)  The Plan provided for the payment of long term disability benefits to covered employees who met the definition of disability.  The Plan defined *disabled* as follows:

> You are disabled when Prudential determines that: you are unable to perform the **material and substantial duties**[2] of your **regular occupation**[3] due to your **sickness** or **injury**, and you have a 20% or more loss in you **indexed monthly earnings** due to that **sickness** or **injury**.  After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation**[4] for which you are reasonably

---

[2] Material and substantial duties are defined as "duties that are normally required for the performance of [the] regular occupation; and cannot be reasonably omitted or modified, except that if [employee is] required to work on average in excess of 40 hours per week, Prudential will consider [employee] able to perform that requirement if [employee is] working or ha[s] the capacity to work 40 hours per week."  (D.I. 26 at A-11)

[3] The Plan defines regular occupation as "the occupation [the employee] routinely perform[s] when [the] disability begins. Prudential will look at [the] occupation as it is normally performed instead of how the work tasks are performed for a specific employer at a specific location."  (D.I. 26 at A-11)

[4] Gainful occupation is defined as "an occupation, including self employment, that is or can be expected to provide [employee] with an income equal to at least a percentage of [employee's] indexed monthly earnings within 12 months of [employee's] return

2

fitted by education, training or experience.

(Id. at A-11) (emphasis added in original)  Defendant both
administers and funds the Plan.  (Id. at A-11, A-258)  As a full-
time employee, plaintiff was insured under the Plan.  (D.I. 26 at
A-2, A-258)

## C. Plaintiff's Medical Records and Defendant's Response to Plaintiff's Claim

Plaintiff's disabilities surrounding this dispute began in
1992 when her primary care physician, Dr. Michael J. Bradley,
noted pain in plaintiff's left forearm, hand and fingers.  (D.I.
27 at A-276)  His records indicate that she had underwent surgery
twice for ganglion cyst removal.  (Id.)  In 1993, plaintiff was
diagnosed with bilateral carpal tunnel syndrome by her
orthopedist, Dr. Glen D. Rowe.  (Id. at A-459)  In April of 1995,
Dr. Rowe performed a release of the left carpal tunnel in
plaintiff's left wrist.  (Id.)  Her condition subsided until 1999
when she was diagnosed with left ulnar nerve palsy and left wrist
irritation.   (Id. at A-454)  Dr. Rowe performed a left anterior
intramuscular ulnar nerve transposition in September of 1999.
(Id. at 453)  Despite the surgery, plaintiff's pain remained
constant and she began experiencing neck pain and back spasms.
(Id. at A-450)  Physical therapy proved unhelpful.  (Id.)  X-rays

---

to work, depending on the plan for which you are enrolled."
(D.I. 26 at A-11)  Plaintiff had enrolled in Option II which was
70% of her monthly earnings.  (Id. at A-258)

revealed straightening consistent with spasm and loss of the normal lordotic curve, as well as anterior superior end plate spurring. (Id. at A-450)

In March of 2000, plaintiff underwent gall bladder surgery. (Id. at A-448) She subsequently went on disability leave from Bank One on May 1, 2000. (D.I. 26 at A-45) On May 18, 2000, plaintiff visited Dr. Rowe again complaining of neck pain and throbbing in the left elbow and wrist. (Id. at A-446) Plaintiff believed that the pain was related to working in her garden. (Id.) An MRI conducted on June 2, 2000 revealed mild spondylosis and degenerative disc disease without evidence of disc herniation. (Id. at A-442) Additionally, an EMG/nerve conduction study showed no evidence of carpal tunnel syndrome, unlar neuropathy or cervical radiculopathy. (Id.) On July 17, 2000, Dr. Rowe noted that "we have tried chiropractic and physical therapy and there is little else to offer the patient." (Id.) Accordingly, plaintiff was referred to Dr. Upadyhay for pain management. (Id.) Dr. Upadyhay diagnosed her with having chronic cervical and neck pain. (Id. at A-384, A-388)

Due to plaintiff's scheduled surgery for anterior intramuscular ulnar nerve transportation and release of a medial conjoined tendon of the right elbow in September of 1999, defendant determined that she was unable to perform the material and substantial duties of her job. (Id. at A-68 and A-69)

4

Plaintiff received long term disability benefits for a twenty-four month period from October 30, 2000 through October 29, 2002. (Id. at A-71)

On February 14, 2001, plaintiff appeared at Dr. Rowe's office complaining of right elbow pain and left wrist pain. (Id. at A-441) She stated that she was unable to lift her arm because of pain and numbness in the right elbow. (Id.) Shortly thereafter, Dr. Rowe informed defendant that plaintiff was unable to work at any occupation because of pain and spasms in her cervical spine. (D.I. 26 at A-245)

Based on a referral from Dr. Rowe, plaintiff was evaluated by orthopedist and rheumatologist, Dr. Eric R. Tamesis. (D.I. 27 at A-439-440) He diagnosed her with polyarthritis, bilateral carpal tunnel syndrome, and lateral and medial epicondylitis of the right elbow, noting pain in the right elbow, neck and left wrist. (Id. at A-478-479) Dr. Tamesis also indicated that six months of physical therapy and two corticosteroid injections in the left wrist had failed to alleviate plaintiff's pain. (Id.) Plaintiff met with Dr. Tamesis again in March 2001, once more complaining of pain and stiffness in both of her hands. (Id. at A-477) Additionally, she described stiffness in her neck, shoulders and hips. (Id.) Dr. Tamesis noted that plaintiff was not improving and had tendencies consistent with inflammatory polyarthritis. (Id.)

Throughout March and April of 2001, plaintiff continuously experienced persistent numbness and tingling in the fingers of her right hand. (Id. at A-438)  Dr. Rowe diagnosed the condition as right elbow tardiness of the ulnar nerve compression and medial epicondylitis.  (Id. at A-436)  Because plaintiff's disability had persisted throughout the 182 day elimination period as required under the Plan (D.I. 26 at A-12), her long term disability benefits were approved on April 17, 2001 and effective October 30, 2000 for a twenty-four month period.  (Id. at A-68)

On May 22, 2001, Dr. Rowe performed a right elbow anterior intramuscular ulnar nerve transposition.  (Id.)  When plaintiff's right elbow pain continued, an EMG was conducted, revealing mild right ulnar neuropathy.  (Id. at A-433)  Dr. Rowe indicated, however, that such sensitivity was not unusual and would subside within the next year.  (Id. at A-430)

On October 22, 2001, plaintiff underwent an MRI of her cervical spine which revealed degenerative disc disease.  (Id.) Plaintiff continued to suffer from left wrist pain as well as pain and spasms in her cervical spine throughout January of 2002. (Id.)  Consequently, in a letter dated January 16, 2002, Dr. Rowe informed defendant that plaintiff's back condition made her unable to work.  (D.I. 26 at A-245)  Her neck, left wrist, and right hand pain persisted throughout February and March of 2002.

(D.I. 27 at A-475)   Plaintiff also began to experience bilateral

knee pain during this time.   (Id.)   On February 4, 2002, Dr.

Tamesis confirmed his previous diagnosis of polyarthritis, also

noting that plaintiff displayed features of fibromyalgia

syndrome.   (Id.)

On June 24, 2002, defendant informed plaintiff that her long

term disability benefits would terminate on October 29, 2002.

(D.I. 26 at A-71)   Defendant explained that,

> [a]fter a thorough evaluation of the
> information provided, we have determined that
> although you continue to experience knee and
> wrist pain, the medical documentation does
> not support an impairment preventing you from
> performing the necessary and substantial
> functions of any occupation.   We find that
> you maintain the functional ability to
> perform in a sedentary occupation that does
> not require repetitive hand work.

(Id.)   In addition to evaluations by defendant's physicians,

defendant indicated that the medical reviewer considered the

medical records provided by Dr. Rowe.   (Id.)

In a responsive letter written by Dr. Tamesis on July 11,

2002, he informed defendant that plaintiff suffered from

inflammatory polyarthritis which tremendously limited her ability

to do any significant activities of daily living.   Specifically,

he noted that "[t]his markedly impairs her ability to participate

in any occupation at this time resulting in her current

disability."   (Id. at A-471)   On July 24, 2002, Dr. Rowe sent a

similar letter to defendant, indicating that plaintiff's

7

persistent pain and spasm in her cervical spine made her unable to work.  (D.I. 26 at A-247)

On July 26, 2002, medical records from Dr. Tamesis demonstrated that plaintiff still experienced significant knee pain despite steroid injections.  (D.I. 27 at A-472)  An MRI revealed evidence of small joint effusion, but no tears.  (Id.)

On July 29, 2002, plaintiff appealed defendant's decision to terminate her long term disability benefits to the Appeals Review Unit.  (D.I. 26 at A-75)  She included letters from both Dr. Rowe and Dr. Tamesis explaining her inability to work as well as a personal statement.  (Id.)  In her statement, plaintiff stated that "d[ue] to my rheumatoid arthritis[,] I have pain in my hands, ankles, wrists, knees and legs.  My hands and ankles swell on a daily basis.  My joints crack and [are] very painful.  The muscles in my neck cause me a great deal of pain, d[ue] to the spasms."  (Id.)  She also noted that sitting, standing or walking for more than a short time were difficult.  (Id.)

On September 5, 2002, defendant's claims manager, Michelle Pence, reviewed plaintiff's recent medical records with Dr. Foye, a consultant for defendant.  Per their discussion, an Independent Medical Exam ("IME") was ordered, specifically "with either ortho, rheumatologist or rehab dr."  (Id. at A-56)

On October 22, 2002, defendant informed plaintiff that she would need to undergo an IME with physiatrist, Dr. Peter Bandera.

8

(D.I. 26 at A-81)  Plaintiff attended the comprehensive
examination, assessment, and record review on October 30, 2002.[5]
(D.I. 26 at A-211)  After the fifteen minute meeting with
plaintiff and evaluating her complaints, medical history,
radiological reports and the opinions of plaintiff's treating
doctors, Dr. Bandera contradicted the core findings of both Dr.
Rowe and Dr. Tamesis.  (Id. at A-213)

   While he did find trace swelling of the hands bilaterally,
Dr. Bandera's report indicates that he found "no tenderness,
warmth, crepitus or swelling relative to the shoulders, elbows,
or right wrist."  (Id. at A-212)  Although he observed tenderness
in plaintiff's left extensor wrist, he found her range of motion
in the upper extremities to be within normal limits.  (Id.)
Likewise, Dr. Bandera found that plaintiff's range of motion in
her fingers were normal, even though she experienced pain when
making a fist or moving her fingers.  (Id.)  Range of motion in
her cervical, thoracic, and lumbosacral spine were also found to
be within normal limits.  (Id.)  No spasm or muscle guarding was
apparent.  (Id.)  Range of motion in her lower extremities was
found normal as well, without tenderness or swelling.  (Id.)

   Dr. Bandera concluded that plaintiff "has multiple

---

[5] Dr. Bandera reviewed records from Dr. Penny, Dr. Rowe,
multiple MRI reports / radiological studies, Dr. Tamesis,
multiple therapy notes, Dr. Upadhyay, Dr. Abrams/Bradley, and
multiple old records of medical care.  (D.I. 26 at A-211)

subjective complaints that do not correlate objectively." (Id.)
He noted that,

> [s]he does not need any restrictions to
> length of sitting. It is felt that she has
> no restrictions to sitting/standing/walking
> activities. She may be restricted to
> lift/carry 5-10 pounds frequently. It is
> felt that she should defer high impact
> activities. From a functional perspective
> she may have a mildly reduced ability to
> manipulate small objects such as coins.

(Id.) Ultimately, Dr. Bandera concluded that plaintiff could
perform in a light duty capacity and return to a work environment
which adhered to the specified modifications. (Id.)

On November 20, 2002, a transferable skills analysis ("TSA")
was performed which considered plaintiff's skills demonstrated in
prior occupations and her current restrictions as outlined by Dr.
Bandera. (Id. at A-59) The TSA identified a number of sedentary
and light occupations consistent with plaintiff's skills and
functional capacity. (Id.) Occupations included an information
clerk, an insurance clerk, a surveillance system monitor, a loan
collector, or a sales representative. (Id.)

On November 27, 2002, defendant informed plaintiff that the
Appeals Review Unit had upheld the decision to terminate her long
term disability benefits. (Id. at A-83) At the outset, the
letter incorrectly noted that defendant had received records from
Dr. Schwartz and Dr. Tamesis. (Id. at A-84) While Dr. Schwartz
had evaluated plaintiff in the past, his evaluation was not sent

10

in connection with plaintiff's appeal. Rather, records were sent
from Dr. Rowe, an orthopedist who works in the same office. (Id.
at A-247) In denying plaintiff's appeal, defendant explained
that "while you may continue to experience symptoms of pain . .
., [r]estrictions and [l]imitations provided by Dr. Bandera as
well as medical evidence from your treating physicians supports
your ability to perform another occupation." (Id. at A-84)
Besides summarizing the June 2002 denial letter and indicating
that it had received records from Dr. Schwartz and Dr. Tamesis,
the letter did not mention the findings or conclusions of
plaintiff's treating physicians. (Id.) Defendant did, however,
indicate that it would keep her claim active, pending a decision
on her Social Security Disability Benefits claim. (Id.)

In February of 2003, plaintiff made a second appeal to
defendant for long term disability benefits. (Id. at A-86) In
her appeal, plaintiff stated that she was unable to return to
work due to elbow, wrist, and knee pain. (Id.) Plaintiff
described her recent wrist surgery with Dr. Errol Ger, as well as
her upcoming arthroscopic knee surgery with Dr. Rowe.[6] (Id.)
She also attached two new medical opinions written by Dr. Tamesis

---

[6] Plaintiff submitted to left arthroscopic knee surgery on
April 29, 2003. (D.I. 27 at A-415) Contrary to the previous MRI
which demonstrated no meniscal tears (id. at A-472), the
procedure revealed "extensive chondromalacia to the medial
femoral condyle where her pain was present and also to the
patella and a small area in the lateral tibial plateau." (Id. at
A-415)

and Dr. Rowe. (Id.) In his January 8, 2003 opinion, Dr. Tamesis
certified that he had diagnosed plaintiff with rheumatoid
arthritis,

> [a] severe disabling inflammatory arthritis
> that results in multiple joint swelling and
> destruction of the joints. This markedly
> limits her activities of daily living, most
> especially those that require repetitive
> movements. I have now started her on
> Remicade infusion therapy that [] requires
> she receive these every 8 weeks at the
> minimum to help control the disease process.
> While this is ongoing and until we can
> control the disease[,] I feel she continues
> to be disabled from any occupation.

(D.I. 27 at A-468) Similarly, Dr. Rowe's narrative, written
February 10, 2003, indicated that plaintiff suffered from: (1)
"First degree MCL sprain and degenerative joint disease of the
left knee"; (2) "Triangular fibrocartilage tear of the left
wrist"; (3) "Right elbow olecranon bursitis"; (4) "Cervical and
thoracic strain"; (5) "Degenerative disc disease of the cervical
spine"; and (6) "Lumbosacral strain." (D.I. 26 at A-251)[7]

On May 8, 2003, both Dr. Rowe and Dr. Tamesis again sent
opinions to defendant detailing plaintiff's inability to work.
(D.I. 26 at A-252-253) In his statement, Dr. Rowe mentioned
plaintiff's recent knee surgery, as well as her complaints of

---

[7] At the end of plaintiff's appeal letter, she voiced her
disgust that her denial of benefits was based on one fifteen
minute office visit with Dr. Bandera, the only doctor who would
accept her insurance, and not even a specialist in either of the
fields for which her condition had been diagnosed. (D.I. 26 at
A-86)

12

"triangular fibrocartilage complex tear of the left wrist, right elbow olecranon bursitis, cervical and thoracic strain, degenerative disc disease of the cervical spine, and lumbosacral strain." (Id. at A-252) He also noted that plaintiff was to return for a re-evaluation on May 28, 2003 and that her ability to work would then be addressed. (Id.) In Dr. Tamesis' statement, he certified that plaintiff's seronegative inflammatory arthritis, generalized degenerative joint disease and bilateral carpal tunnel syndrome had significantly impacted her activities of daily living. (Id. at A-253) Specifically, "she has significant difficulty in range of motion of her hands. This limits her ability to lift objects above 10 pounds, she also has significant difficulty grasping objects and doing repetitive tasks as grip remains weak . . .." He also noted that while Remicade infusion therapy had improved soft tissue swelling in her hands, "her pains remain significant." (Id.)

Notwithstanding these letters, defendant again denied plaintiff's request for long term disability benefits on May 12, 2003. (Id. at A-93) In explaining its reasoning, defendant noted that Dr. Bandera took plaintiff's wrist condition, which was subsequently operated on by Dr. Ger, into account when making his determination. (Id. at A-95) Moreover, defendant claimed that plaintiff's knee surgery in April of 2003 did not support an inability to perform sedentary duties from October 2002 through

13

April 2003. (Id.) Additionally, the decision focused on Dr. Tamesis' and Dr. Rowe's failure to respond to Dr. Bandera's IME report as requested by defendant, as opposed to their medical findings. (Id. at A-94)

On May 23, 2003, plaintiff appealed defendant's decision to deny benefits. (Id. at A-97) Shortly thereafter, plaintiff sent defendant an opinion from Dr. Tamesis responding to Dr. Bandera's IME. (Id. at A-254) Dr. Tamesis stated that at the time of plaintiff's evaluation with Dr. Bandera, she was being treated with Methotrexate, a potent immunosuppressive agent. (Id.) Accordingly, Dr. Bandera's opinion was based on an evaluation that took place while the plaintiff was under the influence of strong medication. (Id.) In response to Dr. Bandera's observations of a lack of swelling, Dr. Tamesis noted that plaintiff's condition could produce generalized joint pain and stiffness, even in the absence of swelling. (Id.) He also found Dr. Bandera's diagnosis of negative inflammatory arthritis incorrect. (Id.) In Dr. Tamesis' opinion, plaintiff suffered from seronegative rheumatoid arthritis. (Id.) In connection with plaintiff's subjective complaints, Dr. Tamesis posited that her subjective symptoms "certainly correlate with objective findings," and her condition has markedly impacted her activities of daily living - an observation Dr. Tamesis believed could not be made in a one time evaluation. (Id. at A-255) Furthermore,

14

Dr. Tamesis stated that plaintiff's chronic stiffness and joint
pain prevented her from sitting, walking or standing for long
periods of time and, despite the use of various analgesics,
plaintiff's chronic pain remained significant.  (Id.)

     On December 2, 2003, plaintiff notified defendant by letter
of the status of her social security claim.  (Id. at A-102)  On
November 19, 2003, Administrative Law Judge Linda M. Berstein,
ruled in favor of plaintiff, finding that she was disabled by the
fact that she was unable "to engage in any substantial, gainful
activity by reason of any medically determinable physical or
mental impairment . . .."  (Id. at A-230)

     On December 9, 2003, defendant's Appeal Review Unit
forwarded plaintiff's file to Dr. Foye for an external file
review.  (Id. at A-64)  Dr. Foye had never treated nor examined
plaintiff and is paid an hourly rate of $300 by defendant.  (D.I.
27 at A-558)  He completed a report on December 30, 2003, and
added an addendum on February 10, 2004.  (D.I. 26 at A-214 -
A224)  Based on review of all of plaintiff's medical records, Dr.
Foye concluded that plaintiff's conditions with respect to her
cervical, lumbar, and thoracic spine, as well as her left knee,
did not prevent her from engaging in sedentary work.  (Id. at A-
223)  He did find, however, that

          [f]rom the combination of the physical exam
          findings by Dr. Tamesis and also the
          evaluation by Dr. Bandera, and also the blood
          work results, overall it does appear most

15

> likely that the claimant does have some type
> of inflammatory poly arthritis, although she
> is sero-negative for rheumatoid arthritis.

(<u>Id.</u>)  Consequently, plaintiff's recurrent inflammation/synovitis

in her hands would create difficulty for her if required to

perform frequent or continuous repetitive hand activities.  (<u>Id.</u>

at A-224)  Dr. Foye noted that plaintiff would most likely be

capable of performing repetitive hand activities "occassionally,"

as in less than one third of the workday.  (<u>Id.</u>)  He also noted

that she might have difficulty with overhead activities, due to

chronic neck and shoulder pain.  (<u>Id.</u>)  He then concluded,

stating that

> [w]ith these restrictions / limitations /
> accommodations in place, I would expect that
> she would be capable of full time work.  I
> recommend considering vocational assessment
> to determine if such work is actually
> available to her in the workplace, and
> whether this would represent gainful
> employment for her.

(<u>Id.</u>)

On March 15, 2004, defendant again notified plaintiff that

she was capable of performing duties of a gainful occupation.

(<u>Id.</u> at A-106)  In the letter, defendant summarized the

information in the previous denials, as well as the findings and

restrictions as set forth by Dr. Foye.  (<u>Id.</u> at A-104 - 106)

Defendant did not note Dr. Foye's recommendation for vocational

assessment to determine whether appropriate work was actually

available for the plaintiff.  (<u>Id.</u> at A-106)  Rather, defendant

16

used the gainful occupations that were previously identified on
October 20, 2002 and the restrictions and limitations provided by
Dr. Bandera and Dr. Foye as a means of upholding its previous
decision to deny long term disability benefits.  (Id. at A-59, A-
106)  The letter made no mention of Dr. Tamesis' responsive
letter to Dr. Bandera's IME, nor did it speak to the findings of
any of plaintiff's treating physicians.  (Id. at A-104-106)  It
did mention plaintiff's favorable Social Security Disability
award, stating that

> Prudential determines eligibility for []
> benefits based on the terms of the Group
> Policy, separate from criteria used by the
> Social Security Administration in determining
> eligibility for Social Security Disability
> Benefits.  Prudential must evaluate claims
> based on terms of the Group Policy
> independent of the Social Security
> Administration.

(Id. at A-106)[8]  Plaintiff was then informed that she completed
the final level of appeal and, if dissatisfied with the decision,
could file a lawsuit under ERISA.  (Id.)  This litigation ensued.

**III. STANDARD OF REVIEW**

---

[8] Defendant's statement is inconsistent with the answer
given in plaintiff's first set of interrogatories.  (D.I. 27 at
A-578, 14)  When asked why defendant did not give any
consideration to the Social Security determination that plaintiff
was disabled, defendant responded by stating that "Prudential
considers Social Security determinations as one factor in its
evaluation, but does not consider them to be determinative."
(Id.)  The opinion of treating physicians and subjective
complaints of pain are also factors the defendant considers in
making a determination.  (Id.)

17

Because the parties have referred to matters outside the pleadings, their motions to dismiss shall be treated as motions for summary judgment and disposed of as provided in Rule 56 of the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 12 (b) (6).  A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of proving that no genuine issue of material fact is in dispute. Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986).  "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)(internal citations omitted).

If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).  The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party

18

opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment. There must be enough evidence to enable a jury to reasonably find for the nonmoving party on that issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In other words, the court must grant summary judgment if the party responding to the motion fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. Omnipoint Comm. Enters., L.P. v. Newtown Township, 219 F.3d 240, 242 (3d Cir. 2000) (quoting Celotex, 477 U.S. at 323).

## IV. DISCUSSION

Defendant moves for summary judgment on the basis that the decision denying plaintiff's long term disability benefits was supported by substantial evidence and not erroneous as a matter of law. (D.I. 19 at 14) To the contrary, plaintiff, in her cross-motion for summary judgment, argues that defendant's decision to deny benefits under the plan was arbitrary and capricious. (D.I. 22 at 19)

19

As a threshold matter, liability under § 1132(a)(1)(B) depends on whether defendant is a fiduciary or administrator within the meaning of ERISA. Blakely v. WSMW Indust., Inc., 2004 WL 1739717 (D.Del 2004). Both parties agree that defendant satisfies ERISA's definition of "administrator." (D.I. 19 at ¶4)

Where a plaintiff challenges a denial of benefits under § 1132(a)(1)(B), courts generally employ a de novo standard of review. Firestone Tire & Rubber Co. v. Brunch, 489 U.S. 101, 115 (1989). When the benefit plan grants the administrator or fiduciary discretion in determining eligibility for benefits, the decision is reviewed under an arbitrary and capricious standard. See Mitchell v. Eastman Kodak Co., 113 F.3d 433, 437 (3d Cir. 1997). Accordingly, an administrator or fiduciary's determination will be upheld unless it was made "'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" Abnathya v. Hoffman-LaRoche, Inc., 2 F.3d 40, 45 (3d Cir. 1993) (citing Adamo v. Anchor Hocking Corp., 720 F.Supp. 491, 500 (W.D.Pa.1989)).

In the present case, the Plan contains explicit language granting defendant discretion to determine eligibility for benefits. (D.I. 26 at A-11) Given this explicit vesting of discretion to determine eligibility for benefits, this case is not subject to a de novo review. (D.I. 19 at 10-11)

Courts apply a heightened arbitrary and capricious standard

20

of review where the administrator's decision is potentially clouded by a conflict of interest based on both its funding and administration of the plan. See Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 390 (3d Cir. 2000). It is undisputed that defendant also funds the plan which it administers. (D.I. 26 at A-11, A-258) Thus, a heightened arbitrary and capricious review is appropriate. "While the heightened standard is deferential, it is not absolutely so." Blakely, 2004 WL 1739717 at 8 (citing Pinto, 214 F.3d 377 at 393). Courts are instructed to use a sliding-scale approach, "intensifying the degree of scrutiny to match the degree of conflict," when determining the amount of deference to grant the administrator. Pinto, 214 F.3d 377 at 379. Accordingly, courts should not only look at whether the result is supported by reason, but at the process by which the determination was made. Id. at 393. Ultimately, however, the inquiry is fact specific and must be considered under the totality of the circumstances. Id. The Third Circuit has noted the presence of certain factors which suggest that the administrator's decision was arbitrary and capricious. Id. Such facts include decision reversals in the absence of new medical information; use of self-serving and selective use of medical evidence; and indications that the administrator's determination conflicts with its own employee's internal recommendations. Id. at 393-394. See e.g. Sanderson v. Continental Cas. Corp., 279 F.

21

Supp.2d 466, 473 (D. Del. 2003).

In the present case, the first and third factors are not directly at issue. Defendant never reversed its position on plaintiff's eligibility for long-term disability benefits. Moreover, defendant solicited additional information from plaintiff at every level of the appeals process. Furthermore, there is no evidence in the record that any of defendant's staff concluded that plaintiff was eligible for long-term disability benefits.[9] The second factor, which considers whether the administrator was self-serving in its consideration of the evidence, is at issue. According to plaintiff, less deference should be afforded to defendant's decision because defendant gave more weight to evidence that favored the refusal of benefits, while giving plaintiff's treating physicians' reports little to no consideration. For the following reasons, the court agrees.

## A. Defendant's Failure to Consider Favorable Evidence From Plaintiff's Treating Physicians

In each denial, but most notably the final denial letter, defendant clearly gave more weight to evidence that favored the refusal of long-term disability benefits. In the final denial of benefits, defendant accorded great weight to Dr. Bandera and Dr. Foye's conclusions that plaintiff could work in a gainful

---

[9] There is evidence, however, that defendant failed to act on Dr. Foye's recommendation for vocational assessment. These actions clearly support a finding of self-dealing and may fall under the third Pinto factor.

22

occupation.  (D.I. 26 at A-106)  While the letter mentioned Dr.
Foye's conclusion that plaintiff suffered from inflammatory
polyarthritis, defendant failed to reference Dr. Rowe or Dr.
Tamesis, or attempt to reconcile their conflicting opinions that
plaintiff could not work with diagnosed inflammatory
polyarthritis.  (Id. at A-105-106)  Defendant's reasoning is
questionable, especially since its second denial letter focused
so heavily on Dr. Rowe and Dr. Tamesis' failure to respond to Dr.
Bandera's IME.  (Id. at A-94)

     While ERISA requires no special deference to treating
physicians, defendant cannot reject reliable medical evidence
without some objective basis for its conclusion.  See Black &
Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).  The
record at bar is devoid of any evidence indicating that the
opinions of defendant's physicians were not supported or
reliable.  Moreover, unlike Dr. Rowe or Dr. Tamesis, Dr. Foye
never treated or even met the plaintiff.  He simply reviewed her
medical records.  (D.I. 27 at A-558)  Dr. Foye did specifically
recommend that an IME be conducted "with either [an] ortho,
rheumatologist or rehab dr"  (D.I. 26 at A-56, A-211) but,
instead, the IME was conducted by Dr. Bandera, a physiatrist.
Given Dr. Rowe and Dr. Tamesis' focus in the areas of orthopedics
and rheumatology (D.I. 27 at A-439, A-459), the court finds it
suspect that defendant so easily accepted Dr. Foye and Dr.

23

Bandera's reports over her treating physicians.  See Skretvedt v.
E.I. DuPoint de Nemours and Co., 268 F.3d 167, 184 (3d Cir. 2001)
(recognizing that opinions of a claimant's treating physician are
entitled to substantial and at times controlling weight).  Based
on this precedent, Dr. Tamesis' and Dr. Rowe's conclusions were
entitled to more weight or, at the very least, a thorough and
fully supported discussion of why their conclusions were
rejected.

### B.   Defendant's Selective Use of Dr. Foye's Testimony

Further evidence of defendant's self-serving actions are
found in its treatment of Dr. Foye's conclusions that favored
plaintiff's eligibility for long-term disability benefits.
Although Dr. Foye ultimately concluded that plaintiff could work
in a light-duty capacity, he noted a number of restrictions with
which plaintiff must comply if she were to return to the work
force full-time.  (D.I. 26 at A-223)  Based on plaintiff's
"recurrent inflammation / synovitis in her hands," Dr. Foye
believed that she would most likely be capable of performing
repetitive hand activities "occasionally," as in less than one
third of the workday.  (Id.)  He also noted that she might have
difficulty with overhead activities, due to her chronic neck and
shoulder pains.  He then recommended, in light of his
conclusions, that defendant "consider[] vocational assessment to
determine if such work is actually available to her in the

24

workplace, and whether this would represent gainful employment for her." (Id.) Not only did defendant fail to mention or explain Dr. Foye's recommendation in the denial letter, defendant completely ignored it, relying on the gainful occupations that were previously identified in October 2002. (Id. at A-106) This apparent willingness to use the helpful portions of Dr. Foye's testimony while ignoring those portions that would support the continuance of benefits is some evidence that defendant was acting in a self-interested manner. See Pinto, 214 F.3d at 394 (noting that crediting one helpful portion of the doctor's testimony while discrediting unhelpful portions "raise[d] likelihood of self-dealing").

## C.  Defendant's Failure to Consider Plaintiff's Favorable Social Security Decision

The court, in its decision to remand, has also taken into account the fact that plaintiff's disability is supported by the Social Security Administration's determination. While the Social Security Administration's decision is not dispositive, it may be a factor considered by the court in reviewing the administrator's decision. See Edgerton v. CNA Ins., Co., 215 F. Supp.2d 541, 549 (E.D.Pa. 2002).

Defendant asserts that its practice is to use a Social Security Administration decision as a factor in determining eligibility for benefits. (D.I. 27 at A-578, ¶14)  There is, however, no evidence demonstrating that the favorable Social

25

Security decision was a part of defendant's final analysis.
Other than noting in defendant's internal correspondence that
plaintiff had sent notice of the favorable Social Security
Disability Benefits award, nothing else is mentioned.[10]   (D.I. 26
at A-64)   Again, there is no explanation by defendant as to why
the decision was rejected as evidence of plaintiff's disability.

    For all the above reasons, the court finds that defendant
impermissibly used evidence that supported the denial of
plaintiff's benefits while ignoring or failing to satisfactorily
explain its rejection of evidence supporting the award of such
benefits.   Accordingly, the court finds that defendant engaged in
impermissible self-dealing and its decision under the heightened
standard was arbitrary and capricious.

    The Third Circuit has recognized that remand may be an
appropriate remedy when additional evidence must be considered by
the administrator to resolve a factual issue.   See Mitchell v.
Eastman Kodak Co., 113 F.3d 433, 436 (3d Cir. 1997).   The Third
Circuit has also stated that a district court must be careful not

---

    [10] It appears as if defendant forgot about the decision when
it wrote the final denial letter.   While the award is mentioned
in the beginning of the letter (id. at A-106), defendant
concludes the letter by stating "our records indicate that you
are currently waiting on the status of your appeal for Social
Security Disability Benefits with [an] Administrative Law Judge.
Therefore, we will keep your claim active and follow up on the
status of the hearing."   (Id.)   Based on this error, it is
reasonable to assume that little to no weight was given to the
favorable decision.

to substitute its own opinion for that of the administrator. Id.
In the case at bar, there is a host of evidence the administrator
neglected to analyze. The court finds there are factual issues
regarding the extent of plaintiff's condition due to her treating
physicians' reports, plaintiff's ability to perform in any
occupation due to the lack of vocational evidence on this issue
and the impact of the Social Security Administration's favorable
determination for plaintiff. As a result, the court grants
plaintiff's motion in part and remands to defendant for
reconsideration consistent with this memorandum opinion. See
Sanderson, 279 F. Supp.2d at 478.

## V. CONCLUSION

For the reasons stated above, defendant's motion for summary
judgment is denied and plaintiff's cross-motion for summary
judgment is granted in part. An appropriate order shall issue.